UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

KONINKLIJKE PHILIPS N.V.,

                Plaintiff

v.

THALES DIS AIS USA, LLC, THALES
DIS AIS DEUTSCHLAND GMBH,
THALES USA, INC., THALES S.A.,
CALAMP CORP., XIRGO
TECHNOLOGIES, LLC, and LAIRD
CONNECTIVITY, INC.,

                Defendants.

C.A. No.:  20-01713 (CFC)



PUBLIC VERSION

**REPLY DECLARATION OF DR. BERTRAM HUBER
IN SUPPORT OF
PHILIPS' OPPOSITION TO THALES' MOTION FOR PRELIMINARY
INJUNCTION**

1

# TABLE OF CONTENTS

I.     GENERAL OBSERVATIONS ........................................................3

II.    GENERAL VIEWS ABOUT HOW FRAND LICENSING SHOULD BE
       ORGANIZED VERSUS SPECIFIC CONTRACT TERMS OF ETSI
       FRAND RULES ..........................................................................7

III.   INCORRECT INTERPRETATION OF THE ETSI GUIDELINES FOR
       ANTITRUST COMPLIANCE .......................................................9

IV.    VIEWS EXPRESSED BY THE EUROPEAN COMMISSION
       REGARDING INTELLECTUAL PROPERTY AND
       STANDARDIZATION IN 1992 ..................................................15

V.     INTERPRETATION OF FRAND UNDER ETSI, TAKING INTO
       ACCOUNT THE REGULATIONS AND THE DEVELOPMENT OF THE
       ETSI IPR POLICY .....................................................................17

VI.    CONFIDENTIALITY IN THE CONTEXT OF LICENSE AGREEMENTS
       IS A GENERAL PRACTICE .......................................................18

VII.   OVEREMPHASIZING THE RELEVANCE OF "*PATENT HOLD-UP*"....21

VIII   SEEKING INJUNCTIONS ..........................................................25

IX.    THE EUROPEAN COMMISSION MOTOROLA INVESTIGATION.......26

X.     MR. DJAVAHERIAN'S CRITICIZATION OF ME PERSONALLY ........28

XI.    MISINTERPRETING CJEU HUAWEI V. ZTE ..........................................31

XI.    CONCLUSION............................................................................31

1.      I, Dr. Bertram Huber, declare under penalty of perjury under the laws of the United States, as follows.

2.      I have reviewed the declarations of Mr. David Djavaherian and Professor Jorge L. Contreras.  I offer the following replies to some of their positions.[1]  I also stand by all of the positions in my previous Declaration submitted in this matter.

## I.      GENERAL OBSERVATIONS

3.      As a general observation, I read Mr. Djavaherian's declaration as mostly basing his analysis on general pronouncements about "*FRAND*," including citing mismatched case law that did not interpret the ETSI IPR Policy and academic commentators who address theoretical constructs of FRAND.  He seeks to interpret "*FRAND*" as a generalized and universal concept, disconnected from the specific commitment made by an IPR holder to a specific standards development organization.

4.      For example, as I will elaborate on further below, Mr. Djavaherian disregards the express language of the ETSI IPR Policy, the process of its creation, and the appertaining debates over the past more than 25 years.  One

---

[1] My rebuttals here are mostly directly to Mr. Djavaherian, rather than Prof. Contreras, because Prof. Contreras largely does not rebut my analysis, and where he does, it is not persuasive for the reasons stated in my prior Declaration.

fundamental difference is that I was personally involved in the establishment of the ETSI IPR Policy in contrast to Mr. Djavaherian and Prof. Contreras.

5.      Another general shortcoming of Mr. Djavaherian's analysis is that his main focus is on individual standard essential patents but not on portfolios of standard essential patents. This makes a fundamental difference because negotiating a license agreement for one or only a few single patents versus a large portfolio of patents follows fundamentally different routes.

6.      Even more generally, there is a dispute as to the question of whether Thales can be considered a willing licensee under the ETSI terms. Thales, together with its two declarants, appears to presuppose that this is the case simply on the ground that it has declared to be willing to abide by the setting of FRAND terms and conditions by the Court. But such general preparedness has repeatedly been conditioned on the reservation "*to challenge the infringement and validity and enforceability of any of Philip's SEPs at any time and in any jurisdiction*."[2] While challenging the validity and essentiality of licensed patents may be possible under a concluded license agreement, such specific and explicit conditioning of a preparedness to enter into a license agreement points into a direction where the prospective licensee appears not to be truly interested in entering into a license agreement, by way of compromise and guided by good faith behavior under the

---

[2] First Antonitsch Declaration, 7.; Second Antonitsch Declaration, 6.

4

expectations of ETSI. Under any circumstance, conditioning the entering into a license agreement, and honoring resulting license fee payment obligations, upon final adjudication of validity and essentiality of the standard essential patents covered by the license by a court would not be in keeping with the expected constructive good faith approach required by the ETSI IPR Policy for the negotiation and eventual conclusion of a FRAND license agreement. The express mentioning of such reservation – and, in addition, mentioning "*the relevant appellate courts*"[3] – casts doubt on the seriousness and usefulness of Thales' stated preparedness to "*execute and abide by a worldwide license to Philips' SEPs ... on such final FRAND terms and conditions as are determined by this Court.*"[4]

7.      To give another example of behaviors which cannot be considered compatible with the behavior of a willing licensee: when a prospective licensee insists in negotiating separate license agreements to be concluded for different legal entities which all form part of a group of companies. In such case, it is sufficient if the license agreement is being negotiated and concluded with only one of the companies forming part of the group of companies, which will typically be the parent company.[5] This case is similar to a situation where the prospective

---

[3] First Antonitsch Declaration, 7.; Second Antonitsch Declaration, 6.
[4] Thales Reply Brief, page 2.
[5] The German Regional Court (Landgericht) in Düsseldorf in *Fraunhofer-Gessellschaft (MPEG-LA) v. ZTE*, Case No. 4a O 15/17 (Regional Court Düsseldorf) (Nov. 9, 2018), provides that the industry practice is for a single license for the entire group of companies, being concluded

licensee insists in being granted licenses patent by patent, country by country or standard by standard. Such behavior is indicative of a licensee who is not truly interested in entering into a FRAND license agreement, applying a constructive approach and fair and reasonable behavior, as required by ETSI, but rather endeavoring to complicate negotiations and to make the whole process of negotiation and license agreement conclusion inappropriately complicated and burdensome for the SEP holder. So, summarizing, the SEP holder must only conclude one single license agreement with one group company which typically will be the parent company of the group. Such license agreement will have to be a portfolio license and include – at least – all SEPs held by the licensor in all jurisdictions and relevant for all applicable ETSI standards used by the infringing products in question. And to be clear, even under these circumstances, the SEP holder is only obligated to conclude a license agreement with a truly willing licensee. While the prospective licensee is entitled to require the grant of a FRAND license under SEPs, which requires a corresponding constructive and good faith behavior of the license seeker, the SEP holder, obviously, cannot force an unwilling licensee to conclude a license agreement. It can, however, enforce its

---

typically with the parent company. E.g., 417.  Also, the German Federal Court of Justice (Bundesgerichtshof) makes clear in its decision KZR 36/17 *Sisvel v. Haier* (May 5, 2020) that the general alerting of infringement of SEP(s) is proper if made to the parent company of the actual infringer(s). 89.

SEPs making use of the ordinary course of law in the relevant jurisdictions. This naturally includes the seeking of injunctions.

8.     Additionally, I note that Prof. Contreras and Mr. Djavaherian simply ignore the prior history of negotiations between Philips and Thales.  That is improper.  As I have previously discussed, acts or omissions that hinder or delay negotiations are not in keeping with the obligation of a potential licensee to negotiate in a fair and reasonable way as contemplated by the ETSI IPR Policy, and there are facts in the negotiations between Thales and Philips that indicate at least delay and other behavior inconsistent with the behavior of a willing licensee.

## II.     GENERAL VIEWS ABOUT HOW FRAND LICENSING SHOULD BE ORGANIZED VERSUS SPECIFIC CONTRACT TERMS OF ETSI FRAND RULES

9.     Substantial parts of Mr. Djavaherian's declaration deal with statements about how Mr. Djavaherian thinks standards development **generally** is being (or should be) performed.[6] [7] This is, however, completely disconnected from (1) the specific rules and terms of **ETSI**, and (2) the specific practices applied by **ETSI**. ETSI is the standard setting organization that is relevant to this case, not other organizations.  For example, in the case of ETSI, core focus is put on

---

[6] Djavaherian Declaration 24.–40.

[7] The very same is the case, in fact, with the Contreras Declaration. Prof. Contreras appears to have no experience whatsoever with the ETSI IPR Policy and its coming into existence which, however, does not keep him from speculating about what was "*well-known to the developers of ETSI's policies*." Contreras Declaration 29.

standardizing the most modern, cutting-edge technological solutions[8] and not solutions which "*need not focus on the "best" available option*."[9]

10.     In general, Mr. Djavaherian's purported interpretations of FRAND are inconsistent with the facts, well established legal conclusions, the history of the ETSI IPR Policy, ETSI's expressed intent and terms, as in particular contained in the ETSI Directives, and out of touch with reality. Mr. Djavaherian has no personal experience from the relevant time frame, when ETSI adopted the ETSI IPR Policy of 1994, and as a result does not understand the intent of ETSI in drafting the contractual language at issue.

11.     Mr. Djavaherian also creates a faulty interpretation of FRAND because he fails to understand the objectives of the ETSI IPR Policy and its specific terms. Although he claims that his interpretation creates a *"level playing field,"[10]* he skews his analysis in favor of technology implementers at the cost of technology innovators at every turn. For instance, he determines that "*hold-up*" is an important consideration in interpreting FRAND, but he never considers the effects of "*reverse hold-up*" and "*hold-out*" and he disregards that an implementer without a license commits patent infringement.

---

[8] ETSI IPR Policy, Clause 3.1.
[9] Djavaherian Declaration 31.
[10] Djavaherian Declaration esp. 35. sqq.

## III.   INCORRECT INTERPRETATION OF THE ETSI GUIDELINES FOR ANTITRUST COMPLIANCE

12.    Mr. Djavaherian relies on the ETSI Guidelines for Antitrust Compliance, and attempts to read into them extra obligations for IPR holders under FRAND. However, he fails to realize that, unlike the ETSI IPR Policy and the ETSI Directives, the Guidelines for Antitrust Compliance merely state the pre-existing general principles of European antitrust law.

13.    It is generally misplaced to overemphasize standard development organizations' antitrust policies, particularly in ETSI, as Mr. Djavaherian does.

14.    When Mr. Djavaherian points to the ETSI Guidelines for Antitrust Compliance,[11] he misunderstands the purpose of these Guidelines. Mr. Djavaherian fails to recognize that the ETSI Guidelines for Antitrust Compliance do not impose any separate obligations on ETSI members, because antitrust regulations are always applicable to all market participants within the geographical reach of such regulations.  The core purpose of the ETSI Guidelines for Antitrust Compliance is to alert ETSI members to existing public law constraints.  The ETSI Guidelines for Antitrust Compliance are largely aimed at SMEs[12] who may be less sophisticated and less familiar with these legal regulations, even though the regulations apply to all market participants,

---

[11] Djavaherian Declaration 41., 49., 60., 62., 78.
[12] Small and Medium-sized Enterprises.

independent of their size.  The ETSI Guidelines for Antitrust Compliance only explain; they do not impose any additional restrictions on the ETSI IPR Policy or FRAND IPR declarations made pursuant thereto.

15.     Mr. Djavaherian, in contrast, incorrectly interprets the ETSI Guidelines for Antitrust Compliance as though they were meant to create regulations for IPR licensing pursuant to the ETSI FRAND commitment, or to provide interpretative guidance regarding FRAND terms and conditions as referenced in the ETSI IPR Policy at Clause 6.1.  Mr. Djavaherian takes out-of-context excerpts from the ETSI Guidelines for Antitrust Compliance, but it is clear when read in their entirety that they do not create separate obligations for IPR licensing pursuant to the ETSI FRAND commitment nor provide interpretative guidance regarding FRAND terms and conditions as referenced in the ETSI IPR Policy.[13]

16.     The ETSI Guidelines for Antitrust Compliance are not part of the ETSI IPR Policy and do not include any explanation or direction concerning FRAND licensing.  In fact, the ETSI Guidelines for Antitrust Compliance were not introduced into the ETSI Directives until 2007, thirteen years **after** the ETSI IPR Policy was established and put into practice.  The ETSI Guidelines for Antitrust Compliance were not part of ETSI's deliberations in establishing the ETSI IPR Policy, but instead came much later for a different purpose.

---

[13] ETSI IPR Policy Clause 6.1.

17.     Although the document contains four sections and comprises 9 pages,[14] the only mention of "*fair, reasonable, and non-discriminatory*" terms in the ETSI Guidelines for Antitrust Compliance is in a footnote disclaiming any responsibility on ETSI's part for determining whether disclosed licensing terms are "*fair, reasonable, and non-discriminatory*."[15]  Instead, FRAND terms and conditions are determined by private negotiations among parties.[16]

18.     Mr. Djavaherian's references to the ETSI Guidelines for Antitrust Compliance refer largely to Part B, which provides a general overview of European competition law principles, but does not set forth any ETSI policy and does not specifically relate to FRAND licensing pursuant to the ETSI IPR Policy. Moreover, there is a significant disconnect between the actual text of the ETSI Guidelines for Antitrust Compliance and Mr. Djavaherian's characterization of those Guidelines. For example, Mr. Djavaherian cites general European competition law principles described in the ETSI Guidelines for Antitrust

---

[14] The ETSI Guidelines for Antitrust Compliance are comprised of four parts: Part A (introduction); Part B (general overview of the main European competition law provisions, which are Articles 101 and 102 of the Treaty on the Functioning of the European Union (TFEU)); Part C (guidelines for antitrust compliance); and Part D ("*do's and don'ts*" of participating in technical standardisation meetings).

[15] ETSI Guidelines for Antitrust Compliance, D.1.6, footnote 13.

[16] Which is expressly stated in the ETSI Guide on IPRs Section 2.3: "*Chairmen [of Technical Bodies, i.e. the technical working groups for standardization] shall not allow any discussion on commercial issues in the Technical Body, in particular but not limited to discussions on details of specific licensing terms and conditions.*"

Compliance as if they were policies developed or enforced by ETSI, but they are not part of the ETSI IPR Policy or its specific FRAND terms.

19.     Mr. Djavaherian states that "*ETSI's Antitrust Guidelines . . . expressly note that they shall apply to all ETSI activities*,"[17] in an apparent attempt to suggest that the ETSI Guidelines for Antitrust Compliance have some substantive application to the issue of non-discriminatory licensing pursuant to FRAND licensing undertakings.  However, FRAND licensing negotiations and conclusion of license agreements take place outside of ETSI.  Indeed, the ETSI Guidelines for Antitrust Compliance explain that ETSI members **must not** discuss licensing in the course of ETSI activities.[18]

20.     Mr. Djavaherian also cites the ETSI Guidelines for Antitrust Compliance out of context when he says that they state that '*[t]he imposition of discriminatory and unfair conditions by the dominant company, **to any categories of users, or any other company having contractual relationships with the dominant company,** is abusive.*'"[19]  Mr. Djavaherian's implication that this is a pronouncement of ETSI regarding FRAND licensing is refuted by the language of the cited subsection of the ETSI Guidelines for Antitrust Compliance, Section B.3.3 e).  In that subsection, the document is providing background on general

---

[17] Djavaherian Declaration 62.
[18] ETSI Guidelines for Antitrust Compliance, Section D.2.2, D.2.3.
[19] Djavaherian Declaration 78. (emphasis in original).

principles of European competition law as to when dominant firms may have

abused their dominance, not any specific policy of ETSI.  Of course, there are

differences between European competition law and U.S. competition law. Further,

this subsection does not even describe European competition law treatment of

patent licensing transactions, which are subject to a different analysis, described

elsewhere, namely in Section B.3.3 c) ("*Abuse of intellectual property rights*").

According to the ETSI Guidelines for Antitrust Compliance, European

competition law treats intellectual property rights differently than other types of

business activities, and in particular focuses on "*refusal to license*," which "*in

some cases*" may be regarded as abusive.[20]

21.    In addition, Mr. Djavaherian's citation of the phrase *"level playing

field"*[21] from the ETSI Guidelines for Antitrust Compliance is from a section that

simply states the aims of competition law generally; it is not directed to patent

licensing or FRAND.

22.    The ETSI Guidelines for Antitrust Compliance only repeat generalities

and rules which are set by the competent European authorities and which evolve

over time. Consequently, the Guidelines contain axioms such as "*it is important

for ETSI and its members to strictly comply with all laws that relate to the conduct*

---

[20] ETSI Guidelines for Antitrust Compliance, Section B.3.3 c).
[21] Djavaherian Declaration 49., 60., 62.

*of their activities*."[22] In doing so, the Guidelines merely remind parties of their preexisting obligation as parties under the jurisdiction of the European Union to observe competition and antitrust law regulations, as well as any other legal requirements.

23.     Despite this, Mr. Djavaherian tries to create additional regulations from the ETSI Guidelines for Antitrust Compliance, but there are none. He tries to give specific meaning to certain language in section B, which is designated as mere background information,[23] but he does not cite a single text portion from section C of the Guidelines for Antitrust Compliance, which covers the stipulations of the Guidelines for Antitrust Compliance as such.[24] The only place where the ETSI Guidelines for Antitrust Compliance could have possibly imposed additional obligations on members of ETSI being SEP holders, is section C of the Guidelines, but ETSI chose not do so.

24.     Resultantly, Mr. Djavaherian misunderstands the relevance of the ETSI Guidelines for Antitrust Compliance.  As noted above, a review of Section B.3.3 e) demonstrates that, in addition to being a general restatement of competition law principles rather than a requirement that ETSI rules impose on its members in all

---

[22] Guidelines for Antitrust Compliance, A.
[23] Djavaherian Declaration 49., 60., 62., 78. ETSI Guidelines for Antitrust Compliance, B.
[24] ETSI Guidelines for Antitrust Compliance, C.

aspects of their licensing activities, it refers to "*other types of abuse*," other than patent licensing.[25]  Mr. Djavaherian also fails to note that the text regarding such "*other types of abuse*" is discussing the situation of *"[t]he imposition of discriminatory and unfair conditions*."[26]  If Mr. Djavaherian is attempting to argue that this applies to patent licensing, then this would be referring to an analysis of an agreement at the outset, something he does not and cannot do.

## IV.  VIEWS EXPRESSED BY THE EUROPEAN COMMISSION REGARDING INTELLECTUAL PROPERTY AND STANDARDIZATION IN 1992

25.     During my involvement in the ETSI IPR Committee discussions in the early 1990s, I was aware of the views expressed by the European Commission about standardization and intellectual property rights. For example, the European Commission issued a communication on intellectual property rights and standardization in October 1992.[27] In that communication, the European Commission did not support any view that IPR owners are required to create a *"level playing field"* among licensees.

26.     As the European Commission further noted in the 1992 communication, "*If agreement is reached between the rightholder and the standard-making body, the terms for licences must be fair, reasonable and non-discriminatory.  It is not*

---

[25] As evidenced by ETSI Guidelines for Antitrust Compliance, Section B.3.3 c).
[26] Djavaherian Declaration 78.
[27] COM(92) 445, Communication from the EU Commission, Intellectual Property Rights and Standardization (Oct. 27, 1992), LexUriServ.do (europa.eu).

*feasible or appropriate to be more specific as to what constitutes 'fairness' or 'reasonableness' since these are subjective factors determined by the circumstances surrounding the negotiation.  If the rightholder is to be satisfied that his investment in research and development can be adequately recovered, he would expect the royalty rate to relate in some way to the normal freely-negotiated commercial rate, allowing for the greatly increased market for his technology which standardization will bring*."[28]

27.    The 1992 Communication also expresses concern not to disincentivize research & development activities, such as by imposing compulsory licensing: "*Therefore, any application of Article 86 in the field of public standardization must be balanced against the policy objective of maintaining the Community's strength in research and development*."[29]  The continued existence of incentives for companies to develop intellectual property through innovation depends on IPR policies that allow for licensing that adequately and fairly compensates IPR holders.  The ETSI IPR Policy should not be interpreted in a manner that gives all benefits to implementers at the expense of IPR holders.

---

[28] COM(92) 445, Communication from the EU Commission, Intellectual Property Rights and Standardization, Section 4.3.3 (Oct. 27, 1992), LexUriServ.do (europa.eu).
[29] COM(92) 445, Communication from the EU Commission, Intellectual Property Rights and Standardization, Sections 5.1.15 and 5.1.16. (Oct. 27, 1992), LexUriServ.do (europa.eu).

## V.   INTERPRETATION OF FRAND UNDER ETSI, TAKING INTO ACCOUNT THE REGULATIONS AND THE DEVELOPMENT OF THE ETSI IPR POLICY

28.    The 1992 Communication also notes that abuse of a dominant position by a standard-making body and its members could be accomplished either by the imposition of unfair purchasing prices (e.g., unfairly low royalties for IPR owners) or selling prices (e.g., unreasonable royalties to be paid by the licensee).[30] IPR Policies in standards development should balance the interests of licensors and licensees, and should not be interpreted in a manner that has exclusive concern for only the licensee's competitive position.

29.    Mr. Djavaherian actually does acknowledge that the holder of a standard essential patent is not obligated to "*seek out and grant licenses to all potential implementers.*"[31]  By that acknowledgement, he contradicts his incorrect assertion that the essential IPR holder is obligated, pursuant to the ETSI IPR Policy, to create a *"level playing field"* among all implementers.[32] Additionally, of course, in real-world licensing situations, one could not seriously suggest under the ETSI IPR Policy that IPR holders would have the ability to (or be expected to) bring about exactly equal competitive conditions among all manufacturers of a

---

[30] COM(92) 445, Communication from the EU Commission, Intellectual Property Rights and Standardization, Section 5.1.6 (Oct. 27, 1992), LexUriServ.do (europa.eu).
[31] Djavaherian Declaration 59.
[32] Djavaherian Declaration esp. 35. sqq., 60. sqq.

product, who may differ vastly in their size, capitalization, technical ability, number of employees, marketing expertise, and any number of other factors that affect competitive standing.  The ETSI IPR Policy was not intended to attempt to place such an impossible burden on IPR holders, and it should not be interpreted in this manner.  The ETSI IPR Policy does not require licenses on FRAND terms and conditions to have identical terms for all licensees.  Rather, it is based on a presumption of contractual freedom that allows parties to negotiate individualized terms within a range of FRAND.

30.     Mr. Djavaherian reports about ETSI, "*beginning in the early 2010s*" having undertaken "*significant efforts to review and consider updates*" to its IPR policy.[33] But he fails to note that these efforts have not resulted in even a single change of any substance to the ETSI IPR Policy.

## VI.   CONFIDENTIALITY IN THE CONTEXT OF LICENSE AGREEMENTS IS A GENERAL PRACTICE

31.     Mr. Djavaherian attempts to paint a picture of confidentiality provisions in license agreements being sometimes used and sometimes not.[34] But beyond his statement as such, he offers no proof. Mr. Djavaherian fails to note that confidentiality provisions (as well as asymmetry of information) are general practice in transactions in many fields, including telecommunications, that they

---

[33] Djavaherian Declaration 18.
[34] Djavaherian Declaration 73. and esp. 96.

have been the norm in the telecommunications field for decades, that they exist

both in the interest of implementers and innovators, and that despite it all (or

perhaps with the help of it) the mobile telecommunications industry is thriving.

The licensees have naturally no interest in allowing their competitors to view their

long-term business contracts.  In fact, such sharing of pricing information among

competitors could give rise to antitrust concerns.[35]

32.    In my own decades-long and extensive licensing practice, I do not

recall any specific agreement where a confidentiality clause was not present.  I

can hardly imagine that Mr. Djavaherian's own industry practice, e.g., at

Broadcom and Tessera was any different.

33.    Aware of this ordinary practice, the ETSI Guide on IPRs expressly

allows the use of confidentiality agreements "*to protect the commercial interests

of both potential licensor and potential licensee during an Essential IPR licensing

negotiation*" and acknowledges it is "*general practice*."[36]  The ETSI Guide on

IPRs further notes that this practice "*is not challenged*."[37]

---

[35] The ETSI Guidelines for Antitrust Compliance, while they do **not** address FRAND licensing in the manner asserted by Mr. Djavaherian, specifically caution against price fixing and sharing of royalty information among competitors.  ETSI Guidelines for Antitrust Compliance, D.2.2 and D.2.3.
[36] ETSI Guide on IPRs, Section 4.4.
[37] ETSI Guide on IPRs, Section 4.4.

34.     Mr. Djavaherian repeatedly cites from a recent CEN-CENELEC document.[38] It should be noted that the positions taken in such document are **not** endorsed by ETSI. In fact, to a large extent, the cited "*principles*" are not at all compatible with the ETSI Directives, in particular the ETSI IPR Policy. In short, the document is not relevant to ETSI and, consequently, has no effect for the proper interpretation of the ETSI IPR Policy and any other part of the ETSI Directives.

35.     While Mr. Djavaherian refers to the CJEU Huawei v. ZTE case,[39] he fails to note that the CJEU expressly acknowledges that the typical negotiation situation between a standard essential patent holder and a potential licensee is conducted in the absence of information about other previously agreed upon license agreements.[40]  One can infer from this that in the CJEU's understanding, the standard essential patent holder is not required to disclose any previous licensing agreements to the potential licensee before the potential licensee makes

---

[38] Djavaherian Declaration e.g., 70., 97.

[39] Djavaherian Declaration 99. Case C-170/13, *Huawei Techs. Co. Ltd. v. ZTE Corp.,* Case C-170/13, 62013CJ0170 (July 16, 2015). In general, it should be noted that the CJEU case is a competition law case addressing the effect of European competition law on the ability of an IPR owner to obtain an injunction for a standard essential patent; it is not a case about contract interpretation or enforcement of licenses under the ETSI IPR Policy.

[40] Case C-170/13, *Huawei Techs. Co. Ltd. v. ZTE Corp.,* Case C-170/13, 62013CJ0170 (July 16, 2015) ¶ 64 (noting that the court is assuming a situation "*in the absence of a public standard licensing agreement*" and "*where license agreements already concluded with other competitors are not made public*").

its counteroffer, which must be prompt and must correspond to FRAND terms and conditions.[41]

## VII.   OVEREMPHASIZING THE RELEVANCE OF "*PATENT HOLD-UP*"

36.   Mr. Djavaherian concludes that the FRAND commitment is designed predominantly to prevent "*patent hold-up*."[42]  This is an incorrect interpretation of the ETSI IPR Policy and the emanating FRAND commitment.  ETSI's focus and intent is on a balanced approach, giving due regard to the interests of implementers and the right of IPR holders to "*be adequately and fairly rewarded for the use of their IPRs.*"[43]  The ETSI IPR Policy was designed to balance ensuring that standardized technologies are available to potential users, with ensuring adequate and fair compensation to IPR holders, thus incentivizing future research & development into future innovations which become part of future standards.

37.   I have dealt with in detail with "*patent hold-up*" in my first Declaration already and incorporate my analysis there.[44] Importantly, arguments based on the "*patent hold-up*" theory, such as those of Mr. Djavaherian, fall short of providing

---

[41] Case C-170/13, *Huawei Techs. Co. Ltd. v. ZTE Corp.,* Case C-170/13, 62013CJ0170 (July 16, 2015) ¶ 66 (noting that the alleged infringer/prospective licensee must make a prompt and specific counteroffer corresponding to FRAND terms).
[42] Djavaherian Declaration 46.
[43] ETSI IPR Policy, Clause 3.2.
[44] First Huber Declaration section IV G, 185. sqq.

actual evidence that in fact there is such a widespread problem in this industry.[45]

What we actually see is that the global mobile telecommunications industry

segment has developed and evolved as hardly any other sector during the past two

and a half decades.  Without a doubt, the telecommunications industry serves as

an excellent example that standardization efforts are rendering successful results.

In short, the market functions well,[46] as does the system of essential IPR licensing

in large standards development organizations as it has been practiced over the past

---

[45] For example, please refer to:  Wright, Joshua D., Commissioner, Federal Trade Commission, SSOs, FRAND, and Antitrust: Lessons from the Economics of Incomplete Contracts, at the Center for the Protection of Intellectual Property, Inaugural Academic Conference: The Commercial Function of Patents in Today's Innovation Economy, George Mason University School of Law, at 20 (Aug. 12, 2013) (noting "*unremarkable*" empirical evidence of patent hold-up); Wireless Devices With 3G and/or 4G Capabilities and Components Thereof, Inv. No. 337-TA-868, Initial Determination of Administrative Law Judge Theodore R. Essex, at 124 (June 13, 2014) (Public Version) (citing TIA comments to FTC noting that the TIA disagrees that patent hold-up is "*plaguing the . . . standard development process*"); Galetovic, Alexander, et al., An Empirical Examination of Patent Hold-Up, Hoover Institution Working Group on Intellectual Property, Innovation, and Prosperity, Stanford University, Working Paper Series no. 15010, at 26 (Mar. 31, 2015) (demonstrating lack of empirical evidence of patent hold-up); see also Sidak, J. Gregory, The meaning of FRAND, Part I: Royalties, Journal of Competition & Economics, 9(4):931, at 1021 (2013); Sidak, J. Gregory, The Antitrust Division's Devaluation of Standard-Essential Patents, 104 The Georgetown Law Journal Online 48 (2015), providing many citations at footnote 49, (noting that *"[b]y early 2015 more than two dozen economists and lawyers had disproved or disputed the numerous assumptions and predictions for the patent holdup and royalty stacking conjectures*.").

[46] This is evidenced by comparing the findings of Bekkers, Rudi, Intellectual property rights and standardization: the case of GSM, Telecommunications Policy 26:171-188, at 185 (2002), reporting that in 2002 the GSM market was dominated by five companies: Ericsson, Nokia, Siemens, Motorola and Alcatel, which together covered over 85% of the market, with later developments. Today, most of these companies are no longer present in this market at all, while others, e.g., Samsung, Apple, Huawei, and others have successfully gained large market shares.

more than two decades.[47]  In fact, *"[b]y early 2015 more than two dozen economists and lawyers had disproved or disputed the numerous assumptions and predictions for the patent holdup and royalty stacking conjectures*."[48]

38.     Mr. Djavaherian assumes that the core *raison d'être* of the FRAND commitment would be to avoid "*patent hold-up*" on the part of IPR owners. However, he does not take into account: (1) the body of literature demonstrating empirically the absence of patent hold-up; and (2) the countervailing concern of reverse hold-up. "*Reverse hold-up*" occurs when prospective licensees use their leverage to obtain license rates that are below FRAND.  In a "*hold-out*" situation, prospective licensees either refuse to take a FRAND license or delay the negotiation process and thus the conclusion of a (necessary) license agreement while proceeding to infringe the patents of SEP holders that developed the technology at great expense to them.

39.     I have already dealt with "*reverse hold-up*", "*hold-out*", as well as "*patent hold-up*" in my earlier Declaration and therefore I point back to that

---

[47] Knut Blind (Coordinator), et al., Fraunhofer Institute for Communication System and Dialogic, et al., Study on the Interplay between Standards and Intellectual Property Rights (IPRs), Final Report, commissioned by the Directorate General for Enterprise and Industry of the EU Commission, at 99, 118 (Apr. 2011), EUROPA - European Commission - Study on the Interplay between Standards and Intellectual Property Rights (IPRs) - Final report (iplytics.com).
[48] Sidak, J. Gregory, The Antitrust Division's Devaluation of Standard-Essential Patents, 104 The Georgetown Law Journal Online 48 (2015) (providing many citations at footnote 49), antitrust-divisions-devaluation-of-standard-essential-patents.pdf (criterioneconomics.com).

analysis.[49] Therefore, I would only also point again here to the recent Policy

Statement on Remedies for Standards-Essential Patents Subject to Voluntary

F/RAND Commitments.[50] It clarifies in particular that remedies, such as

injunctions "*should be available for infringement of standards-essential patents*

*subject to a F/RAND commitment, if the facts of a given case warrant them.*"[51] It

also addresses possible misunderstandings of the earlier 2013 Policy Statement,[52]

saying that *"[t]he 2013 policy statement may also have been misinterpreted to*

*suggest that antitrust law is applicable to F/RAND disputes.  Although the U.S.*

*International Trade Commission may consider "competitive conditions in the*

*United States economy" as part of its public interest analysis, see, e.g., 19 U.S.C.*

*§ 1337(d)(1), that does not signify that F/RAND licensing disputes raise antitrust*

*concerns.*"[53]

---

[49] First Huber Declaration section IV G 200. sqq.

[50] Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments of the U.S. Patent & Trademark Office (USPTO), the National Institute of Standards and Technology (NIST), and the U.S. Department of Justice, Antitrust Division (DOJ), December 18, 2019.

[51] Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments of the U.S. Patent & Trademark Office (USPTO), the National Institute of Standards and Technology (NIST), and the U.S. Department of Justice, Antitrust Division (DOJ), December 18, 2019, p 5.

[52] DOJ/USPTO, Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments, January 2013.

[53] Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments of the U.S. Patent & Trademark Office (USPTO), the National Institute of Standards and Technology (NIST), and the U.S. Department of Justice, Antitrust Division (DOJ), December 18, 2019, p 4 footnote 9.

## VIII  SEEKING INJUNCTIONS

40.     As I have shown in my first Declaration,[54] it is clear that there is

nothing in the ETSI IPR Policy, in particular when additionally taking into

account the more than five-year process of it coming into existence, which would

disallow the seeking of injunctive relief.[55] Similarly, while Mr. Djavaherian states

that "*some within the ETSI IPRSC were of the opinion that the ETSI already*

*implicitly restricted the use of injunctive relief*,"[56] he provides no support for that

statement, and even if there were "*some*" people of that view, it would have been

a view that is indefensible, as I have previously discussed. Mr. Djavaherian's

analysis is based on the **2012-15** time period when the ETSI IPR Special

Committee discussed such issues, i.e. around 20 years after the adoption of the

ETSI IPR Policy. The fact that the ETSI IPR Policy did not prohibit injunctions

could not have been changed merely by the ETSI IPR Special Committee

discussing such issues.[57] In any case, such discussion has not resulted in a

respective modification of the ETSI IPR Policy.

---

[54] First Huber Declaration section IV E 202. sqq.
[55] Whether or not eventually an injunction will be issued is of course always subject to the applicable laws and regulations in the relevant jurisdiction.
[56] Djavaherian Declaration 82.
[57] Djavaherian Declaration 82.

41.     Also Mr. Djavaherian's citing of a very recent paper of the European Association of Automotive Suppliers,[58] notably an association of implementers/prospective licensees, not of SEP holders, does not contribute anythingnew. The same is true for Mr. Djavaherian repeatedly citing from a CEN-CENELEC document.[59] Again, the positions taken in such document are **not** endorsed by ETSI and, to a large extent, are not compatible with the ETSI Directives, in particular the ETSI IPR Policy and its specific terms.

## IX.    THE EUROPEAN COMMISSION MOTOROLA INVESTIGATION

42.     In discussing the European Commission's investigation of Motorola, Mr. Djavaherian attempts to use this case as support for the proposition that the Commission "*found that the licensee's prior non-FRAND behavior does not prevent that licensee from subsequently relying on the ETSI IPR Policy to protect against claims for injunctions*."[60]   However, the issue in that case was whether Motorola's action for injunctive relief against Apple was in conflict with European Commission competition law.  The Commission found that Apple's willingness throughout the process to license on FRAND terms and conditions pursuant to the German Orange Book precedent meant that it was a violation of

---

[58] Djavaherian Declaration 84., footnote 49.
[59] Djavaherian Declaration e.g., 84.
[60] Djavaherian Declaration 79.; see also Thales Reply, page 7.

26

competition law for Motorola to nevertheless pursue injunctive relief under European competition law.

43.     Mr. Djavaherian's attempt to compare the *Motorola* case to the present case relies on incorrect characterizations of both the issues under review and the facts of the case.  For example, Mr. Djavaherian fails to mention more precisely that in the *Motorola* case "*Apple argued that certain clauses of the Settlement Agreement, which hinder its ability to challenge the infringement and validity of the SEPs covered by the Settlement Agreement, are void.*"[61]

44.     In addition, the European Commission's decision declined to impose a fine on Motorola, because the CJEU had not yet ruled on the circumstances in which obtaining an injunction for a standards-essential patent subject to a FRAND commitment could violate European competition law.[62]  In the meantime, the CJEU has ruled on this issue.[63]  The result is that the CJEU decision provides further support for the proposition that licensees must not engage in reverse hold-up, and rather must promptly respond to offers of FRAND licenses from essential IPR holders with FRAND counteroffers and must also provide suitable security for royalty payments during the course of negotiation. The CJEU did not articulate

---

[61] CLA-0181, European Commission, Case AT.39985, *Motorola - Enforcement of GPRS Standard Essential Patents* ¶ 171, 39985_928_16.pdf (europa.eu).
[62] European Commission, Case AT.39985, *Motorola - Enforcement of GPRS Standard Essential Patents* ¶ 561, 39985_928_16.pdf (europa.eu).
[63] CJEU (Court of Justice of the European Union) *Huawei v. ZTE*, No. C-170/13, July 16, 2015, CURIA - Dokumente (europa.eu).

any requirement that the IPR holder disclose other license agreements in support of a "*non-discrimination*" analysis.

45.     The CJEU decision also reaffirms the rights of IPR holders to obtain fair and adequate compensation for the use of their IPRs and to enforce standard essential patents against implementers/infringers who are unwilling to take a license.  This further development of the law underscores the importance of appropriately accounting for the SEP holder's intellectual property rights.

## X.     MR. DJAVAHERIAN'S CRITICIZATION OF ME PERSONALLY

46.     In the later part of his declaration, Mr. Djavaherian bluntly attempts to put in doubt my experiences and opinions, including my specific work during the 5 ½ years of the development of the ETSI IPR Policy. But Mr. Djavaherian never offers any proof for what he personally thinks. He claims that it is "*apparent from the minutes of the various meetings and the associated contributions that Dr. Huber was not, at the time, a leading contributor to the ETSI Committee.*"[64] This is not true, however, and Mr. Djavaherian cannot support this opinion because it is a fact that only a minimal fraction of the relevant documents and minutes of the numerous meetings of the original ETSI IPR Committee are available in the ETSI

---

[64] Djavaherian Declaration 88.

archives.[65] The only documents which are available are the minutes of the ETSI General Assemblies and a few ETSI Technical Assemblies which dealt with the ETSI IPR Policy. But discussions, exchange of arguments and drafting of the language of the ETSI IPR Policy did not take place at these assemblies. They took place in the original ETSI IPR Committee of which I was a member from day one.[66] Of course, Mr. Djavaherian cannot know about details of meetings where he has not participated, such that he can opine on my participation, and he has not referenced any minutes or other related documents from such meetings. Thus, Mr. Djavaherian's criticism of my alleged "*individual views*" on "*ETSI's intentions*"[67] is wrong.

47.     Moreover, I see nothing in Mr. Djavaherian's qualifications or background that would give him any source of knowledge or expertise concerning the deliberations around the ETSI IPR Policy in the early 1990s.  According to Mr. Djavaherian's CV, he was an undergraduate student during the relevant time period.  Mr. Djavaherian is speculating about what occurred in the past at ETSI based on his review of a small subset of the relevant documents.  By contrast, I

---

[65] In fact, to my knowledge, only the minutes from the ETSI Special Committee on IPR instituted in 1994 where I was also called to participate and which I cited in my first Declaration 69.-70. are contained in the ETSI archives. To be precise, the ETSI Special Committee on IPR consisted only in a fraction of the members of the ETSI IPR Committee, namely those specifically called to participate (I was among them).

[66] Please refer to my first Declaration 23.

[67] Djavaherian Declaration 92.

was participating actively as a member of the ETSI IPR Committee throughout the whole phase when the ETSI IPR Policy was elaborated.  Therefore, I disagree with Mr. Djavaherian's efforts to retroactively interpret the history of the adoption of the ETSI IPR Policy to conform to his novel theories.

48.     Mr. Djavaherian also cites from an article of Mr. Rosenbrock, the former Director-General of ETSI.[68] This cited article, as an earlier article I had written, was dealing with the issue of whether the ETSI IPR Policy requires **license to all** or **access to all**. It is thus used out of context by Mr. Djavaherian in his declaration and has no relevance, nor have I noticed Thales even discussing or relying on it in its reply brief.  To go into all the details of why Mr. Djavaharian is wrong and mischaracterizing it would take too much effort and not be relevant anyway.  I just note that the selective quotes picked by Mr. Djavaherian do not allow for a comprehensive appreciation.

49.     I also note that, because Mr. Djavaherian oddly wants to compare me to Mr. Rosenbrock, Mr. Rosenbrock took office towards the end of 1990 (when the work of the original ETSI IPR Committee[69] was already ongoing for 1 ½ years). Previously he held technical and administrative positions at the German Federal

---

[68] Djavaherian Declaration 89. sqq.
[69] Note: The original ETSI IPR Committee (IPRC) where I participated in, should not be mistaken for the much later instituted ETSI IPR Special Committee (IPRSC) which continues to exist today. The IPRSC was formed in 2007, many years after the adoption of the ETSI IPR Policy in 1994.

Post Office, later the Federal Ministry of Post and Telecommunications. He never

worked in industry or in any legal function, e.g., dealing with license negotiations.

## XI.    MISINTERPRETING CJEU HUAWEI V. ZTE

50.    Mr. Djavaherian assumes that the CJEU in its decision *Huawei v. ZTE*

has "*expressly addressed the SEP owner's obligation to provide information*

*regarding its royalty methodology*."[70] But this is Mr. Djavaherian's interpretation

but not the language used by the CJEU which requires "*specifying ... the royalty*

*and the way in which it is to be calculated*."[71] In other words, the CJEU requires

under European competition law that a licensing offer to be made by the SEP

holder to contain sufficient information not only about the royalty rate as such but

also about further elements constituent for the specific calculation of the royalty

when properly performing the concluded license agreement. This comprises for

example the royalty base, the payment intervals, etc. It would certainly be

overreaching to expect this to include internal business calculations and

assumptions of the licensor as Mr. Djavaherian appears to believe.

## XI.    CONCLUSION

51.    My specific rebuttals are set forth above, but in conclusion, I note again

that in general, Mr. Djavaherian's positions appear to rest on the assumption that

---

[70] Djavaherian Declaration 99.
[71] CJEU (Court of Justice of the European Union) *Huawei v. ZTE*, No. C-170/13, July 16, 2015, CURIA - Dokumente (europa.eu). 71.

FRAND licensing was introduced with the near exclusive intent of facilitating broad adoption of standards by allowing implementers of standards to make use of standard-essential patents on minimal royalty terms or without ever willingly taking a license. In other words, he essentially opines that FRAND exists to unilaterally benefit implementers.  This is incorrect.  The ETSI IPR Policy "*seeks a balance between the needs of standardisation for public use in the field of telecommunications and the rights of the owners of IPRs.*"[72] In addition, the ETSI IPR Policy expressly states in describing its objectives, that IPR holders are to be "*adequately and fairly*" rewarded for the use of their inventions.[73]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 23, 2021 in Backnang, Germany

Dr. Bertram Huber

_____

[72] ETSI IPR Policy, Clause 3.1.
[73] ETSI IPR Policy, Clause 3.1.

# EXHIBIT A



Regional Court Düsseldorf

4a O 15/17

Decision of 09 November 2018

[…]

Grounds

[…]

III.

The defendant cannot successfully invoke the antitrust compulsory license objection.

It cannot be established that the plaintiff is using its dominant market position (see point 1) in an abusive manner (see point 2).

1.

The plaintiff holds a dominant market position within the meaning of Article 102 TFEU.

a)

"Dominance" in this context means economic power which allows a company to prevent effective competition on the market (in time, geographically and objectively) and to behave to a significant extent independently of its competitors, customers and consumers (ECJ SIg. 78, 207 para. 65 et seq. - United Brands; ECJ ECR 79, 461 para. 38 et seq. - Hoffmann-La Roche). The exact definition of the market in product and geographic terms is carried out by mean of the so-called demand market concept. It is necessary to identify the competitive forces to which the companies concerned are subject. It also identifies those companies which are effectively able to constrain the behaviour of the companies concerned and to prevent withdrawal of competitive pressure. It must be clarified which products or services are functionally interchangeable from the point of view of the consumers. It is allocated to the same product market what cannot be substituted by other products or services from the point of view of the consumer due to the respective characteristics, prices and intended uses. A combination of several factors (e.g. market share, company structure, competitive situation, behaviour on the market; but basically not the price) must be taken into account



(Higher Regional Court Düsseldorf, judgment of 30 March 2017, docket no. I-15 U 66/15, para. 148 – Mobiles Kommunikationssystem, cited according to juris).

In connection with the prohibition rights from a patent asserted here, the demarcation described is to be made in relation to the licensing market (Higher Regional Court Düsseldorf, ibid., para. 149; Kühnen, ibid., chap. E., para. 217): The supplier is the patent proprietor, who alone is able to grant a license for the respective patent; the buyer is the user interested in the patent-protected technology. The mere ownership of patents alone does not constitute a dominant position. If, however, the patent owner is given the opportunity to prevent effective competition on a downstream market by means of his monopoly position due to additional circumstances, then a dominant market position exists (ECJ, GRUR Int 1995, 490 - Magill TVG Guide; ECJ, WuW 2013, 427 - Astra Zeneca; Federal Court of Justice, NJW-RR 2010, 392 ff. - Reisestellenkarte). Such a downstream product market exists for goods/services licensed under the patent.

Not every standard essential patent as such establishes market dominance (Higher Regional Court Düsseldorf, ibid., para. 150; Kühnen, ibid., chap. E., para. 220). However, such a situation is to be assumed without further ado if access to the use of the SEP in question presents itself as a genuine prerequisite for market entry (Higher Regional Court Düsseldorf, loc. cit.; Kühnen, ibid., chapter E, para. 221), which is the case if only products are offered and demanded on the relevant market that implement the standard through the use of the SEP (Higher Regional Court Düsseldorf, loc. cit.; Kühnen, loc. cit.). The same applies if products are offered on the relevant market that do not have the SEP product configuration, but a competitive offer is not possible without access to the use of the contested SEP (Kühnen, op. cit.).

Conversely, it follows from the foregoing that the lack of standard essentiality of a patent does not necessarily preclude the assumption of dominance. Market dominance can result from the technical or economic superiority of a patented invention even without standard essentiality (Higher Regional Court Düsseldorf, loc. cit.).

The defendant bears the burden of presentation and proof for market dominance in accordance with the general principles (Higher Regional Court Düsseldorf, ibid., para. 151; Kühnen, ibid., chapter E, para. 225). In this respect, the defendant is required to submit very concrete facts which permit a judicial review of whether or not a dominant position exists on the relevant geographic and product market (Kühnen, loc.cit.).

b)

On the basis of the foregoing principles, there is no reasonable doubt that the plaintiff, by virtue of its capacity as proprietor of the patent, enjoys a dominant position on the market.

The defendant has argued that there is no economically viable ("realistic") alternative to the AVC/H.264 patent pool on the licensing market for the AVC/H.264 standard. The

2/19



defendant further substantiated this submission by referring to an article by M P Sharabayko and N G Markov written for the *"International Conference on Information Technologies in Business and Industriy 2016"* under the title *"H.264/AVC Video Compression on Smartphones"* (Annex B1; German translation: Annex 1a) and argued that almost all smartphones available worldwide make use of the standard at issue in order to play video content. The plaintiff has not contested that submission.

Also, there is no interchangeability of the AVC/H.264 standard with other common video coding standards - which the plaintiff also does not deny.

The foregoing also applies in particular to the technical function provided by the patent in suit. The patent in suit is essential for the use of the AVC/H.264 standard (cf. Section I).

2.

However, it cannot be established that the plaintiff abused its dominant market position by failing to comply with the requirements laid down in the ECJ ruling for the holder of an SEP for which a FRAND declaration exists.

a)

The European Court of Justice (ECJ) has imposed on the holder of a standard essential patent (hereinafter referred to as "SEP"), who has undertaken vis-à-vis a standardization organization to grant a license to any third party on fair, reasonable and non-discriminatory terms ("FRAND" = "fair, reasonable and non-discriminatory"), in the case K / C, docket no. C-170/13, with judgment of 16 July 2007 in the form of the order of correction of 15. December 2015 (GRUR 2015, 764) in interpretation of Art. 102 TFEU duties which, if the holder of a standard essential patent complied, result in a suit for injunctive relief or recall being regarded not as an abuse of its dominant market position (ECJ, GRUR 2015, 764, para. 55) (see lit. aa). The case at issue must also be assessed according to these stipulations (see lit. bb)

aa)

The ECJ judgement referred to results in a regime of duties/obligations to be followed by the patent proprietor and the patent user, the individual procedural steps of which build on one another, so that the infringer only has to react in the manner incumbent upon him if the patent proprietor has previously fulfilled the duties incumbent upon him (Higher Regional Court Düsseldorf, Urt. v. 30.03.2017, Az.: I-15 U 66/15 - Mobile communication system, cited after juris).

This regime provides that the patentee must inform the alleged infringed party "before filing the action" (or "before the judicial assertion"), stating the SEP in question and the nature of the infringement (ECJ, GRUR 2015, 764, recitals 62 and 71). If the alleged infringer has thereupon expressed his willingness to enter into a licence agreement under FRAND



conditions, the patentee must submit a concrete written licence offer under FRAND conditions (ECJ, ibid., para. 71) in order not to expose himself to the allegation of abuse of his dominant market position. This must indicate in particular the licence fee and the way in which it has been calculated (op.cit.). It is then incumbent on the alleged infringer to respond to this offer with care, in accordance with business practices recognised in the field and in good faith (ECJ, ibid., para. 65, 71). If the alleged infringer does not accept the offer, he may invoke the objection of abuse regarding an injunction or recall action only if he makes the holder of the SEP concerned a concrete counter-offer in writing within a short period, which complies with the FRAND conditions (ECJ, ibid., marginal 66). Furthermore, from the time when his counteroffer is rejected, the patent user must provide adequate security in accordance with the business practices recognised in the relevant field (ECJ, ibid., para. 67).

The antitrust restrictions established by the ECJ for the assertion of the injunction and recall claim also apply to the destruction claim (Higher Regional Court Düsseldorf, order of 13 January 2016, docket no. I-15 U 65/15, para. 16, cited after juris).

bb)

The ECJ case law described above also applies to the present case.

To the extent that the plaintiff is of the opinion that the present constellation of facts, according to which - which is still to be shown - a routine licensing practice already exists, precludes an application of the principles set out in the cited ECJ judgment, and that it is rather a recourse to the so-called "Orange Book Standard" jurisdiction, which imposes on the patent user the requirement of an offer to conclude a licensing agreement (BGH, GRUR 2009, 694, para. 29), the Chamber does not agree with this.

As can be inferred from the grounds of the judgment, the ECJ has seen the facts to be assessed by it characterised by the fact that *"on the one hand"* the plaintiff's patent is essential for a standard standardised by a standardisation organisation (ECJ, GRUR 2015, 764, para. 48) and *"on the other hand"* an irrevocable promise exists on the part of the holder to grant licences to third parties under FRAND conditions (ECJ, ibid., para. 51). It is precisely with these aspects that the ECJ links the special catalogue of obligations drawn up for the patent proprietor:

"In such a constellation, in order for an action for injunction or recall not to be regarded as abusive, the SEP holder must fulfil conditions designed to ensure a fair balance between the interests concerned". (ECJ, ibid., recital 55; emphasis on this point).

The (further) delimitation of the initial situation described in this way from cases in which an existing licensing practice exists, on the other hand, cannot be inferred from the ECJ ruling. It is true that paragraph 64 of the ECJ judgement states that



KATHER · AUGENSTEIN
RECHTSANWÄLTE

"[...]. Moreover, where neither a standard licence agreement nor licence agreements already concluded with other competitors have been published, the SEP holder is better placed than the alleged infringer to determine whether his offer complies with the conditions of equal treatment".

However, the ECJ did not want to create a further differentiation criterion in this way. The linguistic introduction with the word "moreover", which merely marks an additional argument for the view that the patentee must take the initiative in the direction of concluding a licence agreement, speaks against this. The systematic position of the passage in relation to the description of the obligations of the proprietor of the patent, which follows precisely from the particularities described above (paragraphs 48 and 51), also underlines that only an additional argument for those obligations is to be presented and not a new distinguishing criterion. Ultimately, the fact that the expectation raised by the patent holder that he would be prepared to conclude a licence agreement under FRAND conditions remains valid even in such a case (ECJ, ibid., para. 54) also speaks against a departure from the established duty programme in the case of an existing licensing practice. This is even more encouraged by the already "lived" licensing practice. Similarly, in these cases the possibility of a lack of information regarding the use of the doctrine of a standard essential patent by the alleged infringer remains - a circumstance which led the ECJ to statute the obligation of the patentee to make an initial offer (ECJ, ibid., para. 62). The mere fact that a standard license agreement has been published does not imply that the patent user is aware of the use of the standard essential patent(s). The search for a corresponding standard license agreement might rather require such knowledge as a rule.

In addition, the view that an established licensing agreement practice goes beyond the principles set out in the ECJ ruling also leads to practical problems in defining when such a constellation can be assumed to exist.

However, the previous remarks do not exclude the possibility of giving special importance to any existing licensing practice of the patent proprietor in the context of the examination of the duty programme to be provided by him, for example by attributing to it an indicative effect for the appropriateness of the contract terms offered (Higher Regional Court Düsseldorf, decision of 30 March 2017, docket no. I-15 U 66/15, para. 203 – Mobiles Kommunikationssystem, cited according to juris; Regional Court Düsseldorf, decision of 31 March 2016, docket no. 4a O 73/14, para. 226, cited according to juris; Kühnen, ibid., Chapter E, para. 423).

b)

The e-mail dated 08 September 2011 (Annex K9 - Exhibit B) contains a sufficient notification of infringement.



Since the notice of infringement "must designate the SEP in question and indicate the manner in which it is alleged to have been infringed" (ECJ, ibid., para. 61), at least the indication of the publication number of the patent in suit, the attacked embodiment and the accused act of use (within the meaning of Sections 9 et seq. of the German Patent Act (PatG)) to the infringer is required (Higher Regional Court Düsseldorf, Urt. v. 30.03.2017, ref.: I-15 U 66/15, marginal 172 - Mobile communication system, cited according to juris). However, the notice of infringement does not require detailed (technical and/or legal) explanations - the other part only needs to be put in a position - if necessary with expert assistance - to examine the allegation of infringement (Higher Regional Court Düsseldorf, loc. cit.; Kühnen, ibid., chapter E., marginal no. 328; further Regional Court Mannheim, judgment of 29.01.2016 - 7 O 66/15 - marginal no. 57). The purpose of the infringement report is to give the user, who may still be in good faith with regard to the encroachment on the protected area, the opportunity to inquire about the granting of a usage permit promised to any interested party on the basis of the FRAND declaration (Kühnen, loc.cit.). However, the obligation to make a voluntary disclosure is not an end in itself. It is therefore dispensable where it presents itself as a useless formality because, on the basis of the overall circumstances, it can be assumed with certainty that the defendant infringing the patent has knowledge of the use of the patent by the challenged form of performance and that his reference to the fact that the plaintiff did not notify him of this appears as an abuse of rights (Kühnen, ibid., Chapter E., para. 33). However, high demands must be made regarding the existence of such an offence (loc. cit.).

According to this provision, the letter of MPEG LA dated 08 September 2011 (Annex K9 - Exhibit B) proves to be a sufficient indication of infringement.

aa)

The fact that the letter in question was exchanged between MPEG LA and the parent company of the defendant is not detrimental.

(1)

If - on the part of the patent user - it is ensured that an infringement notification sent to the parent company is forwarded within the group to the respective subsidiaries concerned, no formal notification is required to all subsidiaries (Higher Regional Court Düsseldorf, loc. cit., para. 175; Kühnen, ibid., Chapter E, para. 329). In the absence of any indications to the contrary, group membership alone gives rise to the justified assumption that the subsidiaries concerned will be informed (Higher Regional Court Düsseldorf, loc.cit.).

In addition, the parties' prior correspondence in this case also justifies the confidence that information concerning licensing issues will be passed on within the defendant's group.

So the MPEG LA wrote in the e-mail of 08 September 2011 first to Mr. M:



"N has advised me to contact you as you are responsible for patent licensing issues at C."

In response to this request from MPEG LA, which was obviously looking for the contact responsible for IP matters at the C Group, the parent company's reply email of 15 September 2011 (Annex K9 - Exhibit B; German translation: Annex K9 - Exhibit B - a) from Mr. O:

"„[...]. I'd like to introduce myself. My name is O and [I] am an IPR manager at the C Group. I've just been assigned as your contact. As you mentioned below, my colleague Mr M will receive some documents from you via FedEx. Since this is an express delivery, I wanted to ask if it would be possible, if you have not yet sent the documents, to send them to me at the address indicated on the signature."

The parent company then fueled confidence that MPEG LA was in contact with the right person to negotiate a corporate license.

(2)

The letter written by MPEG LA can also be interpreted as an indication of infringement on the part of the plaintiff.

It is to be expected that MPEG LA may take legal action in connection with the granting of licenses to the AVC/H.264 patent pool.

The standard licence agreement for the pool at issue here (Annex K9 - Exhibit P - a) is concluded, after the entry pass,

"This Agreement was entered into on XXX 20XXX between MPEG LA, LLC, a limited liability company incorporated under the laws of the State of Delaware with its registered office in Denver, Colorade, USA (hereinafter referred to as "Licensee"), and XXX (hereinafter referred to as "Licensee").",

between MPEG LA and the respective licensee. For this purpose, sublicenses are granted to MPEG LA by the holders of the pool patents:

"Each Licensor grants to the Licensee a worldwide, non-exclusive license and/or sublicense to all patents essential to AVC that may be licensed or sublicensed by the Licensor to enable the Licensee to grant to the Licensee worldwide, non-exclusive sublicenses to all such patents essential to AVC under the terms of this Agreement. (Standard licence agreement, Annex K9 - Exhibit P - a, p. 2, last paragraph).

Point 3.1 of the standard licence agreement (Annex K9 - Exhibit G - a; emphasis on this point) also states that:



"For the licenses granted under Article 2 of this Agreement under the AVC Essential Patents in the AVC Patent Portfolio, the Licensee shall pay to the Licensee the following fees to the benefit of the licensors for the term of this Agreement:".

This content of the contract does not directly regulate the contractual relationship between MPEG LA and the respective pool patent holders - the subject matter of the contract is rather the contractual relationship between MPEG LA and the respective licensee - but it gives an indication of the possibilities for action of MPEG LA in connection with the licensing of the standard at issue here.

After presenting the standard license agreements, the defendant also did not deny that MPEG LA had concluded them, i.e. that the model referred to in the standard license agreement is lived.

Furthermore, the defendant's procedural conduct, according to which it "considers it questionable" that the plaintiff can transfer its antitrust obligations to MPEG LA and that MPEG LA can assume these obligations for the plaintiff, is (procedurally) also irrelevant because its parent company itself became the pool patent holder in September 2012, thus being aware of the possibilities for action of MPEG LA within the scope of licensing the standard at issue here, in particular the granting of a right to sublicense to MPEG LA by the pool patent holders.

bb)

With regard to the substantive requirements for a notice of infringement, the defendant is entitled to have the letter of MPEG LA dated 08 September 2011 (Annex K9 - Exhibit B/ Exhibit B - a) contain only general information on the infringing product - referred to there as "mobile handset and tablet products" - and on the infringed property right(s) - in the form of a reference to "the AVC patent portfolio" with "more than 1000 essential AVC patents of 25 patent holders". It does not mention the publication number of concrete patents from the extensive pool or the concrete designation of alleged infringing products.

However, this content is exceptionally sufficient against the background of the preliminary correspondence between the defendant's parent company and MPEG LA as well as the parent company's conduct after the notice of infringement.

The defendant does not deny that the parent company was aware of the pool patents and that the standard license agreement had already been concluded with a large number of market participants. This is also obvious because the MPEG LA website provides information both on the pool composition (in particular in the form of the list of patent holders and associated patents, Annex K9 - Exhibit E/ Exhibit E - a, and in the form of the Cross Reference Chart, Annex K9 - Exhibit G) and on the licensees (Annex K9 - Exhibit H/ Exhibit H - a).



The defendant claims that the parent company was nevertheless unable to conclude that the mobile telephones and tablets attacked would make use of the doctrine of the plaintiff's patent. However, the contrary assumption is supported by the fact that the legal department of the C Group and MPEG LA had already been in contact since 2006 with regard to the standard license agreement, in the course of which the same agreement was brought to the attention of the Group several times. A corresponding knowledge on the part of the parent company is further suggested by the fact that approximately one year after the e-mail of 8 September 2011 in question here, the parent company itself acquired patents stored in the pool, which requires a certain amount of market observation even before this purchase decision is made. Finally, a further indication results from the fact that the parent company did not requested further information to determine the infringement question within the framework of the licence agreement negotiations that followed in the years 2013 - 2017.

In the light of the foregoing, it can be assumed from an overall view that the parent company was aware of the AVC/H.264 patent pool as such and of the need to license AVC-enabled products to mobile and tablet operators.

c)

The parent company has also sufficiently indicated its willingness to license.

The parent company of the defendant responded by e-mail of 15 September 2011 in the person of Mr O (Annex K9 - Exhibit B/Exhibit B - a) to the message of the MPEG LA of 08 September 2011 by requesting that the contract documents be sent to itself as the responsible person.

This may not reflect concrete references to a possible contract, but the communication - which is sufficient - does reflect the parent company's will to address licensing issues relating to the AVC/H.264 standard.

The fact that the MPEG LA also understood the reaction in the sense outlined becomes clear in the following correspondence, in which the negotiating parties - after receiving the contract documents - tried to find a date for a meeting (cf. e-mail of Mr. O dated 26 September 2011 and e-mail of Mr. P (MPEG LA) dated 17 September 2011, both Annex K9 - Exhibit B/ Exhibit B - a).

The party submissions do not reveal whether and how the negotiations continued in 2012. However, this does not imply that the parent company is not prepared to dissociate itself from the basic willingness to license. Among other things, there is communication between the parent company and MPEG LA from the years 2013 and 2016 (in particular letter of MPEG LA dated 07.01.2013, Annex K9 - Exhibit C; German translation: Annex K9 - Exhibit C - a; e-mail traffic, Annex Volume B8; German translation: Annex Volume B8a),



in which the license negotiations - now taking into account the fact that the parent company itself had become a member of the pool - were continued.

d)

By sending the standard license agreement to the parent company in February 2012, a FRAND-compliant offer attributable to the plaintiff was submitted, which both meets the (rather) "formal" requirements established by the ECJ (see lit. aa)) and proves to be fair, reasonable and non-discriminatory in terms of content (see lit. bb)).

aa)

MPEG LA's offer in the form of the standard license agreement sent at the end of September 2011 meets the (rather) "formal" requirements that the ECJ places on the patent holder's offer.

The offer must then be made in writing and must also be concrete in the sense that it specifies the licence fee and the relevant calculation parameters (relevant reference value, applicable licence rate, staggered rate if applicable) as well as the method of calculation (Higher Regional Court Düsseldorf, decision of 30 March 2017, docket no. I-15 U 66/15, para. 203 – Mobiles Kommunikationssystem, cited according to juris; Kühnen, ibid., Chapter E. para. 325). The points which are usually the subject of licensing agreements must be included in the offer in the form of meaningful provisions (Higher Regional Court Düsseldorf, loc.cit.).

These criteria are fulfilled with the delivery of the standard license agreement document.

(1)

In terms of its objective explanatory value, the sending of the standard license agreement is a sufficiently concrete offer. The content of the contract recognisable from this is in particular also suitable to legitimise the acts of use of the C Group.

(a)

By sending the standard licence agreement and the information contained in the e-mail of 08 September 2011 (Annex K9 - Exhibit B/ Exhibit B - a), the parent company was able to recognise that MPEG LA was seeking to conclude a licence (under the terms of the standard licence agreement).

This is stated in the e-mail of 08 September 2011 (Annex K9 - Exhibit B - a):

"Today I am sending you copies of our MPEG-4 Visual License, AVC License and VC-1 License for review. [...] Enclosed I also send you a .pdf-version of all licenses for easier



viewing. Please note that the electronic copies are for information purposes only and cannot be used for signature".

Conversely, it follows from the information, limited solely to the digital version of the contract, that the documents thus received cannot serve as the relevant contractual document that the documents sent by post could very well fulfil that function. The intention of MPEG LA to conclude the contract was therefore openly stated in the mailing of the same.

The offer character of the sending of the standard license agreement is not missing because MPEG LA had already sent contract documents for the disputed standard to the parent company. As the sending of the contract documents in September 2011 was preceded by the e-mail of 08 September 2011 (Annex K9 - Exhibit B/ Exhibit B - a), the parent company was able to recognise - as stated under b) - that MPEG LA was interested in initiating concrete contract negotiations on the standard at issue.

Finally, the standard contract also indicates the parameters required for the licence calculation, whereby the calculation factors for the unit licence are derived in particular from Clause 3.1.1.

(b)

It is also harmless that the standard license agreement was not addressed to the defendant but to the person in charge of the license negotiations in the defendant's group ("O"). The conclusion of a group license was in question (cf. Kühnen, ibid., Chapter E., recital 320) and Mr. O expressly asked for the documents to be sent to him by e-mail dated 15 September 2011.

(c)

Finally, the assumption that an offer in the form of the standard licence agreement send to the parent company, which also covers the defendant, is not precluded neither by the fact that by this licensing of the subsidiaries was not directly achieved, nor that according to Section 2.1 of the standard licence agreement a licensing of distribution activities takes place vis-à-vis end customers, but not vis-à-vis wholesalers and retailers - as practised by the defendant.

As already explained, it is in principle - also in this case - in accordance with a FRAND procedure that the patent proprietor prepares possible licence negotiations by sending a notice of infringement to the parent company of a group of companies (cf. in this regard under lit. b), aa), (1)) and conducting the subsequent contract negotiations with this company (cf. in this regard lit. (b)). It follows from this that, in principle, this communication between the patent proprietor and the parent company must also be



taken into account for the assessment of the prospects of success of a later antitrust compulsory license objection.

Something else may apply if - which is not to be decided here - it is already expressed either in the preparatory acts for the contract negotiations or within the framework of the contract negotiations themselves that subsidiaries affiliated to the group cannot be covered by the contract offer submitted to the parent company from the outset.

That's not the case here, though.

The contractual offer submitted to the parent company does not exclude the possibility of licensing the subsidiaries from the outset. MPEG LA has - which is undisputed between the parties - rather expressed the need for licensing of all group companies, although the concrete form of a license covering all group companies would be clarified during the contract negotiations.

The licensing of the subsidiaries, too, is already expressed in the standard document sent to the parent company in Section 2.9, which declares the general willingness of the subsidiaries to also conclude licenses. In practice, the licensing of group-affiliated companies is implemented through various variants. First, there is the possibility that the top management will guarantee that the parent company will take a license covering the entire group - as in the case of the Q group, for example. If other group companies only act as distribution companies of the parent company ("distribution chain"), a licensing by the parent company alone is sufficient to legitimise the distribution of the subsidiaries via the exhaustion principle. Furthermore, licenses can be granted to all subsidiaries by means of a separate affiliate agreement, or each company concludes its own license agreement - as is the case with the "R Group". The fact that the course of the contract negotiations - offer to the parent company with subsequent negotiation of further contract details - took place in the manner described can be found for example in the e-mail of the P (MPEG LA) of 29 April 2016 (annex B8/ annex B8a), in which it says among other things:

"As discussed, our licenses cover the legal entity that offers the final products on the market. Therefore, C would complete the licenses to cover all of C's products that contain the applicable technologies."

On the basis of the foregoing, it also follows that the fact that the standard licence agreement does not cover acts of distribution to wholesalers and retailers, as undertaken by the defendant, does not preclude a suitable offer.

Irrespective of the fact that the defendant - as the screenshot presented as Annex K6 shows - in any event also acts as an offeror to end customers, it is now undisputed between the parties following the presentation of the standard licence agreements already concluded that distribution activities to wholesale and retail customers are also



legitimised at least via the principle of exhaustion. The fact that this was not apparent to the parent company at the time the offer was made is harmless.

In this context, it is also important to note that the usual starting point for contract negotiations in this business field is communication with the parent company, which use is undisputedly covered by the standard license agreement. The question of the inclusion of the acts of use of the subsidiaries is then the subject of contractual negotiations following the offer made to the parent company. In this context, the question of licensing distribution activities to commercial customers would also have had to be discussed with the result already presented here. In the present case, however, the parent company did not include this aspect in the contract negotiations, which would have been expected if it had identified an obstacle to the conclusion of the licence agreement. This is all the more true as only she - unlike the responsible MPEG LA - knew in detail the group structures that were considerable for the conclusion of the license agreement.

(2)

As a result, the way in which the licence fee is calculated is also sufficiently explained, although neither the contractual document nor the documents sent in connection with it explicitly refer to it.

As information on the "method of calculation", the ECJ does not only require information on the amount of the licence fee and its calculation. Rather, the SEP holder must explain to the infringer in a concrete and comprehensible manner why the proposed licence fees are FRAND (Higher Regional Court Düsseldorf, ibid., para. 203; Kühnen, ibid., Chapter E., para. 309). The method of license fee calculation does not require strict mathematical derivation. If this is possible in a specific case, it is sufficient to demonstrate the acceptance of the required (standard) license rates on the market by way of license agreements already concluded (Regional Court Düsseldorf, decision of 13 July 2017, docket no. 4a O 154/15, para. 311, cited according to juris). However, the patentee then has to justify (more or less substantiated depending on the circumstances of the individual case), in particular, why the royalty envisaged by him is FRAND precisely against this background (Higher Regional Court Düsseldorf, ibid., para. 203; Regional Court Düsseldorf, ibid., para. 310; Kühnen, ibid., para. 326). If there is a sufficient number of licence agreements and acceptance on the market can be demonstrated in this way (e.g. market share of products licensed at a certain fee level), no further information on the appropriateness of the licence fee level will normally be required (Regional Court Düsseldorf, ibid., para. 311). However, the SEP holder must, in principle, present a report on all major license agreements - otherwise there is a risk that only those agreements will be presented that support the required level of license fees (Regional Court Düsseldorf, ibid., para. 313).

In accordance with the above, the manner of calculation in connection with the offer in question has been sufficiently explained.



The standard license agreement, which was received by the parent company in September 2011, does not itself contain any information on the method of calculation in the sense set out above. In this respect, however, the parent company's knowledge that the contractual document is a standard license agreement which has already been concluded by a large number of licensees can be used as a basis.

In this respect, reference can essentially be made to the explanations under b), bb) above. In addition, the e-mail of 08 September 2011 (Annex K9 - Exhibit B - a) also contains a reference to the fact that the conclusion of the standard licence agreement is customary when it says:

"Normally, C would have to negotiate individual licenses directly with each individual patent holder, but our patent portfolio licenses allow license protection through a single transaction."

The submission of the individual concluded licence agreements themselves, on the other hand, is not to be demanded within the framework of the offer. It is neither stated nor apparent that this is customary in the industry.

Without prejudice to the foregoing, it must in any event be assumed that, by September 2012 at the latest, when the parent company itself obtained the status of pool patent holder, it had sufficient knowledge of the manner in which the royalties were calculated.

bb)

The offer under review here also complies with FRAND principles in terms of content.

(1)

Fair and reasonable" contractual terms are those which are not offered to the licensee as an abuse of a dominant position. The contractual conditions must be reasonable and may not be exploitative (Higher Regional Court Düsseldorf, order of 17 November 2016, docket no. I-15 U 66/15, para. 15, quoted according to juris). An offer by the licensor may, in particular, prove unfair/inappropriate if a licence fee is charged which significantly exceeds the hypothetical price which would have been formed in the case of effective competition on the dominant market, unless there is an economic justification for the price formation (Regional Court Düsseldorf, decision of 31 March 2016, docket no. 4a O 73/14, para. 225, cited according to juris; Huttenlauch/ Lübbig, in: Loewenheim/ Meessen/ Riesenkampff/ Kerstin/ Meyer-Lindemann, Kartellrecht, Commentary, 3. Ed., 2016, Art. 102 TFEU, para. 182; Kühnen, ibid., Kap. E., para. 245). In the case of a standard property right, the inappropriateness may also result from the fact that, in the event of a licence claim, a cumulative total licence charge would also arise for the other standard property rights which is not economically viable (Kühnen, ibid., Chapter E., para. 246). In this context, it should be noted that a mathematically exact derivation of a FRAND-compliant licence fee



does not have to be made, but rather an approximate decision based on valuations and estimates has to be made (Kühnen, ibid., Chapter E., para. 425). Comparable licence agreements can be an important indication of the appropriateness of the licence conditions offered (Regional Court Düsseldorf, loc. cit.; Kühnen, ibid., Cap. E., para. 245, para. 430). The contractual offer must also prove to be appropriate with regard to the other contractual conditions (intellectual property rights subject to licence, licence area, etc.).

The prohibition of discrimination establishes an obligation of equal treatment for the dominant company by requiring it to grant the same prices and conditions to trading partners who are in the same position (Higher Regional Court Düsseldorf, decision of 30 March 2017, docket no. I-15 U 66/15, para. 208 – Mobiles Kommunikationssystem, cited according to juris). Only comparable facts are to be included in the principle of equal treatment, while market-dominating companies can also react differently to different market conditions (loc. cit.). A difference of treatment is therefore permissible if it is objectively justified (loc. cit.). The broad scope for objective justification to which the holder of an intellectual property right is generally entitled is limited if, in addition to the dominant market position, other circumstances arise from which it results that the unequal treatment endangers the freedom of competition (Higher Regional Court Düsseldorf, ibid., para. 209). These may in particular consist in the fact that access to a downstream product market depends on compliance with the patent doctrine (Federal Court of Justice, GRUR 2004, 966 (968) – Standard-Spundfass) or that the product - as here - is only competitive when the patent is used (Higher Regional Court Düsseldorf, loc. cit.).

The licence seeker is obliged to provide evidence and evidence for unequal treatment (Higher Regional Court Düsseldorf, ibid., para. 212) or the existence of an exploitation offence (Regional Court Düsseldorf, decision of 30 November 2006, docket no. 4b O 58/05, para. 140 – Videosignal-Codierung I, cited according to juris; Kühnen, ibid., Chapter E, para. 247, para. 308). However, account must be taken of the fact that the licence seeker regularly has no detailed knowledge of the SEP holder's licensing practice, in particular of existing licence agreements with third parties and their regulatory content. This justifies the imposition of a secondary burden of presentation on the SEP holder, who is naturally aware of the contractual relationships with other licensees and who can reasonably be expected to provide further information in this regard (Higher Regional Court Düsseldorf, ibid., para. 212; Kühnen, ibid., para. E., para. 311). The information on licensees must be complete in this context and must not be reduced to a few well-known companies in the sector (Kühnen, op. cit.). The lecture must also contain information on which - concretely to be named - companies with which significance on the relevant market have taken a license and under what concrete conditions (Higher Regional Court Düsseldorf, loc.cit.). If unequal treatment has been determined, it is incumbent on the patent proprietor to explain any circumstances justifying the different treatment and, if necessary, to prove them (Higher Regional Court Düsseldorf, loc. cit.; Kühnen, loc. cit.).



(2)

The defendant's objections to the FRAND compliance, based on the standard set out in point (1) above, do not prevail.

(a)

The fact that MPEG LA aims to license all group companies in accordance with the standard license agreement does not prove to be abusive either from the point of view of appropriateness or in consideration of the prohibition of discrimination.

Group-wide licence agreements are customary in the electronics and mobile communications sectors (Kühnen, ibid., section E, para. 411). In this respect, the large number of already concluded standard license agreements, which the defendant did not contest, also have a considerable indicative effect in this case for the industry customary nature of a group-wide license.

It is also undisputed that the parent company manufactures the attacked embodiments and that these are marketed worldwide by subsidiaries, so that the pool patent holders also have a special interest in the granting of a group-wide licence against this background. This is the only way to avoid a mixture of licensed and unlicensed products within a group, which would otherwise lead to effective law enforcement no longer being possible in the absence of separability of the rightfully marketed products from the infringing products.

The defendant has not put forward any other circumstances from which it could be inferred that the plaintiff/MPEG LA acted in an exploitative or discriminatory manner.

(b)

Also, the fact that the standard licence agreement provides for a pool licence does not preclude the FRAND compliance of the offer.

Due to the reference list (Annex K9 - Exhibit G), use of the pool patents is also sufficiently explained (cf. with regard to portfolio licenses: Higher Regional Court Düsseldorf, order of 17 November 2016, docket no. I-15 U 66/15, para. 26 et seq.; Kühnen, ibid., Kap. E., para. 420).

Offering a license in a patent pool does not in itself constitute grounds for accusations of abusive inappropriateness. It regularly serves the well-understood interest of potential license seekers that they are offered a one-stop user license for the entire standard at uniform conditions, because they are thus relieved of the necessity of having to apply for a license for their patents from each individual property right holder (Regional Court Düsseldorf, 4b O 508/05, para. 119 - Videosignal-Codierung I, cited after juris). In this respect, the "Guidelines on the Application of Art. 101 of the Treaty on the Functioning of



the European Union to Technology Transfer Agreements" of 28 March 2014 (Official Journal C 89/3) (hereinafter referred to as "the Guidelines") also provide guidance (cf. Kühnen, ibid., Chapter E, para. 299). As regards the application of the prohibition of cartels under Article 101 TFEU, they provide in paragraph 245 for the following:

"Technology pools can have pro-competitive effects by reducing transaction costs and limiting the accumulation of royalties, thus avoiding double profit maximisation. They enable central licensing of the technologies held by the pool. This is particularly important in industries where intellectual property rights are of central importance and where market presence requires licensing from a significant number of licensors. [...]."

A restrictive effect on competition can only be presumed if further circumstances arise, which is also reflected in paragraph 246 of the Guidelines:

"Technology pools may also restrict competition since their creation necessarily implies joint sales of the combined technologies, which may lead to a price fixing cartel in pools consisting exclusively or predominantly of substitutable technologies. Moreover, technology pools may not only reduce competition between the parties, in particular when they support or de facto establish an industry standard, but may also reduce competition in innovation by foreclosing alternative technologies. An existing standard and a corresponding technology pool can hamper market access for new and improved technologies."

The defendant has not substantiated particular circumstances which make the offer of the pool licence appear restrictive of competition in the sense described above. On the contrary, after the standard licence agreements already concluded had been submitted, it no longer objected to the fact that the granting of licences to the entire pool - and not limited to the portfolio of individual pool patent holders - was in line with industry practice.

e)

The defendant has not made a counteroffer in accordance with FRAND.

The standard license agreement signed by the defendant in the summer of 2018 is to be regarded as a counteroffer (see aa)). However, this contradicts FRAND principles (see bb)), which is why the question of whether it has still been submitted in good time is also irrelevant.

aa)

The standard license agreements signed by the defendant and transmitted to MPEG LA in the defendant's letter of 13 September 2018 are to be considered as a counteroffer. This does not constitute the acceptance of an offer made by MPEG LA to conclude a standard license agreement. The mere availability of the standard license agreement via the MPEG



LA website does not constitute an offer. Rather, making the contract document available for inspection by interested parties serves as information about the license terms. The standard license agreement, which can be understood as an offer, was sent solely to the parent company of the defendant (cf. lit. d), aa), (1)).

bb)

The counteroffer of the defendant, as set out in lit. aa) above, does not prove to be in conformity with FRAND.

The fact that the standard license agreement is concluded solely between MPEG LA and the defendant and not also with the latter's parent company or with the other companies affiliated to the group precludes a FRAND moderation of the offer.

In principle - against the background that a group-related licence is customary in the industry (cf. lit. d), bb), (2), (a)) - it is acceptable that the pool patent holders are only prepared to grant a licence covering the entire group. This is especially true when the prohibition of discrimination is observed, because the conclusion of an AVC/H.264 pool license corresponds to the license model practiced with the previous licensees.

In the present case, even from the point of view of appropriateness, nothing else applies because the defendant - in contrast to its parent company - is prepared to license and it cannot influence the parent company to conclude the standard license agreement.

It is true that the defendant's objection that it could no longer do anything to behave in accordance with FRAND and to maintain the compulsory license objection under antitrust law is, in principle, considerable. This is because affiliated companies are also legally independent persons, so that it is not possible to attribute the conduct of one person to the other without the existence of special circumstances. However, the constellation at issue here is characterised by the fact that the defendant is a wholly-owned subsidiary of the parent company. The latter therefore determines the conduct of the defendant. In this way, the latter can ensure that licences are synchronised in the sense of the industry custom by agreeing to take licences. Therefore, it cannot be established that the defendant - against the background of the parent company's refusal to accept MPEG LA's FRAND-compliant offer - is being treated inappropriately. Rather, it is the case that the parent company, for its part, enforces licensing relating to individual companies by merely agreeing - via the defendant subsidiary - to license individual subsidiaries. The situation in this case is further characterised by the fact that the parent company, as a temporary pool member, had a particular reason for taking a licence in order not to behave in a manner contrary to its own loyalty to the pool.



f)

In view of the fact that there is already no counteroffer from the defendant in accordance with FRAND, it is irrelevant whether sufficient security has been provided.

[...]

Kather Augenstein Rechtsanwälte

Bahnstraße 16

40212 Düsseldorf

P: +49 211 5135360

E-Mail: augenstein@katheraugenstein.com / info@katheraugenstein.com

# EXHIBIT B



KATHER · AUGENSTEIN
RECHTSANWÄLTE

Federal Supreme Court

KZR 35/17

Judgement of 24 November 2020

Ruling

On appeal and with rejection of the cross-appeal, the judgement of the 15th Civil Senate of the Higher Regional Court Düsseldorf of 30 March 2017 is set aside on the issue of costs and insofar as the court of appeal found against the plaintiff.

[...]

Grounds

[...]

II.

44    The Court of Appeal's assumption that the claim seeking an order against the defendant for injunctive relief and to recall patent-infringing products is nevertheless unfounded because the defendant's defence of compulsory licensing under antitrust law currently prevails, does not withstand the attacks of the appeal.

1.

45    In justifying its decision, the Court of Appeal essentially stated: The plaintiff had a dominant position within the meaning of Article 102 TFEU. The answer to the question in dispute between the parties, whether the implementation of the standard necessarily required the use of the patent in suit or whether the standard merely provided for the realisation of the technical teaching of the patent in suit as an option, could also be left unanswered in this context. The use of the patent in suit was in fact unavoidable because UMTS-capable mobile phones - in order to be marketable at all - had to be able to detect



several radio carriers. According to the principles established by the Court of Justice of the European Union in the Huawei/ZTE case, the legal assertion of the claims for injunction, destruction and recall constituted an abuse of this dominant position. Although the plaintiff had fulfilled its duty to inform, it had not made the defendants an offer that complied with FRAND conditions, despite the defendants' declared and continuing willingness to take a licence.

46    However, the declaration of willingness to take a licence had only been made about a year after the plaintiff's first infringement notice of 20 December 2012. However, the failure of a party to take a necessary step in due time did not result in material preclusion; the step in question could in any case still be taken before the action was brought. Subsequently, no circumstances had come to light that would lead to the assumption that the defendant's or its group's willingness to take a licence had lapsed again in the meantime.

47    The offers made by the plaintiff constituted evidential discrimination against the defendants. The plaintiff's licence offers treated the defendants unequally vis-à-vis one of its licensees, a Chinese state-owned enterprise, with regard to the amount of the licence fees without a valid factual reason.

      2.

48    The appeal unsuccessfully challenges the Court of Appeal's affirmation of the plaintiff's status as an addressee under Article 102 TFEU.

      a)

49    The plaintiff is dominant on the licence market relevant here. As the Senate explained in more detail in its judgement of 5 May 2020 between the parties (KZR 36/17, WRP 2020, 1194, marginal no. 54 - FRAND-Einwand), the assumption of an independent licence market first requires a finding that the patent is essential to a standard, i.e. that the use



of the patented teaching is indispensable for the implementation of a standard (standardised by a standardisation organisation or enforced on the market) (FCJ, judgement of 13 July 2004 - KZR 40/02, BGHZ 160, 67, 74 - Standard-Spundfass; WRP 2020, 1194, marginal no. 58 - FRAND-Einwand). July 2004 - KZR 40/02, BGHZ 160, 67, 74 - Standard-Spundfass; WRP 2020, 1194 marginal no. 58 - FRAND-Einwand), so that it is usually technically impossible to circumvent the invention without losing important functions for the product market (FCJ, WRP 2020, 1194 marginal no. 58 - FRAND-Einwand; cf. ECJ, judgement of 16 July 2015 - C-170/13, WRP 2015, 2783 para. 49 - Huawei/ZTE; European Commission, Decision of 29 April 2014 - C (2014) 2892 para. 52 - Motorola). Furthermore, a prerequisite for an independent licensing market is that the technical teaching corresponding to the patent and the standard cannot be substituted by another technical design of the product (FCJ, WRP 2020, 1194 marginal no. 58 - FRAND-Einwand; cf. ECJ, [2004] ECR I-5039 marginal no. 28 - IMS Health; BGHZ 160, 67, 74 - Standard-Spundfass).

b)

50     The Court of Appeal left unanswered whether the standard relevant here only provides for the implementation of the teaching of the patent in suit as an option and whether the use of only one radio carrier corresponds to the standard. However, it found that such a possibly existing non-patent option no longer plays a role in practice, which is why the use of the patent in suit is in any case factually unavoidable within the scope of the implementation of the requirements of the standard. This is sufficient for the assumption of an independent licence market, since a mobile device that does not implement the technical teaching of the patent in suit is not competitive according to it (see ECJ, judgement of 29 April 2004 - C-418/01, [2004] ECR I-5039 = WRP 2004, 717 marginal no. 29 - IMS Health; FCJ, WRP 2020, 1194 marginal no. 59 f. - FRAND-Einwand).



KATHER · AUGENSTEIN
RECHTSANWÄLTE

c)

51    The Court of Appeal did not fail to recognise that, despite the legal barrier to access in such a case, there may be exceptional reasons that can exclude market dominance by the proprietor of the standard-essential patent (FCJ, WRP 2020, 1194 marginal no. 61 et seq. - FRAND-Einwand). However, it was unable to find indications for this either in the parties' submissions or in the circumstances of the case; this stands up to review under the law of review (FCJ, WRP 2020, 1194, marginal no. 62 et seq. - FRAND-Einwand).

3.

52    However, the findings of the Court of Appeal do not justify the assumption that the plaintiff abused this dominant position.

a)

53    As the Senate explained in more detail in its judgement of 5 May 2020 (WRP 2020, 1194 - FRAND-Einwand) between the same parties, following the case law of the European Court of Justice (WRP 2015, 1080 para. 54 et seq. - Huawei/ZTE), a dominant patent holder that has committed itself to a standardisation organisation to grant licences on FRAND terms cannot only abuse its market power by refusing to conclude a corresponding licence agreement with an infringer willing to grant a licence and by bringing an action against it for injunctive relief, recall and removal of products from the distribution channels or for destruction of patent-infringing products. Rather, an abuse may also be present if the patent proprietor is to be blamed for not having made sufficient efforts to fulfil its special responsibility associated with the market-dominating position and to make it possible for an infringer who is in principle willing to take a licence to conclude a licence agreement on reasonable terms (FCJ, WRP 2020, 1194 marginal no. 75 et seq. - FRAND-Einwand; cf. FCJ, order of 11 December 2012 - KVR 7/12, WuW/E DE-R 3821 marginal no. 15 - Fährhafen Puttgarden II).



54    In both cases, the action is abusive because - and only because - the infringer willing to take a licence has a claim that the patent proprietor contractually allows him to use the protected technical teaching on FRAND terms. An abuse of the dominant position of a patent proprietor does not, in principle, result from contractual terms offered by the patent proprietor before or at the beginning of negotiations as such, which, if contractually agreed, could unfairly hinder or discriminate against the licensee. Rather, the abuse of market power follows - not unlike in cases of refusal to supply or refusal of access to an infrastructure facility of the market dominator - only from the refusal of a requested access to the invention per se or from unreasonable conditions for a requested access from which the patent proprietor is not prepared to deviate even at the end of negotiations (cf. FCJ, decision of 24 September 2002, KVR 15/01, BGHZ 152, 84, 94 - Fährhafen Puttgarden I), i.e. the refusal to offer the licensee seeking the conclusion of a licence agreement on FRAND terms, as a result of a negotiation process, those fair, reasonable and non-discriminatory contractual terms and conditions which the licensee can claim and on which he, for his part, is prepared to conclude with the patent proprietor.

      b)

55    It follows from the obligation to refrain from such misuse and the special responsibility of the dominant patentee that they must first point out the infringement of the patent-in-suit to the infringer if the latter is (possibly) not aware of making unlawful use of the teaching of the standard-essential patent by implementing a technical solution required by the standard (ECJ, WRP 2015, 1080, nos. 60-62 - Huawei/ZTE; FCJ, WRP 2020, 1194, no. 73 f. - FRAND-Einwand).

      c)

56    Since the FRAND commitment does not in principle change the fact that anyone who wishes to make use of the technical teaching of a patent must obtain a licence from the



patent proprietor to do so (ECJ, WRP 2015, 1080 para. 58 - Huawei/ZTE), further obligations of conduct on the part of the dominant patent proprietor can only arise if and when the user of the protected technical teaching expresses his intention to conclude a licence agreement on FRAND terms (ECJ, WRP 2015, 1080, para. 63 - Huawei/ZTE).

aa)

57   For this purpose, it is generally not sufficient if the infringer, in response to the infringement notice, merely shows willingness to consider the conclusion of a licence agreement or to enter into negotiations as to whether and under what conditions a conclusion of an agreement would be possible for him. Rather, the infringer, for its part, must clearly and unambiguously declare its willingness to conclude a licence agreement with the patent proprietor on reasonable and non-discriminatory terms, and must also subsequently participate in the licence negotiations in a targeted manner (FCJ, WRP 2020, 1194 marginal no. 83 - FRAND-Einwand).

(1)

58   Not unlike in cases of negotiated access to an infrastructure facility, only the willingness of the user of the invention to place the access to the protected technical solution, which they have already obtained on their own authority through the patent infringement, on a licensing contractual basis for the future can justify the requirement for the dominant patent proprietor to make an offer to the user in this respect, explain this offer in a manner and level of detail appropriate to the circumstances of the case, and engage in a negotiation on this offer and, if appropriate, a counter-offer by the infringer, in order to arrive at a licence agreement governing the use of the infringed and, if applicable, further patents on fair, reasonable and non-discriminatory terms. Such cooperation is the indispensable counterpart to requiring the patentee to accept infringement of the patent in suit for as long as the infringer, for his part, makes such efforts as are required and possible and reasonable in the given factual situation to conclude a licence agreement



on FRAND terms in order to be able to continue to use the patented teaching on that basis (see High Court of England and Wales [J. Birss], judgement of 5 April 2017, [2017] EWHC 711 [Pat] para 562).

(2)

59   The (mutual) willingness to grant/take a licence is not only of fundamental importance because the patent proprietor must only grant a FRAND licence to a user of the invention who is willing to do so and can only grant such a licence at all. It is also indispensable because an appropriate outcome that balances the conflicting interests of both parties can usually only be achieved as the result of a negotiation process in which these interests are articulated and discussed in order to achieve a fair and appropriate balance of interests desired by both parties. The requirements for the conduct of the patent proprietor and the conduct of the user of the invention are mutually dependent. Since the standard of review is what a reasonable party interested in the successful conclusion of the negotiations in a manner that is in the interests of both parties would do to promote this objective at a certain stage of the negotiations, the individual requirements to be met cannot be defined in general terms.

60   If one party initially fails to cooperate as required in the conclusion of a licence agreement on FRAND terms, this is generally to its detriment. Depending on the circumstances, the party may be obliged to compensate for the omissions as far as possible. This corresponds to the usual practices of persons interested in concluding a contract, who, in the event of a delayed reaction to a corresponding offer to negotiate, must normally expect that the other party is no longer interested in concluding a contract.

61   In the case of a standard-essential patent, lower requirements do not result from the fact that the patent proprietor, who has submitted a declaration of willingness to take a licence, has only limited leverage to enforce the IP right, if necessary by taking legal



action (FCJ, WRP 2020, 1194 marginal no. 64 - FRAND-Einwand) and is dependent on concluding licence agreements for the economic exploitation of his patent. On the contrary, the patent infringer may not exploit this structural disadvantage for the purpose of "patent hold-out" (cf. FCJ, WRP 2020, 1194 marginal no. 64 - FRAND-Einwand) without exposing himself to the accusation of dishonest conduct. Otherwise, the restriction of the enforceability of the patent by legal action for the purpose of avoiding an abuse of market power would lead to another distortion of the conditions of competition in that the patent infringer could obtain an unjustified advantage over those competitors who have to seek a licence in due time and therefore pay the appropriate remuneration for the use of standard-essential patents.

(3)

62    If the user who has been made aware of the infringement has failed over a longer period of time to express its interest in a licence agreement on FRAND terms, the user must therefore be expected to make additional efforts to help ensure that, notwithstanding this failure, a corresponding licence agreement can be concluded as soon as possible.

bb)

63    Contrary to the defendant's view, these requirements regarding the patent infringer's willingness to take a licence are in line with Article 102 TFEU and its interpretation in the case law of the Union Court of Justice (WRP 2015, 1080 marginal no. 71 - Huawei/ZTE); they also do not require resubmission.

(1)

64    As the Court of Justice has held, the patent proprietor who has made a FRAND declaration does not in principle abuse its dominant position by bringing an action for an injunction or for the recall of infringing products if, before bringing the action, it has given the infringement notice required, has made a specific offer to the infringer - after



the latter has in turn expressed his intention to conclude a licence agreement on FRAND terms, has made a specific offer of a licence on FRAND terms to the infringer, indicating in particular the licence fee and the way in which it is to be calculated, and the infringer, although continuing to use the protected technical teaching, does not respond to that offer with diligence, in accordance with accepted commercial practices and in good faith, which in particular prohibits him from using delaying tactics in his response (ECJ, WRP 2015, 1080 para. 71 - Huawei/ZTE). Furthermore, the Court of Justice has considered the infringer to be obliged to ensure the realisability of the patent proprietor's claims under the licence agreement to be concluded by providing adequate security from the time when the patent proprietor has rejected a counter-offer made by him (ECJ, WRP 2015, 1080 para. 67Huawei/ZTE).

(2)

65    The Court of Justice of the European Union thus emphasises the mutual obligation to engage in constructive exchanges aimed at achieving a fair balance of the interests involved (ECJ, WRP 2015, 1080, para. 55 - Huawei/ZTE; cf. BGHZ 152, 84, 97 - Fährhafen Puttgarden I). Due account must be taken of the particular legal and factual circumstances of the specific case (ECJ, WRP 2015, 1080 marginal no. 56 Huawei/ZTE). This means that compliance with the "negotiation programme" outlined by the EU Court is regularly sufficient to exclude a breach of the prohibition of abuse and thus the plea of bringing an abusive action. Accordingly, the Court's answer to the questions referred for a preliminary ruling negatively defines the requirements for denying an abuse of market power. However, since the affirmation or denial of an abuse always requires a consideration of all circumstances of the case and a weighing of the mutual interests, special circumstances may also justify stricter or less strict duties of conduct (cf. High Court of England and Wales [J. Birss], Judgement of 5 April 2017, [2017] EWHC 711 [Pat] para 744; UK Supreme Court [Lords Reed, Hodge, Lady Black, Lords Briggs, Sales], Judgement of 26 August 2020, [2020] UKSC 37 para 152 et seq; Gerechtshof Den Haag,



GRUR Int. 2020, 174, 176 para 4.14). In this respect, the examination of a FRAND-Einwand is no different from other cases of abuse of a dominant position.

(3)

66    Without success, the defendants argue that the fact that the EU Court of Justice requires a concrete written licence offer by the patent proprietor after the infringer has expressed its will to conclude a licence agreement on FRAND terms (WRP 2015, 1080, para. 71 - Huawei/ZTE, emphasis by the Senate) precludes an understanding of the obligation to declare willingness to take a licence as a kind of permanent condition or continuing act. This loses sight of the fact that the abuse of market power in cases of the kind at hand results from the dominant undertaking's refusal to fulfil the claim of an undertaking from the opposite side of the market for lawful access to the invention and to grant a licence on FRAND terms for this purpose (ECJ, WRP 2015, 1080 para. 53 - Huawei/ZTE). It is the abusive character of this refusal that can be held against the actionable claim under the patent (ECJ, WRP 2015, 1080 para. 54 - Huawei/ZTE). An abusive refusal by the dominant patent proprietor necessarily presupposes a continuing demand by the infringer for the conclusion of a contract on FRAND terms and its willingness to cooperate in the conclusion of such a contract, without which a "refusal" by the patent proprietor would be futile.

67    For this willingness to take a licence, it is not sufficient that a serious and final refusal of the patent infringer to conclude a use agreement on FRAND terms cannot be established. This ignores the principle, also emphasised by the European Court of Justice, that the party wishing to make use of the technical teaching must obtain a licence to do so (ECJ, WRP 2015, 1080, para. 58 - Huawei/ZTE). However, the patent infringer has already obtained access to the use of the invention, for which it owes an appropriate fee, on his own authority and thus - at least initially - free of charge, so that delaying the resolution of the conflict of interest by concluding a contract obliging him to pay consideration, unlike in the case of claims for supply or access to an infrastructure facility, does not



favour the market dominator but the market opponent. The "delaying tactic", which the infringer may not engage in and which, as the European Court of Justice has expressly stated (WRP 2015, 1080, para. 71 - Huawei/ZTE), excludes an abuse of the dominant position, therefore typically consists precisely in not simply rejecting a licence agreement on FRAND terms, but in ostensibly seeking it, but pushing back the finding of an appropriate solution in detail or at least postponing it as long as possible.

(4)

68   Contrary to the defendant's view, the declaration of willingness to take a licence is thus not a "mere gateway" for the start of the actual negotiations, even according to the case law of the European Court of Justice. Rather, the continued willingness to take a licence is an indispensable prerequisite for successful licensing negotiations and thus also for the accusation of abuse of market power against the patent proprietor in the event of their failure. This is also clear from the context of the Huawei/ZTE decision. The guidelines formulated by the Union Court are based on a proposal by Advocate General Wathelet. This was based on the assumption that an abuse can only be considered against a patent infringer who is objectively ready, willing and able to enter into a FRAND licence agreement (see Opinion of Advocate General Wathelet of 2 - C-170/13, juris paras. 74-75, 80). The Advocate General did not consider a mere willingness to negotiate, which was considered sufficient by ZTE following a press release of the European Commission of 21 December 2012 (IP/12/1448), nor did he necessarily require an unconditional offer to conclude a licence agreement within the meaning of the Senate's Orange-Book decision (Judgement of 6 May 2009 - KZR 39/06, juris para. KZR 39/06, BGHZ 180, 312 marginal no. 29) (see Opinion of Advocate General Wathelet of 20 November 2014 - C-170/13, juris fn. 19). Incidentally, this is also in line with the Commission's view in a decision preceding the decision of the Court of Justice of the Union, in which the Commission expresses that the patent proprietor may seek and enforce an injunction against a potential licensee if the latter is unwilling to enter into a FRAND agreement (decision of 29 April 2014, COM[2014]2892 final, para. 427 [c]). Such an objective willingness to conclude a



FRAND licence agreement is regularly demonstrated, according to the business practices recognised in all areas of economic life and also emphasised by the European Court of Justice as decisive, by the active promotion of negotiations oriented towards the common goal of a successful conclusion. The negotiation steps of parties interested in concluding a contract build on each other. A duty to promote therefore always exists if and insofar as the next negotiation step is to be expected according to business practice and the principles of good faith (cf. on section 203 BGB in case of "falling asleep" of the negotiations: FCJ, judgement of 8 November 2016 - VI ZR 594/15, NJW 2017, 949 marginal no. 16 mwN).

cc)

69    A willingness to take a licence understood in this way is not dispensable, but retains its meaning even if the patent proprietor has submitted a licence offer to the infringer (cf. Kühnen, Hdb. Patentverletzung, 13th ed., chap. E marginal no. 394 et seqq.; Landgericht Düsseldorf, order - 4c O 17/19, juris marginal no. 37).

(1)

70    The offer by which the patent proprietor fulfils its special responsibility as a market dominator to make it possible for the user of the invention to conclude a licence agreement on FRAND terms is not the end point but the starting point of the licence negotiations. At least in a complex situation, as is typically the case in the licensing of standard-essential patents, it is regularly not obvious which contractual terms in the specific case (cf. Gerechtshof Den Haag, GRUR Int. 2020, 174, 179 para. 4.34) meet the requirements of an appropriate balance of interests and at the same time do not violate the prohibition of discrimination under antitrust law. Moreover, as a rule there is not one licence agreement that satisfies FRAND conditions, but a range of possible reasonable solutions (cf. High Court of England and Wales [J. Birss], Judgement of 23 October 2018, [2018] EWCA Civ 2344, GRUR Int. 2019, 357 para. 121; OLG Karlsruhe, GRUR 2020, 166 para.



95; cf. on Section 19 (4) no. 4 GWB aF BGHZ 152, 84, 96 - Fährhafen Puttgarden I). As a rule, the patentee can only take into account any legitimate interests of the user once it is aware of them.

71  It is therefore precisely the purpose of the negotiations to produce a fair and reasonable final result and, to this end, to articulate the interests of both parties and to put forward for discussion factual and legal aspects which, from the point of view of at least one party to the negotiations, may be relevant to this result (cf. Communication from the European Commission of 29 November 2017 on the EU's handling of standard-essential patents, COM[2017] 712 final, p. 7). It is therefore incumbent on the user of the invention to check the patent proprietor's offer to see whether its content requires further information from the patent proprietor and whether and, if so, to what extent the structure of the offer or individual provisions thereof, in particular the IP rights to be covered by the agreement and the amount and method of calculating the licence fee, (possibly) do not comply with FRAND conditions from his point of view. If necessary, the user is obliged to make a counteroffer; however, when this is the case also depends on the individual case and is also governed in this respect by customary and recognised business practices and the principles of good faith. In particular, in the case of a licence offer by the patent proprietor which obviously does not comply with FRAND conditions and which, when assessed objectively, is not meant seriously and thus appears as a refusal to conclude a licence agreement on FRAND conditions (see BGHZ 152, 84, 92 - Fährhafen Puttgarden I), it may suffice as a reaction of a user of the invention who seriously seeks a licence to explain why the offer obviously does not comply with FRAND conditions. The decisive factor is which reaction the user of the invention may assume can properly promote the conclusion of a licence agreement on FRAND terms - provided that the patent proprietor is willing to do so.



(2)

72    If the patent proprietor has made a (at least essentially complete) contractual offer to the
      user of the invention despite the latter's unwillingness to take a licence the invention,
      the user must therefore deal with this offer in such a way that it becomes apparent that
      the user is now pursuing the goal of reaching a mutually equitable result as soon as
      possible. For this purpose, it is not important whether and to what extent the content of
      the patent proprietor's contractual offer already complies in every respect with the
      requirements of the contract to be concluded for fair, reasonable and non-discriminatory
      conditions of use of the contractual property rights.

      (a)

73    If the patent proprietor were obliged to always immediately submit an offer that
      anticipates the appropriate and mutually beneficial outcome of licensing negotiations,
      there would be no need for negotiations and no counter-offer from the user who does not
      want to accept the patent proprietor's offer.

      (b)

74    Even more important is the consideration that the content of a complex licence
      agreement cannot be reviewed, either outside of court proceedings or in court
      proceedings, in the abstract, as it were, to determine whether all contractual terms and
      conditions meet the requirements for a fair, reasonable and non-discriminatory
      structuring of the use of the contractual property rights. Rather, this can regularly only
      be assessed if the party that does not want to accept a contractual term proposed by the
      other party, or at least does not want to accept it without further ado, asserts those
      aspects that, from the point of view of this party, speak against the appropriateness of
      the contractual term or make this appropriateness appear at least doubtful, and if the
      other party then either takes these concerns into account by amending or
      supplementing its proposal or explains why, from its point of view, the concerns do not



prevail (cf. BGHZ 152, 84, 97 - Fährhafen Puttgarden I). It is obvious that arguments and counter-arguments are determined by the conflicting interests of the parties, one of which wants to obtain the highest possible remuneration for the use of the contractual rights and the other wants to pay the lowest possible remuneration for this. Precisely for this reason, however, a negotiation process is required, at the end of which an appropriate balance of interests is sought by both sides. Even if the parties' efforts to find an amicable solution ultimately fail, they can, since they provide indications as to which interests are to be taken into account in detail and how they are to be weighted, form the basis of a court decision, if necessary, as to the extent to which the conflicting views expressed on the individual points in dispute are compatible with the requirement of licensing on FRAND terms (see BGHZ 152, 84, 97 - Fährhafen Puttgarden I).

(c)

75    Since regularly only the efforts of both parties to find a fair balance of interests can lead to a contract with FRAND conditions, especially in cases in which - at least until then - there is no willingness to take a licence on the part of the patent proprietor, the will and the declared willingness of the infringer to reach and contribute to a fair and reasonable conflict resolution are not dispensable. The consideration that the patent proprietor is "not in need of protection" because it is readily possible for him to submit a FRAND-compliant licence offer, which only - if it is indeed fair, reasonable and non-discriminatory - triggers further obligations of conduct on the part of the infringer (according to Kühnen, Hdb. Patentverletzung, chap. E marginal no. 396), already fails because of this dependence of the FRAND-compliance of a certain contract content on the outcome of the negotiation process.

76    Moreover, it again fails to recognise that even an offer that does not comply with FRAND conditions does not in itself constitute an abuse of the patent proprietor's dominant position, which rather lies in refusing or making it impossible for the infringer to negotiate and conclude a FRAND licence agreement that is in line with the interests



articulated in the negotiation process (and instead to enforce the patent or one of the patents to be licensed by taking legal action).

dd)

77    These requirements are also in line with Union law, as interpreted by the Court of Justice in Huawei v ZTE, and do not require resubmission. Accordingly, it is incumbent on the infringer to respond to the patent proprietor's offer with diligence, in accordance with accepted commercial practices in the field and in good faith, which must be determined on the basis of objective factors and implies, inter alia, that delaying tactics are not being pursued (ECJ, WRP 2015, 1080, para. 65 - Huawei/ZTE). The assessment of whether a delaying tactic is being pursued, which is to be made on the basis of objective aspects, is thus also to be made on the basis of the infringer's reaction to the offer, and is thus not limited to the declaration of the wish to license. This is also appropriate. The declaration of a wish to license or of a willingness to negotiate does not say anything about whether this declaration is meant seriously. Rather, it may also be the result of a delaying tactic by the patent user (see Federal Court of Justice, WRP 2020, 1194 marginal no. 82 - FRAND-Einwand), which may not be accepted in order to protect the patent proprietor and the competition between the patent users. Therefore, according to the case law of the European Court of Justice, the further conduct of the infringer must also be taken into account. Accordingly, delaying tactics can be considered in particular - but not exclusively - if the patent user does not react to the patent proprietor's explanations within a reasonable period of time, in particular if the user rejects the patent proprietor's offer but nevertheless fails (although this can be expected according to the concrete circumstances of the individual case in accordance with customary practice and the requirements of good faith, cf. para. 71) to make a concrete counter-offer in writing within a short period of time that complies with FRAND conditions. This is the reason why - as the EU Court of Justice has expressly stated - the infringer cannot rely in this case on the abusive nature of an action for an injunction or a recall (ECJ, WRP 2015, 1080 para. 66 - Huawei/ZTE) and that the same applies if the infringer continues to use the patent



despite the rejection of its counter-offer, but fails to provide adequate security in accordance with accepted practice in the relevant field (ECJ, WRP 2015, 1080, para. 67 - Huawei/ZTE).

78    In which further circumstances not mentioned by the European Court of Justice a lack of willingness to take a licence on the part of the patent infringer exists is a question of the individual case, the assessment of which is incumbent on the national courts (see ECJ, Judgement of 20 May 2010 - C -160/09, [2010] ECR I-4591, para. 24 - Ioannis Katsivardas/Nikolaos Tsitsikas; ECJ, WRP 2015, 1080 para. 70 - Huawei/ZTE; Opinion of Advocate General Wathelet of 20 November 2014 C-170/13, juris para. 76; UK Supreme Court, Judgement of 26 August 2020, [2020] UKSC 37 para. 157) and is in principle the task of the trial judge.

ee)

79    Whether the patent proprietor's action for injunction, recall or destruction is abusive according to these standards may have to be assessed differently for different points in time.

(1)

80    Whether the filing of an action constitutes an abuse of the dominant position of the patent proprietor because it serves to enforce a refusal to grant a licence against an undertaking willing to grant a licence is to be assessed according to the actual circumstances at the time the action is filed. If the infringer's willingness to take a licence is already lacking at this point in time, the concrete conditions offered by the patent proprietor for a licence agreement at this point in time are irrelevant.



(2)

81    If the filing of the action is not abusive, the further prosecution of the claims and thus also the defence of a first instance judgement already obtained - as in the case in dispute - against the infringer's appeal may nevertheless be abusive.

82    The claim of the user of the technical teaching of the invention against the dominant patent proprietor for licensing on FRAND terms remains - up to the limit of forfeiture - even if the user does not initially assert it because he is not prepared to conclude a licence agreement on FRAND terms. He can therefore in principle also assert it subsequently.

83    This does not necessarily mean, however, that the infringer can also plead this licensing claim against the injunctive relief already asserted by way of action or already granted in the first instance. Rather, it is decisive whether the patent proprietor is acting abusively with regard to the subsequently declared willingness to take a licence by pursuing the claims in suit. This requires careful examination in each individual case. The longer the infringer initially waited before asserting his licensing claim, the higher the demands on his cooperation in bringing about a licence agreement on FRAND terms, as explained above (para. 60).

d)

84    Accordingly, the Court of Appeal did not err in law in assuming that the plaintiff was not charged with abuse of its dominant position because it had not sufficiently informed the defendants about the infringement of the patent in suit and its willingness to take a licence it on FRAND terms. As the Senate explained in more detail in its judgement of 5 May 2020, the letter of 20 December 2012 and two further letters from 2013 satisfied the requirements to be met by an infringement notice (FCJ, WRP 2020, 1194 marginal no. 86 et seq. - FRAND-Einwand).



e)

85    On the other hand, the Court of Appeal's assumption that the plaintiff abused its dominant position because it did not offer the defendants or their parent companies (hereinafter also: Haier) a licence agreement on FRAND terms despite having previously declared its willingness to take a licence, and that the contractual terms offered to Haier were discriminatory, does not stand up to review by the Court of Appeal.

aa)

86    The findings of the Court of Appeal do not justify the assumption that Haier agreed to conclude a licence agreement on FRAND terms.

(1)

87    The Court of Appeal correctly saw that the email of 17 December 2013 (AR 41 p. 3/4), i.e. almost a year after the first infringement notice, did not meet the requirements of an infringer willing to take out a licence in terms of time. An infringer who remains silent for several months in response to the infringement notice thus regularly indicates that he is not interested in taking a licence (FCJ, WRP 2020, 1194 marginal no. 92 - FRAND-Einwand). The defendants argue unsuccessfully that the decision of the European Court of Justice does not contain any clear provisions on the time requirements for the exchange of the mutual declarations. This is because the infringer's reaction to the patent proprietor's offer must be made with the diligence required by the accepted commercial practices in the relevant field and in accordance with the requirements of good faith (ECJ, WRP 2015, 1080, para. 71 - Huawei/ZTE). Since the infringer's conduct must not be aimed at delaying the negotiations offered - and thus in particular their commencement - the same must apply to the reaction to the infringement notice - and thus the declaration of willingness to take a licence by the infringer (see Gerechtshof Den Haag, GRUR Int. 2020, 174, 176 para. 4.14).



(2)

88      The appeal successfully challenges the Court of Appeal's assumption that the declaration of 17 December 2013 nevertheless constitutes a sufficient declaration of willingness to take a licence. As the Senate already stated in its judgement of 5 May 2020 (FCJ, WRP 2020, 1194 marginal no. 94 et seq. - FRAND-Einwand), neither this statement nor the other statements of the defendant and its parent companies found by the Court of Appeal express the defendant's will and serious willingness to conclude a licence agreement. The Senate adheres to this after reconsideration.

89      The letter merely expresses the hope that formal negotiations will be entered into and asks for information about a prospective discount. However, in view of the months of silence in response to the statement of willingness to take a licence, in the case of genuine willingness to take a licence it would have been expected that Haier would now indicate that it wanted to do everything possible to promote the negotiations. This required, as explained (paras. 60, 83), additional efforts to help ensure that, notwithstanding this failure, a licence agreement could be concluded as soon as possible.

90      The rest of the letter also does not indicate Haier's intention to pursue a licensing claim and clarify fair, reasonable and non-discriminatory licensing terms. Rather, the hesitant - and thus delaying - behaviour is continued by pointing out that they will not find the time to examine the matter and make a decision before the New Year (AR 41 p. 3). In view of the upcoming turn of the year and the management's involvement with the annual reports and the plans for the new year, an initial review may not have been possible before the turn of the year. However, an initial referral was not in question. Haier had already been informed of the Applicant's willingness to take a licence, the use of the patent-in-suit and the "Wireless Patent Programme" by letters dated 20 December 2012, 22 August 2013 and 11 November 2013. In view of this, the plaintiff could not, in the required objective view, understand Haier's reference to the upcoming turn of the year and the need for examination in the sense of a serious desire to license and a willingness



to promote negotiations on the content of a licence agreement. Against the background of Haier's previous conduct, it was in particular not recognisable to the plaintiff that an examination after the turn of the year was announced for other reasons than to further delay. According to the unchallenged findings of the Court of Appeal, the defendants have also not presented objective reasons why and why it should not have been possible or reasonable for Haier to clarify the use of the portfolio patents by its mobile devices earlier.

(3)

91    Without success, the defendants argue that in the context of the other correspondence between the parties it is remote to assume that they or their parent companies were unwilling to take a licence. The fact that Haier was already a licensee of various other licence pools of the plaintiff at the time does not change the fact that the plaintiff could not, according to the objective recipient's horizon, assume that Haier was willing to conclude a licence agreement on FRAND terms justifying the use of the technical teaching of the patent-in-suit. The fact that the plaintiff's licensing programme was in the market launch phase at that time is not relevant for the understanding of Haier's statements.

92    The fact that on the same 17 December 2013 the plaintiff still replied to the email of Haier's IP Director inter alia that it could provide the latter with further information on an "early bird discount" after receiving a non-disclosure agreement (AR 41 p. 2), and that such information was subsequently exchanged, does not justify a different view. Similarly, the meeting of the parties on 17 February 2014, in which details of the licensing programme were discussed but which, according to the findings of the Court of Appeal, remained inconclusive, and the licence offer of the plaintiff of 29 August 2014 (AR-B 39) are not capable of justifying the conclusion that Haier was clearly and unambiguously prepared to conclude a licence agreement on FRAND terms. For in this respect, too, only an unspecified willingness to negotiate can be ascertained which, in view of the previous



history, from the plaintiff's point of view appeared to be an expression of delaying tactics on Haier's part. In the cover letter to the offer of 29 August 2014 (AR 50), the plaintiff complains that no substantial progress has been made since February of this year, and according to the findings of the Court of Appeal, the plaintiff's offer was rejected by Haier as early as 1 September 2014 without a counteroffer.

(4)

93    The Court of Appeal only examined the further letters of the IP director of the defendant's parent companies from the point of view of whether they gave reason to assume that the original willingness to take a licence had in the meantime lapsed again. The letter of 16 January 2016 (AR 51 p. 8 f.) does not show a clear declaration of willingness to conclude a licence agreement on reasonable and non-discriminatory terms.

(a)

94    As the Court of Appeal correctly pointed out, this already follows from the fact that it included the statement that Haier would be prepared to take a FRAND licence and pay royalties if German courts finally found infringement and validity of the patent-in-suit and the further European patent 852 885 asserted in the dispute decided by the Senate's judgement of 5 May 2020.

95    Such a conditional declaration of willingness to take a licence is insufficient (BGHZ 180, 312 marginal no. 32 - Orange-Book-Standard; FCJ, WRP 2020, 1194 marginal no. 96 FRAND-Einwand). Contrary to the defendant's view, there is also no need for further clarification by the EU Court of Justice in this respect. The Court of Justice has made it clear that the patent infringer remains free to challenge the validity of the patents to be licensed or to challenge or reserve the right to challenge their use, in addition to negotiating the grant of licences (ECJ, WRP 2015, 1080 para. 69 - Huawei/ZTE). However, this does not change the fact that the user of a patent, if he is not its proprietor, must in principle obtain a licence before any use (ECJ, WRP 2015, 1080 marginal no. 59 -



Huawei/ZTE), and acts at his own risk if he believes that he can waive this due to lack of validity or lack of infringement. A conditional willingness to take a licence cannot lead to an unconditional conclusion of a contract; however, the patent proprietor is only obliged to do so. This does not necessarily preclude the patent infringer from reserving the right in the licence agreement to challenge the use of the licence (see also Opinion of Advocate General Wathelet of 20 November 2014 - C-170/13 Opinion No. 5).

(b)

96    The lack of willingness to take a licence is also shown by the fact that the letter of 16 January 2016 contains the request that the plaintiff specify in more detail how all patents in its portfolio are infringed. In light of the fact that the plaintiff had already named the patents belonging to the "Wireless Patent Portfolio" to Haier in a letter of 20 December 2012, that Haier thus had more than three years to review the question of infringement and the use of the portfolio, and that the review had been announced, inter alia, in a letter of 17 December 2013, this justifies the conclusion, based on an overall assessment of all the circumstances, that Haier - and thus the defendants - continued not to be interested in reaching an agreement with the plaintiff.

97    It is true that if the patent proprietor does not want to license a single patent but a portfolio, he must provide the infringer with sufficient information on the patents belonging to the portfolio. However, this obligation does not go beyond what the owner of a portfolio of standard-essential patents must reasonably present in contractual negotiations on a portfolio licence, if a licence is sought from him with which a company wants to put the use of those IP rights it needs for the implementation of a standard on a secure legal basis. Similar to the infringement notice, it is sufficient to set out the nature of the respective standard-relevant functions and their implementation. Detailed technical or legal explanations of the individual patents are not required; the user of the invention only needs to be enabled - if necessary with expert assistance - to get an idea of the significance and scope of the patent portfolio in relation to the standard. Further



explanations are not required for this purpose because the patent proprietor does not have to assume, at least without concrete indications to this effect, that the licensee intends to impose restrictions on the future use of the functionalities covered and made possible by the standard. In the event of ambiguities in this respect or in other respects, honest negotiating partners can be expected to enter into a discussion (see FCJ, WRP 2020, 1194 marginal no. 98 - FRAND-Einwand).

98   Insofar as the parties unanimously stated in the oral proceedings before the Higher Regional Court on 17 November 2016 that it is customary in the industry for the patent proprietor to submit a list of the 10 to 15 most important IP rights ("Proud List") at the beginning of the negotiations, this does not change the obligation of the company willing to take a licence to form its own picture of the standard essentiality of the IP rights in the portfolio and of the extent to which it is dependent on the use of the portfolio for the lawful production of standard-compatible products. The fact that the submission of a "Proud List" is not mandatory already follows from the fact that it typically covers only a small fraction of the patents and therefore does not enable the infringer to conduct a comprehensive examination of the portfolio.

99   The plaintiff had already fulfilled its obligation with a letter dated 20 December 2012. It had enclosed a list of about 235 patents belonging to the patent portfolio. In view of Haier's announcement in the letter of 17 December 2013 that it would examine the patents, the plaintiff was entitled to assume that Haier was at least carrying out a superficial examination of the patent objects and the standard essentiality. As can be seen from plaintiff's letter of 15 February 2013 (AR 41 p. 9), this was also communicated to the plaintiff again by Haier's IP director in a telephone call on the same day. Haier informed the plaintiff by email of 19 February 2013 that the analysis was taking time because of the large number of patents ("Involved large number of patents, still analysing, thanks"). The fact that Haier later insisted on the formal position that the plaintiff was obliged to submit "claim charts" with respect to all patents, despite the plaintiff granting a sufficient period of time for examination, indicated that Haier was still less interested



in a successful conclusion of the negotiations than in further delaying them, especially in light of the fact that Haier had initially not responded to the infringement notice and the offer of a portfolio licence (FCJ, WRP 2020, 1194 para. 98 - FRAND-Einwand), especially as the plaintiff had also referred Haier by letter of 11 December 2015 (AS 9) to its internet pages with information on which technical specifications of the standards mentioned there (indicating the respective sections) were covered by the patent families of the plaintiff's portfolio.

(5)

100   Insofar as the Court of Appeal inferred from the letter of 23 March 2016 (K 51 p. 2 f.) submitted during the appeal proceedings that Haier was (still) willing to take a licence, this does not follow from the content of the letter. Although the letter states that Haier is willing to take out a FRAND licence, it also points out that Haier's own position *remains unchanged* ("*To make a long story short, we wish to express that our position remains unchanged, namely that we are willing to conclude a FRAND licence and we are of the opinion that our offer is FRAND*"; Annex AR 51 p. 3). 3). From the plaintiff's objective point of view, this could only be understood as meaning that the inadmissible condition expressed in the letter of 16 January 2016 was to remain.

101   Contrary to the Respondent's view, this understanding does not contradict the explanatory content of the letter in its entirety. In response to a letter from the plaintiff dated 17 March 2016 (AR 51 p. 3 f.), Haier asks the plaintiff not to constantly repeat the accusation of delaying negotiations; the information provided by the plaintiff with regard to the portfolio patents not asserted in the action was not sufficient. If the plaintiff provided claim charts showing at least that these patents could be standard essential, they could be taken into account in Haier's counter-offer. Furthermore, Haier points out that the plaintiff never explained the calculation of its proposed fee. While it is true that the letter does not expressly address the body of law and patent infringement. However, there is also no reason to assume that Haier no longer adheres to the clear statement in



the letter of 16 January 2016; this applies all the more as Haier had pointed out shortly before in a letter of 7 March 2016 that the question of infringement and the validity of the patent in suit had not yet been confirmed (AR 51 p. 4 ff.). Rather, the plaintiff had to infer from this that it would also receive additional information on the other patents in the portfolio, which Haier had in any case not justified with a lack of information, but only with an alleged obligation of the plaintiff according to the principles of the Huawei/ZTE judgement, would not help in the absence of a legally established infringement and legal validity, and Haier was not interested in the conclusion of a licence agreement, but only in bringing down the injunctive relief awarded by the District Court with alleged failures of a dominant company to offer a FRAND licence.

(6)

102   Nor did the intention to conclude a licence agreement on FRAND terms emerge from previous licence agreement offers made by the first defendant on 13 October 2014 (G 4) and by both defendants on 12 August 2015 (G 19, a few weeks before the date of the oral hearing before the District Court on 29 September 2015) and on 21 September 2015. It is not necessary to decide whether these offers in themselves met FRAND criteria. Because the will to seriously deal with the offers of the plaintiff, in particular its demand for a portfolio licence, cannot be inferred from these offers. The subject matter of the licence should only be the patent families to which the patent-in-suit and the patent-in-suit in the parallel proceedings belong. In view of the fact that Haier had had time to examine the plaintiff's "wireless standard" since receipt of the plaintiff's letter of 20 December 2012 and had announced such an examination, inter alia, in its letter of 17 December 2013, the plaintiff was entitled to request a portfolio licence. December 2013, the plaintiff could at least expect the defendants to provide substantiated factual reasons why they believed they were entitled to the selective licensing of the very two patents-in-suit from which they were threatened with condemnation by the district court, and to deny that worldwide portfolio licence at which the plaintiff's efforts since December 2012 were aimed. Instead, as can be seen from the letter of 21 September 2015 (G 15), the defendants



continued to take the formal position that the plaintiff could not demand licensing of the entire, apparently arbitrarily compiled patent portfolio "Wireless Licensing Program" without first explaining for each patent how and why it should be infringed.

103    Even if one were to regard the contractual offers as a declaration of willingness to take a licence, it would also have to be taken into account that Haier declared its willingness to take a licence only subject to a condition in its letter of 16 January 2016, so that any willingness to take a licence that had been expressed in the meantime would no longer have existed. Against this background, it is also irrelevant that a large number of further emails were exchanged between the parties in the period from November 2015 to April 2016 alone. For these predominantly deal with Haier's or the defendant's demands for further specification of the patent infringement by the portfolio patents and the calculation of the licence fee by the plaintiff. For the reasons explained, it cannot be inferred from this correspondence that Haier was seriously willing to take a licence.

bb)

104    An abuse of the plaintiff's dominant position by pursuing the claims also does not arise with regard to the licence (counter)offer (G 46), which the defendants submitted through their legal representatives on 20 January 2017 - and thus four weeks before the conclusion of the oral hearing in the appeal proceedings on 16 February 2017.

(1)

105    According to the findings of the Court of Appeal, with this contractual offer, which they linked to a security deposit totalling €15,000, the defendants responded to a group and worldwide licence offer submitted by the plaintiff to Haier by letter of 20 December 2016 (AR 63), which was preceded by an earlier offer of 9 December 2015 (AR 51 p. 14 f.), which Haier had rejected. The Court of Appeal assumed that with the counter-offer of 20 January 2017 the defendants had confirmed their willingness to take a licence. It left



unanswered whether the offer contained FRAND conditions; this was irrelevant as the plaintiff's offer had been discriminatory.

(2)

106    This does not stand up to review by the court of appeal. Even if, as the Court of Appeal assumed, the plaintiff's offer treated Haier worse than another licensee of the plaintiff, in particular with regard to the amount and the calculation of the licence fees, without any objective justification, this did not yet result in an abuse of its dominant position.

(a)

107    Since neither the defendant's parent companies nor the defendant itself had by then expressed their willingness and shown the unconditional will to conclude a licence agreement with the plaintiff on FRAND terms, the plaintiff did not abuse its dominant position either by bringing the action or by defending the district court's judgement against the defendant's appeal. The licence conditions offered by it at that time are irrelevant for this, as explained (para. 56). A fortiori, the content of later contractual offers is irrelevant in this respect.

(b)

108    However, the established facts also do not support the assumption that, after the defendant's offer of 20 January 2017 submitted shortly before the end of the oral proceedings at second instance, the further pursuit of the claims for injunctive relief, destruction and recall awarded by the Regional Court proved to be abusive.

109    Even with this contractual offer and the statements on this in the pleading of the same date and subsequent pleadings, the defendants did not express a serious willingness to take a licence. Against the background of a lack of willingness to conclude a licence agreement on FRAND terms, which had been shown for several years and also after the



conviction on the basis of the patent in suit by the District Court, it would have been necessary, as explained (paras. 60, 83), to make increased efforts to contribute to the achievement of an appropriate solution in good faith. Neither the contractual offer nor its explanation do justice to this.

(aa)

110    The defendant's contractual offer - formulated independently of the text last proposed by the plaintiff - does not provide for the defendant's parent companies or the Haier Group as licensees, but only the defendants themselves. According to Art. 4.2, royalties are only payable for products (manufactured or) marketed by the licensees in states where a licensed patent has been granted. Patent families designated as NKO-02 to NKO-45 are listed as licence protection rights. The royalty shall be calculated according to the formula R = A . B . C where A corresponds to a royalty rate of 0.012% for each patent family, B corresponds to the number of patent families and C corresponds to the net selling price of a licensed product, taking into account only patent families essential to the performance of the "wireless standards" defined in Art. 1.21. Art. 4.4 states "by way of clarification" that the licensees (only) *consider* patent families NKO-2, 3 (comprising the patent-in-suit of the proceedings KZR 36/17), 5 and 30 (comprising the patent-in-suit of the present proceedings) to *be* likely to *be* essential in this sense ("*consider ... being likely to be essential*" [sic!]).

111    In their submission of 20 January 2017, the defendants essentially stated the following reasons:

112    The court of appeal's view that there were no objections in principle to a group-wide and worldwide portfolio piece licence was to be contradicted. Since the plaintiff did not offer a group-wide licence, but rather belonged to a group whose companies marketed various licence programmes, it could not expect licensing by the Haier group. The customary



nature of group-wide licensing was disputed; in any case, the plaintiff could not rely on such a practice.

113     Although the plaintiff had not submitted patent specifications and standard documents relating to the submitted "Proud List", they - the defendants - had argued that the plaintiff's portfolio contained 33 standard-essential patent families. "Claim charts had only been submitted for the 13 patent families of the plaintiff's Proud List (NKO-2, 3, 5, 11, 12, 16, 18, 19, 30, 32, 35, 36 and 44). Of these, patent families NKO-3 and 30 (with the patent-in-suit) had been classified as potentially standard-essential in view of the Court of Appeal's observations, with arguments for a lack of standard essentiality in each case. The examination of a further eleven patent families had shown that only the families NKO-2 and 5 were possibly also standard essential; this is explained in more detail. A "Humble List" submitted by them - the defendants - also showed that the other patent families NKO-6, 8, 10, 13 and 26 were not standard essential.

114     The defendants elaborated on this argument in written submissions dated 8 February 2017 and 9 February 2017.

        (bb)

115     This reaction and the reasons given for it do not, as the Senate can judge for itself according to the established content of the contractual offer and in view of the lack of assessment by the Court of Appeal, in any way represent a dispute with the plaintiff's offer or an offer of its own, which an infringer willing to take a licence could assume would thereby make a contribution to bringing about a licence agreement on FRAND terms appropriate to the situation and the time of submission.

        i.

116     It is already sufficient for this that, notwithstanding the fact that the discussions had been held with the Haier group since December 2013 at the latest and that the plaintiff



was seeking a worldwide licensing of its patent portfolio, only the defendants were to be licensees. The listing of American, Chinese, Japanese and other non-European patents in the patent families therefore only had significance for the remote case that the defendant European sales companies of the Haier group supplied to these countries.

117    From the objective point of view of a negotiating partner interested in concluding a contract, the plaintiff was also entitled to expect that the defendants at least gave factual reasons why they thought such selective licensing was in their interests. There is nothing established or discernible that the defendants could have a legitimate interest in a licence agreement that not only - which in the given factual situation is already remote - instead of a worldwide regulation for the Haier Group, which the plaintiff had been seeking in vain since December 2012, only covered the European distribution activity, but did not even include Haier as the manufacturer of the products merely distributed by the defendants, which was in any case jointly responsible for the delivery of the challenged products to the European Union.

118    It can be left unanswered whether the defendants, as distributors alongside Haier, were entitled to their own licensing claim at all. In view of Haier's unwillingness to take a licence, they could in any case not reasonably claim a licence limited to their own activities, which for the plaintiff would be associated with the not remote danger of Haier circumventing its own distribution companies and possibly the necessity of costly enforcement of its property rights "patent by patent and land by land" (cf. UK Supreme Court [Lords Reed, Hodge, Lady Black, Lords Briggs, Sales], Judgement of 26 August 2020, [2020] UKSC 37 para. 166) and thus not only largely failed to achieve the worldwide portfolio licence sought by the plaintiff, but did not even reliably protect the plaintiff from further infringements of the patent-in-suit by Haier.

119    The defendants could also not nevertheless assume that with the proposed contractual arrangement they were making the contribution required in view of the unwillingness to take a licence at that time to bring about a licence agreement on FRAND terms, which



the plaintiff would either have had to accept immediately as offered or which could have served as the basis for conclusive negotiations promising success in the short term.

120   This is already clear from the fact that the defendants merely invoked the fact that the plaintiff does not actively license group-wide and that the customary nature of group-wide licensing is disputed as justification for the selective licensing sought.

121   From the defendant's point of view, there was all the more reason to state reasons as the plaintiff had already rejected a licence offer made by both defendants in a letter of 24 August 2015 (G 21), i.e. almost one and a half years earlier (also a few weeks before the oral proceedings before the Regional Court), referring to the use of the patent in suit by the entire Haier group, inter alia because the offer did not include the entire Haier group.among other reasons, because the offer did not cover the entire Haier group, and according to the defendants' legal representatives in the appeal (written statement of 3 December 2015, p. 7, AS 398), they had recommended to the parent group in this context that it should also sign the licence agreement offer.

122   In contrast, the fact that the plaintiff did not offer the defendants any other portfolios or portfolios of affiliated companies, but which the defendants had not even asked for, obviously could not plausibly make the return to the demand for selective licensing of the defendants.

123   The denial of the customary nature of a group licence cannot be regarded as a constructive contribution of a bona fide negotiating party to the licence agreement negotiations either, against the background that the Haier Group had already concluded group licence agreements with the plaintiff (AR 77, 78; BU 9), as the defendants have referred to themselves.



ii.

124   That the defendants have not expressed their willingness to compensate for the previous lack of willingness to take a licence with the licence offer is also apparent from the proposed royalty provision. Of the patent families included in the offer text, the latter only recognises four as "probably" standard-essential and thus relevant for the assessment of the royalty, whereby it must be assumed in favour of the defendants that they do not reserve the right to doubt the applicability of the royalty provision with regard to these patent families in the contractual offer.

125   In this respect, it is not necessary to clarify whether, as the plaintiff believes and has explained in more detail in its response to the defendant's statement of 20 January 2017, all other patent families are also essential by default. Rather, it is decisive that the purpose of the negotiation process is to clarify, using the technical and patent law expertise available to the parties or, if necessary, which IP rights and families of IP rights are objectively required to be included in the agreement or are only expedient - from the point of view of both parties - because they are essential for the use of the standard or, in any case, are one of several technical possibilities for its implementation. This is all the more significant in the field of information and telecommunication technology, the greater the number of patents involved, since in order to avoid disproportionately high transaction costs, both for the standard essentiality and for the validity of the IP rights, assessments are typically required which take appropriate account of the necessary remaining uncertainties and are therefore made by reasonable negotiating parties where the effort and costs of further clarification would otherwise be manifestly disproportionate to the expected benefits (see UK Supreme Court, Judgement of 26 August 2020, [2020] UKSC 37 para. 5).

126   It can also be left unanswered whether a contractual offer of this content, had it been made by the defendants or Haier at an early stage of the talks, could have expressed the willingness to conclude a licence agreement on FRAND terms. This was because Haier

33



had not entered into a concrete discussion with the plaintiff about the appropriate scope of a licensing of the mobile devices manufactured by Haier and the appropriate remuneration for this. In view of this, a proposal "at the last minute", which - entirely in accordance with the proposed restriction of the taking of the licence to the defendants - resolved the questions not discussed almost entirely to the plaintiff's detriment, and at most left the plaintiff the future possibility of litigating further claims on this contractual basis if necessary, could no longer express the defendants' willingness to decisively promote the conclusion of a licence agreement on FRAND terms, which was necessary at that time at short notice. Rather, the plaintiff had to understand it as an attempt by the defendants to secure themselves with their own licence agreement offer, which they could not seriously expect to be accepted, against a confirmation of the first instance conviction by the Court of Appeal in the event that the latter would assume that, due to the fulfilment of the plaintiff's obligations, Haier or the defendants were obliged to submit a counter-offer to the plaintiff.

III.

127    The Court of Appeal's decision with regard to the claims for injunction, destruction and recall is also not correct for other reasons. The enforcement of these claims is not precluded by the objection of patent ambush, as the Court of Appeal rightly assumed.

1.

128    The Court of Appeal essentially stated in support of its decision: It could be assumed in favour of the defendant that the former proprietor should have disclosed the patent in suit in the standardisation process, but deliberately failed to do so. It could also be left unanswered whether the plaintiff had to accept responsibility for this conduct and whether the plaintiff's later FRAND declaration had been able to cure the legal infringement. The legal consequence of a "patent ambush" was merely a licensing obligation on the part of the IP right holder. A user was only entitled to a licence to a



patent that had not been disclosed intentionally if, in the case of the required disclosure, an alternative to the patented teaching of the asserted patent would have found its way into the standard. This could not be established with an overwhelming probability by the court of facts.

2.

129   The defendant's cross-appeal challenges this without success.

a)

130   It can be left unanswered whether and, if so, under which further conditions it can be objected to as abuse of a dominant position or for other reasons by an infringer if a company, which in the standardisation process has not disclosed a patent application relevant for the application of the standard in violation of the rules of the standardisation organisation, enforces a patent resulting from this application or claiming its priority.

b)

131   A defence claim or a claim for a licence, as the defendants would like to claim, was directed against the company charged with the "patent ambush" and, if applicable, its universal successor in title, and thus not against the plaintiff in the case in dispute. Outside the scope of application of succession protection under Section 15 (3) Patent Act, objections against the former patentee cannot be raised against the new patentee. Section 404 of the Civil Code does not apply in the context of patent assignment. This is because the right to, in and from the patent is an absolute right which knows no debtor (see RGZ 127, 197, 205; RC Mannheim, judgement of 27 February 2009 - 7 O 94/08, juris para. 106). It is true that § 413 BGB provides for the corresponding application of § 404 BGB in the case of the transfer of other rights. However, § 404 BGB is superseded by § 15 (3) Patent Act (Palandt/Grüneberg, BGB, 79th ed., § 413 marginal no. 2). Since the plaintiff's FRAND declaration of commitment ensures that the assertion of the patent in suit does



not lead to a restriction of competition that is no longer acceptable under the legal system, the plaintiff's further obligations do not arise from its special responsibility resulting from its dominant position in the market.

c)

132    Furthermore, "patent ambush" requires in any case that the decision-making process within the standardisation body has been distorted by the withholding of relevant information (cf. European Commission, WuW 2010, 719 para. 29). If a patent application relevant to the standard has not been disclosed, there must at least be indications that the standard would have been formulated differently if the patent plaintiff had not withheld this information. The Court of Appeal did not err in law in denying such indications.

133    The cross-appeal complains unsuccessfully that the court of appeal wrongly considered the defendants to have a burden of proof in this respect. There is no reason to impose a secondary burden of proof on the plaintiff because the fact to be presented lies outside the scope of the defendants' perception. The assumption of a secondary burden of disclosure requires that the party making the allegation is unable or cannot reasonably be expected to provide more detailed information, whereas the party disputing the allegation is aware of all material facts and can reasonably be expected to provide more detailed information (FCJ, judgement of 4 December 2012 - VI ZR 378/11, DStR 2013, 702 marginal no. 16). With regard to the events relevant here, however, both parties are outsiders.

IV.

134    The defendants are also obliged to pay damages to the plaintiff pursuant to Section 139 (2) Patent Act and must provide the plaintiff with the necessary information, which includes the accounting awarded by the District Court, so that the plaintiff can quantify its claim for damages.



1.

135   Without error of law, the Court of Appeal affirmed the fault in the form of negligence
required for the claim for damages also for the period before the plaintiff's first
infringement notice was received. As the Senate explained in more detail in its
judgement of 5 May 2020 between the parties (KZR 36/17, WRP 2020, 1194, marginal no.
109 - FRAND-Einwand), the obligation of the proprietor of a standard-essential patent to
point out the infringement does not change the fact that it is, in principle, the infringer's
responsibility to ensure, before commencing the manufacture or sale of a technical
product, that it does not infringe the intellectual property rights of third parties.

2.

136   The limitation of the amount of the plaintiff's claim for damages to that which would
result according to the standard of a licence analogy, as assumed by the Court of Appeal,
could only be considered if the defendants could counter the plaintiff's claim for
damages with their own claim for damages based on the non-fulfilment of a claim for
the conclusion of a licence agreement on reasonable and non-discriminatory terms.
Since such a claim can only arise if the infringer demands the conclusion of a licence
agreement on FRAND terms from the patent proprietor (initially by expressing
willingness to take a licence) and the patent proprietor fails to respond thereto in
accordance with the obligations incumbent on it due to its dominant position (FCJ, WRP
2020, 1194 marginal no. 111 - FRAND-Einwand), a limitation of the claim for damages in
the dispute is completely ruled out. The defendants have not sufficiently indicated their
willingness to conclude a contract on FRAND terms.

V.

137   There is no need to refer the matter to the European Court of Justice for clarification of
the questions formulated by the defendants in their statement of 26 October 2020. As
stated, the Senate's requirements regarding the infringer's willingness to take a licence



are in line with Article 102 TFEU and its interpretation in the case law of the Union Court of Justice (paras. 63 et seq., 77 et seq., 87). The questions raised in this context concern the balancing of interests in individual cases that is incumbent on the courts of the Member States (see only UK Supreme Court, Judgement of 26 August 2020, [2020] UKSC 37 para. 152).

[…]

# EXHIBIT C



KATHER · AUGENSTEIN
RECHTSANWÄLTE

Federal Court of Justice

KZR 36/17

Decision of 5 May 2020


Ruling

On appeal by the plaintiff, the judgment of the 15th Civil Senate of the Düsseldorf Higher Regional Court of 30 March 2017 is set aside, whilst rejecting the defendant's subsequent appeal on the point of costs, to the extent that the Court of Appeal found to the plaintiff's disadvantage and the judgment of the 4a Civil Chamber of the Düsseldorf Regional Court of 3 November 2015 is not ineffective on the basis of the parties' concurring declarations of lack of need for adjudication (injunctive relief). […]


Grounds

[…]

II.

47   The conclusion of the Court of Appeal that the conviction of the defendants to be ordered to destroy and recall infringing products would nevertheless be unsuccessful because the defendants' objection to a compulsory license under antitrust law is currently applies and the claim for damages and information is therefore only justified to a limited extent, does not pass a review according to the law of appeals.

(1)

48   The Court of Appeal essentially stated in the grounds of its decision: The plaintiff has a market-dominating position on the market within the meaning of Article 102 TFEU. A mobile telephone without GPRS access is not competitive. The judicial enforcement of the aforementioned claims is an abuse of this dominating position in accordance with the principles established by the Court of Justice of the European Union in the Huawei/ZTE case. Although the plaintiff already fulfilled its duty of to notify prior to the



trial, he did not make the defendants a FRAND offer despite its declared and continued willingness to license prior to the trial.

49   It is true that the declaration of the willingness to license was made only about one year after the plaintiff's first notice of infringement. However, this was harmless. The failure of a party to take a necessary step in due time does not entail any material preclusion; the step in question can in any case be taken before the action is filed. Nor have any circumstances subsequently arisen which would give rise to the assumption that the willingness of the defendant or its parent company to license had ceased to exist in the meantime.

50   The offers submitted by the plaintiff constitute evidence of discrimination against the defendant. The plaintiff treats the defendants with its license offers to one of its licensees, a state-owned Chinese company, unequally with regard to the amount of the license fees without a valid objective reason. In relation to the standard license agreement which the plaintiff publishes on its website, the license offers do not provide the defendants with a discount, neither for the past nor for the future. On the other hand, the third party license agreement provides for a discount compared to the standard license agreement, which leads to the fact that the defendants pay many times higher license fees for the past and for the future. The immensely high differences were not objectively justified either as quantity discounts customary in the industry or because of the influence of the Chinese authorities on the conclusion of the third license agreement. Further particularities such as the status of the third party licensee as a reference customer, the special distribution of risk in the lump sum license agreement as well as the deviating procedural situation with regard to the prospects of success in the enforcement of the patent in suit could not justify the high level of the granted discount, neither in itself nor in the required overall consideration. Nor could the plaintiff successfully rely on the fact that the defendants showed no interest in conducting a license agreement on the basis of lump-sum payments. There is not sufficient evidence that the defendants generally rejected lump-sum payments. In the absence of a FRAND offer by the plaintiff, the question of whether the defendant's counter-offers comply with FRAND conditions is not relevant.

51   On the other hand, the enforceability of the claims for rendering information and accounts as well as compensation for damages remains unaffected on the merits. However, the amount of damages to be paid is limited to that which results from the application of the license analogy. As long as the license seeker fulfils his obligations, he/she only owes damages on the basis of a FRAND license fee. Therefore, the accounts

2/20



must also include only such data which are necessary for the determination of damages under that methodology. Information on costs and profit is not required for this purpose and the claim is currently unfounded in this respect as well.

2.

52  The appeal rightly challenges the assumption of the Court of Appeal that the applicant is guilty of abuse of a market-dominating position under Article 102 TFEU.

a)

53  Without success, however, the appeal challenges the affirmation of the plaintiff's norm addressee status under Article 102 TFEU by the Court of Appeal.

aa)

54  During the term of protection of the patent, the plaintiff held a market-dominating position derived from the patent.

(1)

55  The Court of Appeal correctly held that the market-dominating position within the meaning of Article 102 TFEU is the economic power of a company which enables it to prevent effective competition being maintained on the relevant market by affording it the power to behave to an appreciable extent independently of its competitors and customers (ECJ, judgment of 14 March 2002 in Case T-149/98, ECR I-143, paragraph 1). February 1978, Case 27/76 [1978] ECR 207, paragraphs 63/66 = NJW 1978, 2439, 2440 - United Brands v Commission; judgment of 19 April 2012 - C-549/10 P, WRP 2012, paragraph 680. 38 - Tomra; FCJ, order of 16 January 2007 - KVR 12/06, BGHZ 170, 299 marginal 19 - National Geography II; judgment of 24 January 2017 - KZR 47/14, WRP 2017, 563 marginal 25 - VBL equivalent II).

(2)

56  As the Court of Appeal has not disregarded, the market-dominating position of the plaintiff does not follow from the fact that, by virtue of the exclusive right conferred on it, he/she was able to exclude any third party from using the technical teaching of the patent in suit. The mere exclusive rights to which the owner of an intellectual property right is entitled cannot in create the market-dominating position (ECJ, judgment of 6



April 1995 - C-241/91, ECR 1995, 1-743 = EuZW 1995, 339 marginal no. 46 - Magill TV Guide; FCJ, judgment of 13 July 2004 - KZR 40/02, BGHZ 160, 67, 74 - Standard bung barrel).

(3)

57    A market-dominating position generally results from the combination of several factors, each of which need not be decisive in itself (ECJ, NJW 1978, 2439, 2440 - United Brands v Commission). In this context, the definition of the relevant market is of major importance (ECJ, judgment of 26 November 1998 - C-7/97, ECR 1998, 1-7791 = WRP 1999, 167 marginal no. 32 - Oscar Bronner v Mediaprint; BGHZ 160, 67, 73- Standard bung barrel). The determination of a relevant supply market basically follows the demand market concept. According to this concept, the relevant product or service market comprises all products or services which, due to their characteristics, are particularly suitable for satisfying a constant demand and are only to a small extent interchangeable with other products or services (see ECJ, ECR 1998, 1-7791 marginal no. 33 - Oscar Bronner/Mediaprint; BGHZ 160, 67, 73 f. - Standard bung barrel). If an industrial standard (as in this case) or another set of rules (de facto standard) which is apprehended by consumers like a standard prescribes a standardised design of a product which is protected by intellectual property rights and which cannot be substituted by another product from the point of view of the opposite side of the market, the granting of rights which enable potential suppliers of this product to bring it onto the market in the first place regularly constitutes a separate market upstream of the product market (BGHZ 160, 67, 74 - Standard bung barrel; see ECJ, judgment of 29 January 1998, pp. 33 - Oscar Bronner v. Mediaprint; BGHZ 160, 67, 73 et seq. April 2004 - C-418/01, ECR 2004, 1-5039= WRP 2004, 717 para. 44 - IMS Health).

(4)

58    The assumption of such an independent license market thus first of all requires the statement that the patent is essential to the standard, i.e. that the use of the patent-protected teaching is indispensable for the implementation of a standard (standardised by a standardisation organisation or enforced on the market) (BGHZ 160, 67, 74 - Standard Bung barrel), so that it is usually technically impossible to circumvent it without losing important functions for the product market (cf. ECJ, WRP 2015, 2783 marginal 49 - Huawei/ZTE; European Commission, decision of 29 April 2014 - C (2014) 2892 marginal 52 - Motorola). Furthermore, a prerequisite for an independent license market is that the technical teaching corresponding to the patent and the standard is not substitutable by another technical design of the product (see ECJ, ECR 2004, 1-5039 marginal 28 - IMS Health; BGHZ 160, 67, 74 - Standard-Bung barrel).



KATHER · AUGENSTEIN
RECHTSANWÄLTE

(5)

59    The patent in suit is an essential standard patent. As explained (marginal 36 ff.), a mobile
station which complies with the GPRS standard necessarily makes use of the features of
claim 12 of the patent in suit. The specifications are mandatory, as the court of appeal
has found without objection by the parties. Thus, it is decisive that the use of the
technical teaching according to the patent cannot be substituted by a different technical
design of the mobile stations (see BGHZ 160, 67, 74 - Standard-Bung barrel). According to
the findings of the Court of Appeal, which were not objected to, compliance with the GPRS
standard is also mandatory for every mobile station. Switching to another technology, in
particular to the previous version of GPRS (GSM) or to the successor standards (UMTS or
LTE), is not possible because the previous version does not provide fast, competitive data
transmission and sufficient network coverage for the successor standards is not always
guaranteed. A mobile phone without GPRS is therefore not competitive, and a device
conforming to the standard is therefore not substitutable with a non-standard mobile
phone from the point of view of the counterparty.

60    According to the unobjected findings of the Court of Appeal, this also applies in particular
to the technology in question here. Mobile devices that do not allow a negotiation on the
data rate in the sense of the claim patent require a multitude of carrier services. The
available higher transmission speeds cannot be used in this way, so that mobile devices
without the standard essential and patentable technology are too slow compared to
mobile devices with this technology.

bb)

61    The Court of Appeal did not fail to recognise that, despite the access barrier provided by
the standard - and the resulting monopoly position on the licensing market relevant here
- there may be exceptional reasons which may exclude the market dominance of the
holder of a patent essential to the standard (cf. England and Wales Court of Appeal,
judgment of 23 October 2018, [2018] EWCA Civ 2344 marginal 225 f - Unwired Planet v
Huawei; Meyer in: 80 Jahre Patentgerichtsbarkeit in Düsseldorf, pp. 377, 389). However,
neither the parties' submissions nor the circumstances of the case have provided any
evidence to support this. On the other hand, the appeal is unsuccessfully arguing that the
Court of Appeal failed to recognise that a significant countervailing power of patent users
limits market power.

(1)



62   The decisive factor in determining whether a market-dominating position of the plaintiff can be affirmed is not its bargaining power vis-à-vis a particular party, but the economic power which the plaintiff's patent confers on it vis-à-vis the entire market. Contrary to the view of the appeal, the market power in the granting of patent licenses is thus not to be determined relatively, namely with regard to the strength relationship between a concrete license seeker and the patentee.

(a)

63   It is true that the structure of the demand market for patent licensing is different from that for goods and services. While in the latter case the demanders depend on a contract with the supplier with market power in order to have access to the goods and services, the patent user is able to use the patent-related teaching disclosed in the patent and in the standard even without an agreement with the patent holder. However, contrary to the plaintiff's view, it does not follow from this that market power of the owner of a standard essential patent can only exist if the risk of a legal claim against an infringer is so high that the infringer is typically willing to conclude a license agreement on conditions which are considerably less favourable than would be the case under market conditions. This is because the structurally superior power position of the patentee does not result from his negotiating power when negotiating license conditions, but rather from the legal possibility to demand that third parties do not bring or remain on the market any products conforming to the invention, to prevent this if necessary by an action for injunction, recall of the products and destruction and thus to reserve the manufacture of these products for himself (or a licensee) (cf. ECJ, WRP 2015, 1080 marginal no. 52 - Huawei/ZTE). A barrier to market access already results from the fact that these legal obstacles make it unreasonable for any company to operate on the market without prior licensing (cf. ECJ, judgment of 29 April 2004 - C-418/01, ECR 2004, 1-5039 = WRP 2004, 717 para. 28 - IMS Health).

(b)

64   Although it is obvious that the restriction of the claims of the owner of a standard essential patent resulting from the patent infringement considerably weakens his negotiating position, since he has only limited access to the means of pressure necessary for equal license negotiations. This may have an effect in particular in cases where the infringer tries to delay the conclusion of negotiations until the patent has expired ("patent hold-out" or "reverse patent hold-up", cf. Opinion of Advocate General Wathelet of 20 November 2014 - C-170/13, juris para. 42). However, this cannot fundamentally call



into question the patent proprietor's dominating position on the market, but must (only) be taken into account in the assessment of the misuse of the judicial assertion of the patent when weighing up the interests of both sides - which is always necessary. For only the assessment of the behaviour of a patent holder as an abuse legitimises the restriction of his rights and leads to a restriction of the enforceability of a patent.

(2)

65    However, the market-dominating position of the holder of a standard essential patent exists only to the extent and for as long as he can prevent, on account of his legal position, products conforming to the patent from entering or remaining on the market (ECJ, WRP 2015, 1080 marginal no. 52Huawei/ZTE). This legal position regularly is dropped after the expiry of the term of protection of the respective patent, since claims against patent infringers directed into the future are excluded. Admittedly, the expiry of the term of protection only leads to the complete loss of the claims to destruction and recall under Sec. 140a (4) Patent Act in the case of disproportionality within the meaning of Sec. 140a (1), (3) Patent Act. Otherwise, the claims are limited to such products which the infringer had been in possession or ownership until then or which had been manufactured and delivered until then (Grabinski/Zulch, in: Benkard, Patentgesetz, 11th ed., Sec. 140a Patent Act marginal no. 9, 16; Kuhnen, GRUR 2009, 288, 291). This follows from the fact that the purpose of the claims mentioned is not limited to the elimination of the consequences of a (continuing) patent infringement, but that Sec. 140a Patent Act establishes independent claims which also have a general and special preventive deterrent effect and should have a sanctioning character (Draft Act on Combating Product Piracy, BT-Drucks. 11/4792, 27 et seq.; Kühnen, GRUR 2009, 288, 292). However, once the property right has lapsed, the patent proprietor can no longer generally prevent products that are in accordance with the invention from being put on the market. Thus, the structurally superior power position of the patentee no longer applies.

cc)

66    According to Art. 102 TFEU, the dominating position must - as the Court of Appeal has not disregarded - exist in the internal market as a whole or at least in a substantial part of it (ECJ, Judgment of 9 November 1983 - Case 322/81, ECR 1984, 3461 marginal 103 - Michelin v Netherlands; Judgment of 26 November 1998 - C-7/97, WRP 1999, 167 marginal 36 - Oscar Bronner v Mediaprint).

(b)



67    However, the findings made by the Court of Appeal do not justify the assumption that the
      plaintiff abused his market-dominating position.

      aa)

68    The action of a market-dominating patent holder who undertook vis-à-vis a
      standardization organization to grant licenses on FRAND terms may constitute an abuse
      of his dominating position if and to the extent that it is suitable to prevent products
      corresponding to the standard from entering or remaining available on the market (ECJ,
      WRP 2015, 1080 marginal 54 et seq. - Huawei/ZTE; BGHZ 180.312 marginal 22 et seq. -
      Orange Book Standard). According to claims for injunctive relief (BGHZ 180, 312 marginal
      22 - Orange Book Standard), recall and removal of products from the distribution
      channels (ECJ, WRP 2015, 1080 marginal 73 - Huawei/ZTE) or destruction (OLG Düsseldorf,
      GRUR 2017, 1219 marginal 220; OLG Karlsruhe, GRUR 2020, 166 marginal 87) may be
      abusive.

      (1)

69    Even the owner of a standard essential patent, however, is not per se prohibited from
      enforcing his patent on the product market by asserting injunctive and other claims (ECJ,
      WRP 2015, 1080 marginal no. 46 - Huawei/ZTE). For the standard essentiality does not
      alter the fact that the patent proprietor only has to tolerate the use of his patent if he has
      either allowed the person who makes use of his technical teaching to do so or, in any
      event, must allow him to do so, in compliance with his obligation not to abuse his market
      power (see ECJ, WRP 2015, 1080 marginal 53, 58 - Huawei/ZTE).

      (2)

70    In turn, the obligation to license presupposes that the person who intends to use or has
      already used the patent and has already brought patentable products onto the market
      although he does not have a license is also prepared to take a license on this patent on
      reasonable and non-discriminatory terms (ECJ, WRP 2015, 1080 marginal 54 Huawei/ZTE;
      BGHZ 180,312 marginal 27 - Orange Book Standard). Even the patent holder with market
      power does not have to impose the taking of a license on anybody and has no legal means
      to do so, since although the potential licensee can demand that he conclude a license
      agreement, the patent holder, on the other hand, is not entitled to such a claim, but is
      rather advised to enforce claims for patent infringement against anyone who uses the



teaching in accordance with the invention but does not wish to conclude a license agreement for this.

(3)

71    It therefore constitutes an abuse of the dominating position if the patent proprietor asserts claims for injunction, destruction and recall of products although the infringer made an unconditional offer to conclude a license agreement on conditions which the patent proprietor may not refuse without infringing the prohibition of abuse or discrimination (BGHZ 180, 312 marginal no. 27, 29 - Orange Book Standard).

(4)

72    In addition, however, the assertion of such claims by way of an action may also be considered abusive if the infringer has not (yet) agreed to conclude a license agreement on certain reasonable terms, but the patent proprietor is to be blamed for not having made sufficient efforts to meet the special responsibility associated with the dominating position on the market and to enable an infringer who is in principle willing to license to conclude a license agreement on reasonable terms (cf. ECJ, WRP 2015, 1080 marginal no. 54 ff. - Huawei/ZTE).

(a)

73    Therefore, the patent holder must first notify the infringer of the infringement of the patent in suit if the infringer is not aware that by implementing a technical solution required by the standard he is unlawfully making use of the teaching of the patent in suit (ECJ, WRP 2015, 1080 marginal 60-62 - Huawei/ZTE).

74    It is in principle the infringer's responsibility to ensure that no technical property rights of third parties are infringed before commencing the manufacture or distribution of a technical product (FCJ, judgment of 19 December 2000 - X ZR 150/98, GRUR 2001, 323, 327 - Temperature monitor). However, in view of the large number of patents which may affect a product, especially in the field of information and telecommunications technology, it is regularly very difficult to obtain a complete and reliable overview of all relevant property rights, especially since this may require a more detailed examination of the subject matter and scope of protection of a large number of patents in individual cases (cf. ECJ, WRP 2015, 1080 marginal no. 62 - Huawei/ZTE). In contrast, the patent holder who wishes to bring a claim against the (alleged) infringer on the grounds of patent infringement has already examined the infringement allegation. In addition, the



manufacturer of a standard-compatible product may expect that he may use the teaching of a standard essential patent anyway - even if only on the basis of a license agreement on reasonable terms (ECJ, WRP 2015, 1080 marginal 53, 64 - Huawei/ZTE). The market-dominating patent holder may therefore not seek injunctive relief from the infringer who is unaware of the infringement without informing him of the infringement of the patent in suit and thus giving him the opportunity to assert his claim to conclude a license agreement on reasonable terms and thus avert the enforcement of the patent holder's right to injunctive relief (cf. ECJ, WRP 2015, 1080 marginal no. 71 - Huawei/ZTE).

(b)

75    Furthermore, the dominating patent holder may be prohibited from seeking an injunction from the infringer who has been informed of the infringement of the patent in suit if the infringer declared that he wishes to take a license on the patent in suit but is unable, or in any case is unable, to formulate on his own initiative the conditions which the patent holder must grant him in compliance with the prohibition of discrimination and obstruction applicable to him (cf. ECJ, WRP 2015, 1080 marginal no. 63 f. - Huawei/ZTE).

76    Although it is in principle up to the company seeking a license to object to a license claim of the patent holder, this would violate the prohibition of discrimination or obstruction, the principles on the burden of proof and demonstration in proceedings also apply to the parties' out-of-court obligations. The burden of proof for unequal treatment and obstruction is also borne by the license seekers in proceedings, whereas the patent holder bears a primary burden of proof for an objective reason for unequal treatment (Art. 2 of Regulation 1/2003). As in the case of a procedural secondary burden of proof, the patent holder may, however, be obliged to substantiate his license claim in detail in order to enable the person seeking a license to verify whether the license claim constitutes an abuse of the dominating position due to the amount of the license fee or other conditions of the license offered. Otherwise, the company seeking a license would be forced to either run the risk of being ordered to cease and desist from the patent infringement action of the patent owner or to accept a potentially abusively excessive royalty claim or other potentially abusive contractual terms in order to safely exclude the risk of a cease and desist order.

77    The obligation of the dominating patentee to explain and justify the licensing conditions which he considers as fair, reasonable and non-discriminatory (FRAND) is not only, but particularly important if the patentee is not willing to grant a license only on the patent



which he intends to claim, if necessary by way of an action, but wants to allow the use of this patent only within the framework of a portfolio license or other license agreement comprising further property rights.

78   In any case, such a linkage with other intellectual property rights is in principle unobjectionable under antitrust law insofar as it is not linked to claims which oblige the licensee to make payments for the use of non-essential patents and the remuneration is calculated in such a way that users who would like to develop a product for a specific, geographically limited area are not disadvantaged (cf. Communication of the European Commission on the handling of essential standard patents by the EU of 29 November 2017, COM [2017] 712 final p. 9). This is because even the market-dominating patent holder does not have to accept that the infringer, in order to defend himself against an action for an injunction, only wants to take a license for the patent in suit, but not for the other patents which he also needs for the lawful manufacturing or distribution of a product which complies with the standard. Negotiations on worldwide portfolio licenses are therefore common practice and, from an efficiency point of view, also benefit the user of the licensed intellectual property rights (Communication of the European Commission of 29 November 2017, COM [2017] 712 final p. 9). At the same time, however, the inclusion of a possibly large number of additional patents increases the complexity of the issue, which is relevant for the examination whether the contractual terms required of the patent holder are in line with the obligations arising from his dominating position. The patent holder must therefore also provide sufficient information to the infringer seeking a license in this respect.

(c)

79   To what extent, to what degree of detail and at what time the information to be requested from the patentee is required is a question of the individual case and depends in particular also on the respective reaction of the infringer (cf. ECJ, WRP 2015, 1080 marginal 65 ff. Huawei/ZTE).

80   Since the special obligations of conduct imposed on the dominating patent holder are intended to enable the infringer to make lawful use of the patent by concluding a license agreement on FRAND terms and thus to avert the assertion of a claim for injunctive relief, the obligations of the patent holder do not, in any event, differ in favour of the infringer from those which also affect the patent holder in other respects by virtue of his dominating position vis-à-vis a company seeking a license. Otherwise, by using the patent without concluding a license agreement, the infringer could gain an advantage in



competition with those companies which use or intend to use the patent on the basis of a license agreement on reasonable and non-discriminatory terms.

81    What constitutes reasonable and non-discriminatory terms and conditions of a license agreement in a particular case usually depends on a variety of circumstances. As in other cases of (possible) abuse of a dominating position, the dominating patentee is not in principle obliged to grant licenses in the manner of a "uniform rate" which grants equal conditions to all users (BGHZ 160, 67, 78 - Standard bung barrel). Nor does such an obligation arise from the FRAND Self-Commitment Statement. This serves to guarantee actual access to the standardisation rule (cf. European Commission, Horizontal Guideline, ABI. EU C 11, 1 marginal 285, 287). With regard to the prohibition of discrimination, this purpose is satisfied if the conditions set out in Art. 102 para. 2 letter c TFEU and Section 19 (2) no. 3 Restriction of Competition Act, are observed. The prohibition of second-degree discrimination, i.e. discrimination against the trading partners of a dominating company on the upstream or (in this case) downstream market (Opinion of Advocate General Wahl of 20 December 2017- C-525/16, juris marg. 74), protects against the distortion of competition between trading partners through discriminatory conditions (ECJ, judgment of 19 April 2018- C-525/16, WuW 2018, 321 marginal no. 24 - MEO; BGHZ 160, 67, 79- Standard-Bung barrel; FCJ, judgment of 12 April 2016 - KZR 30/14, NZKart 2016, 374 marginal no. 48 - Net Cologne). Furthermore, the commitment under antitrust law and the limitation of the scope of action of the dominating company in the vertical relationship aims at enabling negotiation results which are not influenced by the dominating company and which take into account the interests of both contracting parties in a balanced way. Since appropriate conditions for a contractual relationship, in particular an appropriate price, are regularly not objectively determined, but can only be determined as the result of (possibly similar) negotiated market processes, the serious and targeted participation of the company seeking a license in the negotiation of appropriate contractual conditions is of decisive importance (cf. ECJ, WRP 2015, 1080 marginal nos. 65-68 - Huawei/ZTE).

82    This should be taken into account in particular when considering whether the infringer who is sued under a patent can claim that the patent holder did not allow him to obtain a license on FRAND terms. This is because, in contrast to contractual negotiations which a company wishing to obtain a license before commencing use, the infringer's interest may also be directed - solely or at least primarily - towards delaying the patent holder as far as possible until the expiry of the term of protection of the patent in suit, because he is then no longer threatened with a cease-and-desist order (cf. ECJ, WRP 2015, 1080



marginal no. 65 - Huawei/ZTE). Such conduct is even more attractive from an economic point of view if the licensing of a plurality of patents or a patent portfolio is under consideration, but the patent holder, after the expiry of the patent in suit, only receives damages for the use of that very patent.

83   The obligation of the dominating patentee to inform       the infringer of the infringement and of the possibility of obtaining a license and to make a license offer to the licensee is not a self purpose but is intended to make it easier for the latter to negotiate reasonable conditions with the patentee for his use. For this reason, according to the first indication, it is not sufficient to justify further obligations on the part of the dominating patent holder if the infringer then merely shows himself willing to consider concluding a license agreement or to enter into negotiations as to whether and under what conditions the conclusion of a contract is possible for him (see Opinion of Advocate General Wathelet of 20 November 2014 - C-170/13 marginal no. 50). Rather, the infringer for his part must clearly and unequivocally declare his willingness to conclude a license agreement with the patent holder on reasonable and non-discriminatory terms and must also subsequently participate in the license agreement negotiations in a targeted manner. The High Court of England and Wales (J. Birss) aptly stated that "a willing /icensee must be one willing to take a FRAND /icence on whatever terms are in fact FRAND" (EWHC, judgment of 5 April 2017, [2017] EWHC 711 (Pat) para. 708 - Unwired Planet v Huawei).

bb)

84   The Court of Appeal then held without error of law that the applicant was not guilty of an abuse of its dominating position because it had not sufficiently informed the defendant of the infringement of the patent in suit and of its willingness to license it on FRAND terms.

(1)

85   Such notification shall draw the infringer's attention to the infringement and to the possibility and necessity of obtaining a license. It is sufficient in this respect that the patent is designated and the specific act in which the infringement is to take place is indicated. As the Court of Appeal rightly points out, the latter requires - the designation of the type of infringing act and the challenged embodiments. Detailed technical or legal explanations of the infringement allegation are not required; the infringer must only be enabled to form a picture of the justification of the patent infringement allegation - if



necessary with the help of experts or by obtaining legal advice. The presentation of the infringement allegation based on "Claim Charts", which is widely used in practice, is regularly sufficient, but not mandatory.

(2)

86    The Court of Appeal correctly considered that the applicant's infringement notices satisfied those requirements.

87    According to the findings of the Court of Appeal, in a letter dated December 20, 2012, and two further letters from 2013 to the defendant's parent companies, the plaintiff identified the plaintiff's patent with its publication number, among other things, and stated that the Group companies were infringing the plaintiff's patent by manufacturing and selling mobile communications devices that implemented, among other things, the GSM standard. In doing so, the Court of Appeal assumed without legal error that the reference to the GSM standard also included the GPRS extension. There are no indications that the infringement allegation needed further specification with regard to the affected section of the standard. Moreover, the patentee who has named the infringed patent and the relevant standard may expect the infringer to notify within a short period of time if these details do not suffice to identify the infringement allegation. This also applies if - as here - a large number of patents and standards are mentioned.

88    By the first infringement notice in the letter of 20 December 2012, the applicant also indicated that it offered licenses on FRAND terms.

(3)

89    Rightly and without objection by the defendant, the Court of Appeal also considered the reference to the defendant's parent companies to be sufficient.

cc)

90    It does not, however, stand up to audit review, that the Court of Appeal assumed that the plaintiff was abusing its dominating position by bringing an action to enforce the claims to destruction and recall infringing products (which remained after the injunction had been granted because the patent expired), because it did not offer the defendants a license agreement on FRAND terms, and because the terms offered to the defendants were discriminatory. Its findings do not support either the assumption that the plaintiff was obliged to make a concrete offer of a contract because the defendants showed



themselves willing to license, or the further assumption that the contractual terms offered to the defendants were discriminatory.

(1)

91  The Court of Appeal wrongly assumed that the defendants agreed to conclude a license agreement on FRAND terms.

92  The Court of Appeal correctly saw that the defendant's declaration of 12 December 2013, i.e. more than one year after the first infringement notification, did not meet the requirements for an infringer willing to obtain a license in terms of time alone. An infringer who remains silent for several months on the infringement notification thus regularly indicates that he is not interested in obtaining a license. Contrary to the defendant's view, this is not contradicted by the fact that the plaintiff did not submit the FRAND declaration until 10 April 2013. In fact, already with the first infringement notice in the letter dated December 20, 2012, the plaintiff indicated that it offers licenses on FRAND terms.

93  The Court of Appeal nevertheless found that the defendant was willing to license the patent, since a FRAND license agreement issued outside the reaction period assumed by the Court of Appeal but before the action was filed did not result in a substantive preclusion that the "out-of-court licensing procedure" would be continued and that the patent holder would again be obliged to make an offer to the infringer on FRAND terms.

94  It is not clear whether this is to be acceded to successfully, as the appeal is directed against the assumption of the Court of Appeal that the declaration of 12 December 2013 is a sufficient declaration of readiness to license. Nor do the other statements of the defendants and their parent companies, as established by the Court of Appeal, express the defendants' serious willingness to enter into a license agreement on FRAND terms.

(a)

95  Since no further findings in favor of the defendant are to be expected, the Senate can interpret the defendant's declarations itself. However, it is not binding on the court of last resort if it violates statutory or generally recognised rules of interpretation, laws of thought or principles of experience (see FCJ, judgment of 5 October 2006 - III ZR 166/05, MDR 2007, 135). Even taking into account this limited standard of review, the statements of the Court of Appeal are not free of errors of law. The e-mail letter of 17 December 2013 from the IP director of the defendant's parent companies (Annex AR 39) does not satisfy



the requirements for a serious and unconditional willingness to grant a license on FRAND terms (marg. 83 above). It merely expresses the hope that one will enter into a formal negotiation ("We hope to have a formal negotiation with you") and asks for information about a promised discount ("You mentioned that there will be a discount if we sign the license timely. Please let me know the information such as specific discount amount and the current license royalty arrangement ... '). From the plaintiff's objective point of view as a recipient, the defendants did not indicate - and certainly not clearly and unambiguously - that they were prepared to conclude a license agreement on FRAND terms.

(b)

96   The Court of Appeal examined the further letters from the IP Director of the defendant's parent companies only from the point of view of whether they gave rise to the assumption that the original willingness to license ceased to exist in the meantime. Since the letter of January 16, 2016 (Annex AR 51) contained the statement that, if German courts finally determined an infringement and the validity of the plaintiff's patent and another patent asserted in a parallel litigation between the parties, one would be willing to take a FRAND license and pay license fees, this statement also did not meet the requirements, as the Court of Appeal correctly stated. This applies irrespective of the question, which was not examined by the Court of Appeal, whether and, if so, to what extent the defendants were allowed to restrict a willingness to license factually and geographically. For according to their letter, the defendants not only wanted to reserve - permissibly (ECJ, WRP 2015, 1080 marginal 69 - Huawei/ZTE) - the possibility to have the question of the use of the patent in suit and its validity clarified by a court, even in the case of a FRAND license agreement, but also only made the declaration of the willingness to license themselves in a limited form. Such a conditional declaration of willingness to license is insufficient (BGHZ 180, 312 marginal no. 32 - Orange Book Standard).

(c)

97   To the extent that the Court of Appeal inferred from the letter dated March 23, 2016 (Annex AR 51) transmitted during the appeal proceedings that the defendants had continued to be willing to license, it is again open to question whether and to what extent a willingness to license declared after the filing of the suit (and after a conviction in the first instance) may have an impact on the antitrust assessment of the patentee's conduct. The findings of the Court of Appeal do not indicate a willingness to license in the above mentioned sense. Nor does it result from the content of the letter. Although



there is a statement that one is willing to take a FRAND license, at the same time it is pointed out that one's own position remains unchanged ("To make a long story short, we wish to express that our position remains unchanged, namely that we are willing to conclude a FRAND license and we are of the opinion that our offer is FRAND"; Annex AR 51 p. 3). From the plaintiff's objective recipient's perspective, this could only be understood to mean that the inadmissible condition expressed in the letter of 16 January 2016 should remain.

98    In view of the above, it is not necessary to make a final assessment as to whether the letter also expresses in a broader sense a lack of willingness to enter into an open-ended negotiation process and to accept FRAND conditions with whatever content. This is supported by the fact that it insists on its own counter-offer and states that it is not prepared to improve the offer as long as the applicant is not prepared to specify the way in which  the other patents in its portfolio are infringed ("As long as you remain unwilling to specify the way in which your patents (except EP504 and EP885) could be infringed … we are not able to further amend our offer"). From the plaintiff's objective point of view, this indicated at that time that the defendant used delaying tactics. Admittedly, when offering a portfolio license, the patentee must provide the infringer with sufficient information on the patents belonging to the portfolio. However, this obligation does not go beyond what a party must reasonably provide in case of a portfolio license in contract negotiations. As in the notice of infringement, it is sufficient to explain the nature of the respective infringing act and the challenged embodiments. Detailed technical or legal explanations of the use of the respective patent are not required; the infringer must only be enabled to form an impression of the infringement allegation - if necessary with the help of an expert or by obtaining legal advice. In the event of uncertainty as to the justification of the infringement allegation, honest negotiating partners can be expected to enter into a discussion. The plaintiff had already complied with its obligation in a letter dated December 20, 2012. The plaintiff attached a list of the 450 patents belonging to the patent portfolio. The fact that the defendants insisted after more than three years on the formal position that the plaintiff was obliged to submit claim charts for all patents is in any case an indication that the defendants were less interested in a successful conclusion of the negotiations than in further delaying them in view of the near end of the term of the patent in suit. This again applies irrespective of the question left open by the court of appeal whether and, if so, to what extent the defendants were allowed to reject the offered portfolio license, since the patent owner can at least expect an infringer who is in principle willing to license to at least rely on factual grounds for this.



99    It is true that the letter also required the applicant to explain how the license offered had been calculated. However, it may be assumed, in the defendant's favour, that the applicant has not yet fulfilled its obligation in that regard. This obligation existed only after the defendants had expressed their serious willingness to license.

      (d)

100   Finally, it is unclear whether the Respondent's counter-offer submitted on January 20, 2017, four weeks prior to the February 16, 2017 appeal hearing date, indicates a willingness to enter into a FRAND License Agreement. At the time this offer was made, the term of protection of the patent in suit already expired. As a result, due to the loss of the dominating market position, the plaintiff not only lacked a norm addressee status within the meaning of Art 102 TFEU and Section 19 Restriction of Competition Act, but it could also no longer allow the defendants to use the subject matter of the patent in suit, which became patent-free, in the future. It was not obliged to retroactively legitimise the acts of infringement.

      (2)

101   In the absence of any further consideration, the findings of the Court of Appeal also do not support its assumption that the action constitutes an abuse of the plaintiff      's dominating position because the latter demanded discriminatory contractual conditions from the defendant. It is an error of law in assuming that this could not in itself constitute an objective justification for the unequal treatment.

102   Whether there is an objective justification for different prices must be answered on the basis of a weighing of all interests involved, taking into account the objective of antitrust law which is aimed at freedom of competition (BGHZ 160, 67, 77, FCJ, judgment of 7 August 2010 - KZR 5/10, WRP 2011, 257 marginal no. 23 - Entega 11). The fact that a company in a dominating position does not in principle prevent it from protecting its own commercial interests if these are attacked. It must be able to react to such an attack in a reasonable manner, as long as the conduct does not aim at strengthening the dominating position and its abuse (see ECJ, judgment of 16 September 2008- C-486/06, ECR 2008, 1-7139 para. 50 - Lelos/GlaxoSmithKline). If it was economically reasonable from the plaintiff's point of view to accept an offer that was in itself inadequate in view of the lack of realistic possibilities for judicial enforcement of her claims and in view of the threat of personal or other economic disadvantages, in order to receive any consideration at all for the use of her property rights and to escape such threats by state



authorities, this may, in the necessary weighing of all interests affected, constitute an objective reason for maintaining her usual terms and conditions vis-à-vis other enterprises, provided that these are objectively appropriate and in particular do not impair the competitiveness of the other enterprises.

[…]

2.

108   Furthermore, the defendants are obliged to pay damages to the plaintiff pursuant to Sec. 139 (2) Patent Act and must provide the plaintiff with the necessary information to enable the plaintiff to quantify its claim for damages. The claims are limited in time because of the expiry of the term of protection. The plaintiff has taken this into account in the appeal proceedings by referring to the requests for infringement actions until September 25, 2016.

a)

109   Without any error of law, the Court of Appeal found that the fault required for the claim for damages in the form of negligence also applied to the period prior to receipt of the first notice of infringement from the plaintiff. This is because the obligation of the owner of a standard essential patent does not change the fact that it is in principle the infringer's responsibility to ensure that the property rights of third parties are not infringed prior to commencing the manufacture or distribution of a technical product (BGH, GRUR 2001, 323, 327 - Temperaturwächter). In view of the large number of patents which may affect a product, particularly in the field of information and telecommunications technology, it is admittedly very difficult to obtain a complete and reliable overview of all relevant property rights (cf. ECJ, WRP 2015, 1080 marginal no. 62 - Huawei/ZTE). However, this information deficit is not due to the patent holder's conduct and therefore does not justify a deviation from the otherwise applicable standard of care.

b)

110   The assumption of the Court of Appeal that the amount of the damages to be paid by the defendants is limited to that which would result from the standard of a licence analogy would not be fully correct, even if the starting point of the Court of Appeal were correct, namely that the plaintiff had abused its dominant position with the action for an injunction.



111   The assertion of a claim for damages for patent infringement does not, as the Court of Appeal does not fail to recognise, in principle constitute an abuse of the patent holder's dominant position, even in the case of a standard essential patent (ECJ, WRP 2015, 1080 marginal no. 74 - Huawei/ZTE). The infringer can therefore only counter the patent proprietor's claim for damages with a claim for damages of his own which is based on the non-fulfilment of his claim to the conclusion of a licence agreement on reasonable and non-discriminatory terms and by virtue of which he can demand to be put in the position he would have been in if the patent proprietor had fulfilled this claim without delay. Such a counterclaim can thus arise only where the infringer requires the patentee to conclude a licence agreement on FRAND terms (initially by indicating his willingness to licence) and the patentee does not react to this in accordance with the obligations imposed on him by his dominant position, either by unlawfully refusing to conclude such a licence agreement (cf. BGHZ 160, 67, 82 - Standard-Spundfass) or by not making an offer on FRAND terms despite the patent infringer's willingness to license.

c)

112   Therefore, a limitation of the plaintiff's claim for damages in this case is completely excluded. At any rate, during the term of protection of the plaintiff's patent, the defendants have, as explained, not sufficiently expressed their willingness to conclude a contract on FRAND terms.

[…]

# EXHIBIT D



KATHER · AUGENSTEIN
RECHTSANWÄLTE

Regional Court Mannheim

2 O 34/19

Judgment of 18 August 2020

[…]

Reasons

[…]

C.

The claim for injunctive relief resulting from the infringement is also enforceable. Enforceability is not precluded by the dilatory objection of the Union law prohibition of abuse of a dominant market position under Article 102 TFEU (see I.). The defendant's objection of abuse is unfounded (see II.). A FRAND objection derived from the interveners as the defendant's suppliers also does not apply (see III.).

I.

An action by a market dominant patentee who has undertaken to a standardisation organisation to grant licences on FRAND terms may constitute an abuse of his dominant position if and in so far as it is liable to prevent products conforming to the standard from entering or remaining on the market (CJEU, judgment of 16 July 2015, C-170/13, GRUR 2015, 764, 766 et seq. - Huawei/ZTE; FCJ, judgment of 5 May 2020, KZR 36/17 marginal 68 - FRAND-Einwand; FCJ, judgment of 6 May 2009, KZR 39/06 marginal 22 et seq., BGHZ 180, 312 - Orange Book Standard). According to these provisions, applications to bring an action for an injunction, among other things, may be abusive (see also HRC Karlsruhe, judgment of 6 May 2009, KZR 39/06, para. 22 et seq. 30.10.2019, 6 U 183/16, GRUR 2020, 166 marginal no. 87 - Datenpaketverarbeitung; HRC Düsseldorf, judgment of 30.03.2017, I-15 U 66/15, GRUR 2017, 1219 margin note 220 - mobile communication system).



KATHER · AUGENSTEIN
RECHTSANWÄLTE

The holder of a standard essential patent, however, is not simply prohibited from enforcing his patent on the product market by asserting injunctive relief and other claims (CJEU, loc. cit. nos. 46, 53, 58 - Huawei/ZTE; FCJ, judgment of 5 May 2020, KZR 36/17 nr. 69 - FRAND-Einwand). This is because the standard essentiality does not alter the fact that the patent holder has to tolerate the use of his patent only if he has either allowed the person who makes use of its technical teaching to do so or, in any case, must allow him to do so while observing his obligation not to abuse his market power.

There is no abusive enforcement of the claims in the above sense if, first, the proprietor of the patent has alerted the alleged infringer, before bringing the action, of the infringement of the patent for which he is accused, designating the patent in question and indicating the manner in which it is alleged to have been infringed and, secondly, after the alleged infringer has expressed its willingness to conclude a licensing agreement on FRAND terms, presented to that infringer a specific, written offer for a license on such terms, specifying, in particular, the royalty and the way in which it is to be calculated, and, where the alleged infringer continues to use the patent in question, the alleged infringer has not diligently responded to that offer, in accordance with recognized commercial practices in the field and in good faith, this being a matter which must be established on the basis of objective factors and which implies, in particular, that there are no delaying tactics (CJEU, ibid. para. 71 - Huawei/ZTE). If the alleged infringer does not accept the offer made to him, he can only rely on the abusive character of an action for an injunction or recall if he makes a concrete counter-offer to the owner of the SEP concerned in writing within a short period of time, which complies with the FRAND conditions (CJEU, ibid. para. 66 - Huawei/ZTE).

The program of obligations presupposes that the person who intends to use or has already used the patent and has already put patented products on the market although he does not have a licence, is prepared to take a licence to this patent on reasonable and

2



non-discriminatory terms (FCJ, judgment of 5 May 2020, KZR 36/17 marginal no. 70 - FRAND-Einwand). Even the patent holder with market power does not have to force the taking of a licence on anybody and has no legal means to do so, as the potential licensee can demand the conclusion of a licence agreement from him, but the patent holder, on the other hand, is not entitled to such a claim.

Conversely, the patent proprietor, for his part, must make adequate efforts to meet the special responsibility associated with the dominant position and make it possible for an infringer who is in principle willing to license to conclude a license agreement on reasonable terms (FCJ, judgment of 5 May 2020, KZR 36/17 marginal no. 72 - FRAND-Einwand). Among other things, the market-dominant patent holder may be prohibited from seeking an injunction against the infringer who has been informed of the infringement of the patent at issue if the infringer has declared that he wishes to take a licence on the patent at issue, but is not able, or in any case is not in a position, to formulate on his own initiative the conditions which the patent holder must grant him in compliance with the prohibition of discrimination and obstruction applicable to him (FCJ, Urt. of 05.05.2020, KZR 36/17 marginal no. 75 FRAND objection).

II.

In the present case - after the plaintiff has pointed out the the patent infringement (see 1.) - the defendant is not entitled to a FRAND objection for lack of willingness to license, since it always refers to its suppliers with regard to the "whether" and "how" of the license (see 2.). The defendant seeks to ensure that the royalty relates to the sales price of its suppliers, which in the defendant's counter-offer is a mirror image of the purchase price used as a reference. Since this does not allow the plaintiff a fair share of the benefit of the technology in the saleable end product, the counter-offer is not FRAND-compliant, which significantly confirms the lack of willingness to take a license. The lack of willingness to take a license is also not justified by any alleged discrimination,

3



obstruction or insufficient information basis (see 3.). It can therefore be left unanswered whether the plaintiff has a dominant position on the domestic market or on the European internal market.

1.

The plaintiff alerted the defendant to the infringement by emails dated 21 June 2016, 9 November 2016 and 7 December 2016.

a)

The infringement notice is intended to alert the infringer's attention to the infringement and to the possibility and necessity of taking a licence (on this and on the following FCJ, judgment of 5 May 2020, KZR 36/17 marginal no. 85 - FRAND-Einwand). It is sufficient that the patent is designated and the specific act in which the infringement is to take place is indicated. The latter requires the designation of the type of infringing act and the challenged embodiments. Detailed technical or legal explanations of the infringement allegation are not required; the infringer must only be put in a position - if necessary with expert assistance or by obtaining legal advice - to form a picture of the justification of the patent infringement allegation. The presentation of the infringement allegation on the basis of "Claim Charts", which is widely used in practice, is regularly sufficient, but not mandatory.

b)

The plaintiff first informed the defendants by email of June 21, 2016 (AR 12), which was then further substantiated by email of November 9, 2016 (AR 15), which contained a first license offer, and of December 7, 2016 (AR 13), about the alleged patent infringement, with

4



the name of the patent in suit and the indication of the way in which it is alleged to be infringed.

On [...], the plaintiff provided the defendant with a list of its patents declared as essential to the standard, including the patent in suit, and pointed out the defendant's infringement of the LTE standard, among others. Insofar as the plaintiff did not yet show a technical connection between the patent in suit and the specifically relevant passages of the standard documentation on [...] (which subsequently took place on [...] with the transmission of a claim chart for the patent in suit), this is prejudicial. This is because the infringement notice does not necessarily allow for a final assessment of the infringement allegation. A concretization of the infringement allegation as to the concerned section within the standard is thus generally not required (FCJ, judgment of 5 May 2020, KZR 36/17 marginal no. 87 - FRAND-Einwand; leaving this question unanswered: RC Düsseldorf, judgment of 31.03.2016, 4a O 73/14 marginal 132 - juris; treated as a question of the individual case: RC Mannheim, judgment of 29.01.2016, 7 O 66/15 marginal 48, GRUR-RS 2016, 04228 - Steuerkanal).

The attacked embodiments are adequately designated in the concretising email of 07.12.2016 at the latest. In this email, the plaintiff states, among other things, that its allegation of infringement is linked to the implementation of the LTE standard in the defendant's cars with built-in connectivity (e.g. through [...]). It is irrelevant that the plaintiff did not name the specific vehicle components of the defendant, such as the TCU, which generate the LTE capability. This is because these components are purchased by the defendant and assembled to form the final product, so that there is no information deficit on the part of the defendant.

Overall, the plaintiff thus enabled the defendant to review the infringement of the patent in suit by 7 December 2016 at the latest, if necessary with further assistance from experts. There are no concrete indications that the defendant was not in a position to do so. In

5



particular, the following correspondence between the parties does not provide any indication in this regard. While the defendant asked in emails prior to 7 December 2016 for basic information on the patent portfolio, the technology concerned and its connection to the attacked embodiments (B-KAR 4, B-KAR 5 and B-KAR 6), the subsequent correspondence already concerns further exchanges and requests for information on the FRAND conformity of the first licence offer (see in particular […]).

2.

However, the defendant did not then sufficiently declare its intention to conclude a licence agreement on FRAND terms. There is no willingness to take a license.

a)

Following the notice of infringement, it is not sufficient, in order to create further obligations on the part of the dominant patentee, for the infringer to merely show that he is prepared to consider concluding a licence agreement or to enter into negotiations to determine whether and under what conditions the conclusion of such an agreement would be appropriate for him. Rather, according to recent case law of the Federal Court of Justice, the infringer must declare his clear and unequivocal willingness to conclude a licence agreement with the patent holder on reasonable and non-discriminatory terms and must also subsequently participate in the negotiations on the licence agreement in a targeted manner (FCJ judgment of 5 May.2020, KZR 36/17 marginal no. 83 - FRAND-Einwand; High Court of England and Wales, judgment of 5 April 2017, [2017] EWHC 711 (Council) marginal no. 708 – Unwired Planet v Huawei: "a willing licensee must be one willing to take a FRAND licence on whatever terms are in fact FRAND"; lower instance dissenting view: an informal and blanket declaration is sufficient, HRC Düsseldorf, judgment of 5 April 2017. 30.03.2017, I-15 U 66/15, marginal no. 152, GRUR 2017, 1219 - Mobiles Kommunikationssystem). In particular, a conditional declaration of willingness

6



to license is insufficient (FCJ, judgment of 5 May 2020, KZR 36/17 marginal 96 - FRAND-Einwand). Likewise, a lack of willingness to take a license can also be inferred where the infringer insists on his own counter-offer and declares that he is not prepared to improve the offer (FCJ, judgment of 5 May 2020, KZR 36/17 marginal no. 98 - FRAND-Einwand).

The background to this is that appropriate conditions for a contractual relationship, in particular an appropriate price, are regularly not objectively determined, but can only be recorded as the result of (possibly similar) negotiated market processes. Therefore, the serious and targeted participation of the company seeking a licence in the negotiation of appropriate contractual conditions is of decisive importance (CJEU, ibid. para. 65-68 - Huawei/ZTE; FCJ, judgment of 5 May 2020, KZR 36/17 para. 81 - FRAND-Einwand). In contrast to contractual negotiations, which a company willing to obtain a licence aims at before commencing use, the infringer's interest can also be directed solely or in any case primarily at delaying the patent proprietor until the expiry of the term of protection of the patent at issue, because he is then no longer threatened with an injunction order (CJEU, ibid. marginal 65 - Huawei/ZTE; FCJ judgment of 5 May 2020, KZR 36/17 marginal 82 - FRAND-Einwand). Such behaviour is economically even more attractive if the licensing of a number of patents or a patent portfolio is at issue, but the patent holder only receives compensation for the use of this patent after the patent in suit has expired (FCJ, ibid. - FRAND-Einwand).

b)

According to those standards, the defendant in the present case did not express clearly and unequivocally that it would itself accept a licence on FRAND terms. It always refers to its suppliers as to the "whether" and "how" of the licence. The defendant considers that the suppliers should become licensees (see (aa) below) and that the licence fee should also be based on the sales price of these suppliers (see bb) below).

7



It can remain undecided whether a declaration of willingness to license can be made before the infringer is notified. In the first reactions of the defendant prior to the concrete infringement notification on 7 December 2016, the defendant made a licence acceptance subject to the condition that its products actually infringe patents of the plaintiff (email of 10 June 2016, B-KAR 4; email of 30 June 2016, B-KAR 5; email of 18 November 2016, B-KAR 6). In doing so, the defendant not only wanted to reserve the right - permissibly - to have the question of the use of the patent in suit and its legal validity clarified in court even in the event of a FRAND licence agreement coming into existence, but it itself only issued the declaration of willingness to license - inadmissibly - in a conditional form (see FCJ, judgment of 5 May 2020, KZR 36/17 marginal no. 96).

aa)   The defendant referred the plaintiff to its suppliers as licensees after the infringement notice had become more specific.

Already by email of 14.12.2016 (B-KAR 7), the defendant stated that the most efficient way would be for suppliers - instead of the defendant - to become licensees („Neither the claim charts nor your email contain a sufficient explanation for your refusal to provide licenses to B.'s suppliers. As stated earlier, the most efficient way to license your patents would be licensing the source, eliminating the need to identify and license the companies selling the end product, especially if the supplied products already incorporate the respective standards. So far, you have not shown that this is not the case here.").

In so far as the defendant continued to state that it was prepared to take a licence on FRAND terms, it again qualified this statement by stating that, in view of the lack of information, inter alia, on the preferential licensing of suppliers, it was too early for a meeting. The fact that the defendant's statement was to be understood as a reference to its suppliers according to the relevant objective recipient horizon (see FCJ loc. cit. para. 95 - FRAND-Einwand) is also shown by the fact that the plaintiff took this into account and presented the defendant with the "Tier 1 licensing model" on 5 May 2017, in which

8



the Tier 1 suppliers were to become contractual partners of the offered licensing agreement (AR 17).

The defendant reacted to the Tier 1 licensing model by withdrawing from the licensing negotiations. On 17 May 2017 and 31 January 2018, it informed the plaintiff that it considered participation in the licence negotiations to be unnecessary and that it had instructed its suppliers to conclude a licence agreement (email of 21.06.2017, B-KAR 8; email of 31.01.2018, B-KAR 9 [as a response to AR 16]: „With regard to your email of January 26, 2018, we would like to confirm first that B. has not changed its view that B. does not need to participate in the negotiations and the final contract between its suppliers and Kl. as long as this contract ensures that the suppliers can offer and supply their products ‚free of third party rights' to D. We are not aware of having communicated anything differently to our suppliers when we instructed them to obtain a license from you.").

Against this background, it is also not sufficient for the defendant at the same time to state in the email of 31.01.2018 that it is prepared to take a licence on FRAND terms. Such a general assertion, which is meanwhile contradicted by other statements in the same email, is also insufficient against the background of the absence of several months from the negotiations, which continued until February 2019.

bb)    As regards the royalty, the defendant also refers to its suppliers by seeking to align it on the suppliers' sales price or their purchase price.

This can be seen, for example, in the defendant's email of 19.03.2019 (B-KAR 10), in which it reacted to the plaintiff's second licence offer of 27.02.2019 (AR 14). The defendant rejected this second licence offer because the licence price was not based on the suppliers' components but on a value of connectivity in the end product. The fact that the supplier level should be decisive in the view of the defendant had already been emphasised by the defendant in its complaint against the plaintiff submitted to the EU



KATHER · AUGENSTEIN
RECHTSANWÄLTE

Commission on 26.11.2018 (B-KAR 1), to which it expressly referred in the email to the plaintiff.

The defendant continued this line when it submitted a counter-offer to the plaintiff on 9 May 2019 (B-KAR 12, B-KAR 13), the royalty for which was based on its average purchase price of TCUs - and thus the sales price of Tier 1 suppliers.

c)

The fact that this royalty in the counter-offer of 9 May 2019 is not FRAND-compliant is decisive confirmation of the defendant's unwillingness to license. It can be left open whether the counter-offer made after the action was filed was still in time or could be made up for (the possibility of making up for the declaration of readiness to license is left open by the Federal Court of Justice, judgment of 5 May 2020, KZR 36/17 marginal nos. 94, 97 - FRAND-Einwand; affirmative by the Higher Regional Court of Karlsruhe, judgment of 5 May 2020, KZR 36/17 marginal no. 94, 97 - FRAND-Einwand; affirmative by the Higher Regional Court of Karlsruhe, judgment of 5 May 2020, KZR 36/17 marginal no. 94, 97 30.10.2019, 6 U 183/16 marginal 106 ff., GRUR 2020, 166 - Datenpaketverarbeitung; HRC Düsseldorf, judgment of 30.03.2017, I-15 U 66/15 marginal 158, GRUR 2017, 1219 – Mobiles Kommunikationssystem; negative e.g. RC Düsseldorf, judgment of 31.03.2016, 4a O 73/14 marginals 156 et seq. - juris).

The royalty provided for in the counter bid is not reasonable, as the reference value used in the top-down approach in the form of the average purchase price of TCUs is inappropriate. This reference value prevents the plaintiff from participating reasonably (aa) in the benefit of the technology in the saleable end product (bb). The unreasonableness is further confirmed by the fact that in the automotive industry, with the Avanci pool licensing model, there are templates which relate to the last stage of the value chain (see cc).

10



aa)   At the outset, there is usually not exactly one single contractual arrangement (in particular not one single specific equivalence relationship between licence rights and their remuneration) which in terms of content meets the FRAND criteria. Rather, there are frequently a large number of possible contractual arrangements and license rates that are fair, reasonable or appropriate and non-discriminatory (cf. FCJ, judgment of 5 May 2020, KZR 36/17 margin no. 81 – FRAND-Einwand; HRC Karlsruhe, judgment of 30 October 2019, 6 U 183/16 margin no. 95, GRUR 2020, 166 – Datenpaketverarbeitung UK Court of Appeal, judgment of 23.10.2018, [2018] EWCA Civ 2344, para. 121 - Unwired Planet v Huawei; dissenting: High Court of England and Wales, judgment of 5.4.2017, [2017] EWHC 711 (Rat), para. 158 et seq. – Unwired Planet v Huawei). What can be considered fair and appropriate varies in particular from sector to sector and over time (European Commission, Communication of 29.11.2017, COM (2017) 712 final, p. 8).

However, a licensor must always participate in the economic benefit of the technology in the saleable end product at the last stage of the value chain (also Kühnen, GRUR 2019, 665, 671; Kühnen, Handbuch der Patentverletzung 12th ed. 2020, part E margin no. 487; Martinez, GRUR Int. 2019, 633, 639; Huber, Why the ETSI IP Policy Does Not and Has Never Required Compulsory 'License to All': A Rebuttal to Karl Heinz Rosenbrock (September 15, 2017), https://ssrn.com/abstract=3038447, p. 11; dissenting view: valuation strictly separated by value components Dornis, WRP 2020, 688, 691 f.). The rights of the patent holder under Art. 64(1) EPC, Sections 9, 10 PatG extend to uses of the patented invention, which includes, for example, putting a product which is the subject of a patent on the market or using it. It corresponds to this if the royalty for the use of the patented invention is related to the last stage of the value chain. This is because the use of the invention provides the opportunity for an economic profit based on the saleable end product. The licensor's participation in the inventive use in the saleable end product is thus in line with the European Commission's guideline according to which the licence conditions must be clearly linked to the economic value of the patented technology,

11



without taking into account elements which are attributable to the decision to include the technology in the standard or which concern the market success of the product which has nothing to do with the patented technology (European Commission, Communication of 29.11.2017, COM(2017) 712 final, p. 8).

It is precisely not the case that the patent holder over-participates in the innovations at later market levels when linking them to the saleable end product (cf. Dornis, WRP 2020, 688, 692), especially as various design instruments are available to prevent over-participation. When calculating the royalty by means of the top-down approach, for example, a sales price can be used as a reference value, if necessary without taking into account maximum/low prices (floors/caps), and this can be further limited by applying a percentage total licence fee (cf. Martinez, GRUR Int. 2019, 633, 639). Conversely, the opposite view, according to which the value should be determined strictly according to value components, ultimately leads to the fact that a price of the smallest technical unit could be taken as a basis (so-called Smallest Salable Patent Practicing Unit), without taking into account the use of the invention in the end product, which is also protected by patent law. This would have the consequence that the patentee would regularly not be able to participate in the gains from use of the invention at a later stage of exploitation due to the legal institution of exhaustion (e.g. Kühnen, GRUR 2019, 665, 671; Huber loc.cit.). The practicability argument of the opposite view, that only in the case of components can the specific benefit of a patent be reliably determined (e.g. expert opinion of Prof. I. and Prof. J. of the interveners SH2/3, Exhibit FBD 22, p. 11 f. [cf. already Friedl/Ann, GRUR 2014, 948, 952 et seq., on the cost-based approach favoured for this reason]; cf. also the expert opinion of Prof. H. submitted by the intervener SH4, Exhibit PBP07, p. 13 et seq.), falls short in particular in the case of patent portfolios. Particularly since, from a practical point of view, the determination of the scope of each patent from a patent portfolio for a specific component in the supply chain (or its scope of application only in the end product) - fundamentally unknown to the SEP holder at first access - could be just as

12



complex, especially if double dipping resulting from several licence agreements has to be identified and avoided.

It should be made clear that the patent holder's participation in the economic benefits of the technology in the saleable end product does not mean that a licence agreement has to be concluded exclusively with the producer of that end product. On the contrary, there may be various ways of structuring the agreement in such a way that the benefits of a technology in the saleable end product are already priced in and taken into account in the supply chain.

bb)   The average purchase price of TCUs as a reference in the top-down approach does not adequately reflect the benefit of using the invention in the vehicle as the saleable end product (see (1)). The inappropriate benchmark is not compensated by the percentages used in the counter bid (see (2)).

(1)   The defendant's average purchase price for TCUs only corresponds to its costs of X. EUR or the benefit to Tier 1 suppliers, respectively.

(a)   However, it is undisputed that the defendant benefits in many ways from the connectivity of the vehicles (see in detail S. study Exhibit AR 16 / AR-KAR 21, H. study AR-KAR 23a; K. study, submitted by SH2/3 as FDB 17; also AR-KAR 23c).

With regard to the hardware, the defendant had set a list price of EUR 178.50 gross for an upgrade from a standard UMTS module to an LTE module until the end of 2018 (price list from 16 January 2017 in Exhibit AR-KAR 23); by now, the defendant generally installs LTE-capable TCUs as standard. Furthermore, the technology opens up the possibility for the defendant to generate revenue through a large number of additional paid offers to consumers, which require this connectivity (see the overview in Exhibit AR-KAR 22, AR-KAR 23b [X. as office, X. as personal delivery station], whereby not all listed offers require

13



an internet-capable car). Furthermore, the technology enables the company to achieve cost savings as a result of over-the-air software updates (e.g. instead of necessary recall actions), to optimize research & development costs (e.g. through data collection) or to generate revenues by directing maintenance work to its own workshops.

The 2014 K. study submitted by the interveners SH2 and SH3 ('SH2/3') summarises the importance of built-in connectivity for car manufacturers as follows: "Based on a representative German D-segment vehicle, today's car life cycle revenue can be broken down into its vehicle price (52 percent), connectivity features and services (4 percent), maintenance (6 percent), insurance (14 percent), and operations (24 percent). By 2020, we expect the connectivity-related revenues share to increase moderately to approximately 7 percent in the European premium car segment. This amounts to a global market size of EUR 170 billion to 180 billion for car connectivity in 2020." (FDB 17, S. 7; c.f. also Heiden AR-KAR 23a, page. 3). The K. study predicts that the retail prices for passenger cars will remain stable in principle, which should be connected to the fact that existing additional payment options are included in the base price later than standard, so that profit shares will shift in the result (FDB 17 S. 7 / 19: "New-car prices will stay more or less stable over time. This is based on proprietary research of net list development and an examination of the development of features of German premium vehicles over the last 20 years. Analysis shows that features that used to cost extra in the past have become standard and are included in future car base prices, so that technological development does not increase base prices in the long term.") The K. study states that connectivity not only plays a role in hardware prices, but that the various profit opportunities described above, such as the management of maintenance work, open up (FDB 17, S. 25: "Connectivity revenues may only account for a small share of the total customer life cycle spend by 2020, but connectivity has the potential to trigger a significant redistribution of revenues along five major automotive revenue pools: vehicle price, connectivity hard, "driver's time and attention," maintenance, and insurance. As for the sixth pool operations, we do

14



not anticipate significant effects beyond technical connectivity-based improvements such as fuel savings." ).

(b)    Contrary to the defendant's view, that benefit must also be taken into account when determining a reasonable royalty.

This is based on the connectivity which is the only way to ensure that it can create this added value. It is therefore incomplete if the defendant considers that the benefits of connectivity described are its own innovations which have no connection with the patented technology. Conversely, the defendant's innovations would not be possible without the plaintiff's inventions.

Also, the benefit described can only be achieved by building on the use of the invention after the connectivity modules have been installed in the vehicle. Thus, the defendant's argument that the TCU component - if not even the NAD - is already a saleable "terminal" or "mobile station" with regard to its technical functions, so that this would also be the appropriate basis for the royalty, is not a convincing argument. Connectivity components are only used when they are installed in the vehicle and are connected or interact with other (electronic) components. Without this installation, the relevance of the invention is not yet realised in the partial components, which can be broken down to the smallest technical unit in the form of the telecommunication chip.

In so far as the defendant further refers to the fact that in the mobile telephone industry the selling price of a mobile telephone is in principle used as a reference value - without taking into account further income opportunities such as apps or maintenance - (see for example the High Court of England and Wales, judgment of 5 April 2017, EWHC 711 (Council) para. 604 et seq. Since, unlike mobile telephones, there is no isolated retail price for connectivity in the defendant's vehicles (except, for example, for the abovementioned list price for the update from UMTS to LTE), which the parties agree on, there is no such

15



price available for assessing the benefit of connectivity, which is also fundamentally different in quality in the vehicle.

(c)    The extent to which the defendant's benefit can be quantified in terms of the willingness of consumers to pay x EUR for car connectivity, or what overall figure is appropriate, according to the study carried out by the consultancy S., can remain undecided. In any event, in view of the relative benefit of connectivity for the profit margin, the defendant's calculation, according to which the basis of calculation would not be significantly altered by a mark-up of the total return on sales generated for the whole vehicle on top of the purchase price of a TCU, is not appropriate. Nor is the intervener SH2/3 argument that third-party suppliers offer connectivity plug-ins for as little as x EUR not significant. The reasonably foreseeable benefit depends in particular on those exploitation possibilities which the licensee promises in view of his specific product and customer orientation (see Kühnen, GRUR 2019, 665, 670). Nor does this submission dispute the benefit of the defendant beyond the costs as presented by the plaintiff.

(2)    The inappropriateness of the reference figure is not compensated by the percentages applied in the counter bid. The explanations in the counter-offer (B-KAR 12, B-KAR-13) do not provide sufficient evidence for such compensation.

The defendant itself determines the total percentage of the royalty in the amount of x % at the lower end of the range, so that it is not apparent that there is adequate compensation. This is because the starting point of the counter-offer is that, in the case of mobile phones, the range is between x % and x % according to court decisions (B- KAR 12, ppt p. 7 and others with reference to High Court of England and Wales, judgment of 5 April 2017, [2017] EWHC 711 (Rat) Unwired Planet v Huawei; see also overview in study by IPlytics B-KAR 26, p. 43 with values between x % and x %). However, according to the plaintiff's submissions and the experience of the Board, the sales price of a mobile

16



telephone - and not the purchase price of a component - is regularly taken as the reference value in the mobile telephone sector (see B-KAR 26, p. 43; also in case law, see, for example, HRC Karlsruhe, order of 23 April 2015, 6 U 44/15 - Mobiltelefone; RC Düsseldorf, judgment of 31.03.2016, 4a O 126/14 marginal 17, 226 f. - juris; RC Düsseldorf, judgment of. 31.03.2016, 4a O 73/14, marginal 12, 171 f. - juris, High Court von England und Wales, Urt. v. 05.04.2017, [2017] EWHC 711 (Rat) Rn. 604 Unwired Planet v Huawei; aus der Lit. z.B. Huber, Why the ETSI IPR Policy Does Not and Has Never Required Compulsory ‚License to All': A Rebuttal to Karl Heinz Rosenbrock (September 15, 2017), S. 4, https://ssrn.com/abstract=3038447). It also runs counter to compensation that the defendant seeks to justify the approach of a value at the lower end of the range, inter alia, with low profit margins for car components, without, however, having used its profits in the reference figure (B-KAR 12, ppt. S. 7:" ...").

The plaintiff's SEP share of x % is taken from ETSI's data on the total number of SEPs declared as 2017 (B-KAR 12, ppt pp. 8 et seq.). Even against the background of various studies submitted  (e.g. in an evaluative analysis) with higher SEP shares in the 2G to 4G standards (Exhibit AR 16, p. 3 ff. with reference to ... [more than x % for 3G and 4G], AR-KAR 20a [x % for GSM, x % for 3G, x % for 4G]; B-KAR 27, S. 8 ff. [x% for 2G, x% for 3G, x % for 4G]; less by comparison B-KAR 26, p. 20 [x % but only for 4G]; intervener SH7, HL 48 [x % for 2G to 4G]), it is not apparent that the approach is capable of compensating for the plaintiff's lack of participation in the benefits of the technology in the saleable end product.

cc)    The fact that the lack of participation in the benefits of connectivity in the saleable end product is disproportionate in the automotive industry is further confirmed by the Avanci pool licensing model.

(1)    The Avanci pool licensing model estimates this benefit in the automotive sector by assuming ... The license calculation is based on a top-down approach using an average



KATHER · AUGENSTEIN
RECHTSANWÄLTE

sales price for ... in the amount of x USD and a customary total license fee in the amount of x % of the sales price (with reference to the High Court of England and Wales, judgment dated April 5, 2017, [2017] EWHC 711 (Council), Unwired Planet v Huawei, see in particular B-KAR 30). With the resulting total license burden of x USD and a pool coverage of all relevant SEPs of x % - which the defendant denies -(1) The Avanci pool license model estimates this benefit in the automotive sector by [blackened] the Avanci pool license model arrives at a license fee of 15 USD for LTE and others, which Avanci has also published (AR 19).

There is no evidence that the link to benefits at the last stage of the value chain has not been reflected in the licensing agreements Avanci has concluded with car manufacturers. It is irrelevant whether those conditions were accepted by the other car manufacturers, as the plaintiff claims, or whether the Avanci licence agreement with ... contains ... . Thus, it is not the purpose of that judgment to determine whether the offer made by the plaintiff is FRAND as compared with the Avanci licence agreements or whether the Avanci licence offer to the defendant is FRAND, which the defendant disputes on the ground of alleged discrimination against ... . Nor is it decided whether an average price is FRAND in general, including in the mobile telephone sector.

(2) The extent to which the Avanci pool licensing model is a well-established licensing practice, which the defendant and the interveners dispute, is not significant.

The Avanci pool licensing model is already of indicative importance because major competitors of the defendant have become contractual partners of Avanci. The car manufacturers licensed by Avanci have a market share of approximately 46.6% in Germany according to the number of vehicles sold, where ... has only ... taken a 4G licence and other brands have drawn upon a 2G and 3G licence – offered separately by Avanci – (B-KAR 28, S. 1).

18



Even if it is deduced from the "World Ranking of Manufacturers" of the Organisation Internationale des Constructeurs d'Automobiles (OICA), submitted as Exhibit B-KAR 29, that the car market covered by Avanci comprises only a "handful" of manufacturers worldwide in terms of the absolute number of vehicles, ... are clearly competitors of the defendant ....

The indicative significance of the Avanci pool licensing model is even more significant since the defendant has not concretely demonstrated any contrary established licensing practice of SEPs in the automotive sector (on the plaintiff's licensing practice, see C. II. 3. a) aa) (1)).

In so far as the interveners, SH2 and SH3 ('SH2/3'), consider that a number of well-known licences have been concluded with suppliers at downstream stages of the production chain, it has not been shown that those contracts cover the connectivity of vehicles. Furthermore, as regards other alleged licensing agreements concluded by the defendant's supplier U. with individual Avanci members - who consequently also license to manufacturers through the Avanci licence pool - it is not submitted that the amount of the licence fee is not related to the saleable terminal equipment. Nor does it claim that the SEP holder's S. offer to automotive suppliers submitted by the intervener SH4 does not calculate the royalty in accordance with the Avanci pool licences (cf. Exhibt PBP 6 "3.1...").

Moreover, in so far as the intervener SH4 submits that it has taken or provided a licence from/to other manufacturers of connectivity modules or SEP holders, including Q., R., S., T., it is clear from that agreement that it occupies an exceptional position, given its dual role as a module/TCU supplier and holder of its own SEP portfolio.. The same applies to the presentation that the chip manufacturer and SEP-owner - as well as Avanci member − Q. offers licensing models for "smartphones and other devices" and mentions various automotive suppliers on its homepage.

19



KATHER · AUGENSTEIN
RECHTSANWÄLTE

Finally, the defendant's assertion that some members of Avanci, such as O. and P., had already entered into licences with suppliers of the defendant or were prepared to enter into such negotiations is vague and incomplete in the light of the fact that the intervener, SH2/3, submitted an action in the United States … against the Avanci patent pool, its member O. and P. and the plaintiff with a view to obtaining a licence (Exhibit FBD 10).

(3)    Finally, there is no evidence that the Avanci pool licensing agreements were concluded under undue pressure. That is not substantiated by the defendant and its interveners. In particular, such pressure is not apparent from the affidavit submitted by the defendant by Mr V., lawyer, concerning the … group, which merely states that … have taken a pool licence under inclusion of the 4G standard, as "already significant use existed and thus the risk for infringement complaints by some pool members was estimated to be very high – as it later turned out, justifiedly so" (Exhibit B-KAR 28, p. 2). It merely states an assessment of litigation risks, which by itself not capable of justifying a disproportionate pressure situation. The litigation risk must be seen against the background that the assertion of the right to injunctive relief from an SEP may be unobjectionable under antitrust law and that, in addition, cases are conceivable in which the SEP holder has unlawfully exerted pressure on the subsequent licensee by means of an action for injunction, but the subsequently agreed licence is nevertheless FRAND-compliant (see RC Düsseldorf, judgment of 31.03.2016, 4a O 73/14 margin no. 174 - juris; RC Düsseldorf, judgment of 31.03.2016 4a O 126/14 marginal no. 229 - juris). The fact that the licensees are large companies which have sufficient financial means to have litigation risks assessed and to defend themselves in case of doubt against antitrust claims (see RC Düsseldorf, judgment of 31 March 2016, 4a O 73/14 margin no. 176 - juris) speaks against influencing the Avanci pool license agreements in violation of antitrust law.

d)

20



Moreover, neither the possibility raised by the defendant on 28 June 2019 to have the licence conditions determined by a third party (B-KAR 14) nor the second counter-offer of the defendant in the pleading of 10 June 2020 (B-KAR 42) substantiates its willingness to take license. In this context, it remains undecided whether these counter-offers, which were submitted long after the lawsuit was filed, were still in time or could have been made subsequently from the point of view of the willingness to license (see on the state of opinion above C. II. 2. c).

This is because these offers each contain a reservation by which the defendant shifts the parties' dispute as to the level in the supply chain at which the licence offers (including the level of the royalty) must be made to subsequent proceedings. In contrast to contractual negotiations, which a company wishing to obtain a licence before commencing use, such a reservation can, in particular if, as in this case, the infringer's notice was issued several years ago, be aimed at delaying the patent holder as far as possible until the term of protection of the patent in suit expires, because he is then no longer threatened with a cease and desist order. If the SEP holder agrees to a third party provision, he cannot enforce his injunctive relief at least until a provision has been made, which enables the infringer to prolong the proceedings (RC Düsseldorf, Urt. v. 31.03.2016 4a O 126/14 marginal no. 286 - juris; RC Düsseldorf, conclusion of judgment of 31.03.2016, 4a O 73/14 marginal no. 231 f. - juris). If the SEP holder consents to a judicial review of the royalty pursuant to section 315(3) of the German Civil Code, this is binding on him, whereas the infringer may, under certain circumstances, refuse payment of what he considers to be an unfair performance until it has been determined by judgment (Würdinger in MüKO BGB, 8th ed. 2019, § 315 marginal no. 45; Stadler in Jauernig BGB, 17th ed. 2018, marginal no. 11, respectively mwN. on the state of opinion).

Against this background, a counter-offer without a concrete licence rate is not sufficient (see RC Düsseldorf, Urt. v. 31 March 2016 4a O 126/14 marginal no. 286 f. - juris; Düsseldorf District Court, Conclusion 31 March 2016, 4a O 73/14 marginal no. 231 f. - juris). The CJEU

21



KATHER · AUGENSTEIN
RECHTSANWÄLTE

requires the patent user to make a "concrete counter-offer" (CJEU, loc. cit. para. 66), which, with the aim of promoting out-of-court contractual negotiations by parties willing to license, implies a license fee defined in the contract or at least determined in time (cf. RC Düsseldorf, judgment of 31.03.2016 4a O 126/14 marginal no. 286 f. - juris; RC Düsseldorf, judgment of 31.03.2016, 4a O 73/14 marginal no. 231 f. - juris).

3.

The lack of willingness to license is based on a free decision of the defendant; the plaintiff is not responsible for this either as a result of alleged discrimination (see a) or other obstruction (see b) or as a result of an alleged lack of information on the part of the defendant (see c).

a)

The fact that the defendant refers to its suppliers cannot be justified on the ground that the use of the defendant's services allegedly constitutes discrimination.

aa) In principle, it is left to the patentee to choose at which distribution level he enforces his property right (cf. 13.07.2004 KZR 40/02 margin no. 41 (juris) = BGHZ 160, 67 - Standard-Spundfass; regarding the granting of licences to manufacturers or distributors: HRC Karlsruhe, ed. 23.04.2015, 6 U 44/15 marginal 18 - mobile phones; RC Düsseldorf, judgment of 31.03.2016, 4a O 126/14 margin no. 310 - juris; cf. on copyright FCJ, judgment of 14.05.2009, I ZR 98/06 marginal 61 (juris) - Tripp-Trapp chair; cf. Kühnen, Handbuch der Patentverletzung, 12th edition 2020, Part E marginal 487). The patent proprietor's right to decide for himself against which patent infringer he takes action is not *per se* limited by antitrust law, even in the case of a dominant position (cf. 13.07.2004, KZR 40/02 marginal no. 42 f. (juris) = FCJZ 160, 67 - Standard-Spundfass; RC Düsseldorf, judgment of 13 July 2004 31.03.2016, 4a O 126/14 margin no. 310 - juris; if necessary close RC Düsseldorf,

22



KATHER · AUGENSTEIN
RECHTSANWÄLTE

judgment of 11.07.2018, 4c O 81/17 margin note 237/10 - juris). Nor is a market-dominant patentee obliged in principle to grant licences in the form of a "uniform tariff" which grants equal conditions to all users (FCJ, judgment of 5 May 2020, KZR 36/17 marginal no. 81 - FRAND-Einwand).

The special second-degree prohibition of discrimination laid down in Article 102 (2) (c) TFEU, i.e. discrimination against the trading partners of a dominant company in the pre-existing or post-dominant market, does not apply to the trading partners of a dominant company. - as in this case, protects against the distortion of competition between trading partners by discriminatory conditions (CJEU, judgment of 19 April 2018, C-525/16, WuW 2018, 321 marginal nos. 24 et seq. - MEO; FCJ, judgment of 5 May 2020, KZR 36/17 marginal no. 81 - FRAND-Einwand with further references). Different treatment of trading partners may be objectively justified, which has to be answered by weighing up all interests involved and taking into account the objective of cartel law, which is aimed at freedom of competition (see with regard to price discrimination FCJ, judgment of 5 May 2020, KZR 36/17 marginal no. 102 - FRAND-Einwand; see with regard to the granting of licences to downstream similar companies FCJ, judgment of 5 May 2020, KZR 36/17 marginal no. 81 - FRAND-Einwand with further details). 13 July 2004, KZR 40/02, marginal 44 et seq. (juris) = FCJZ 160, 67 - Standard sheet pile barrel). E.g. it is possible that the assertion of a claim for injunction at distribution partner level is inadmissible if the SEP holder usually concludes licence agreements with manufacturers and there is no objective reason why the SEP holder should initially only use the manufacturer's distribution partner, who can then switch his purchase to another (licensed) manufacturer (HRC Karlsruhe, decision of 23.4.2015, 6 U 44/15, marginal 18, GRUR-RR 2015, 326, 329 - Mobiltelefone; cf. Kühnen, Handbuch der Patentverletzung, 12th ed. 2020, part E marginal 487).

The burden of substantiation and proof of unequal treatment and obstruction lies with the licence seeker, while the patent proprietor bears the burden of demonstration and proof for an objective reason for unequal treatment (FCJ, judgment of 5 May 2020, KZR

23



KATHER · AUGENSTEIN
RECHTSANWÄLTE

36/17 marginal no. 76 - FRAND-Einwand). However, the patent proprietor has a secondary burden of proof to justify his licence claim in detail in order to enable the party seeking a licence to verify whether the licence claim constitutes an abuse of the dominant position (cf. FCJ judgment of 5 May 2020, KZR 36/17 marginal no. 76 - FRAND-Einwand).

bb)   There is no indication that the plaintiff is distorting competition between trading partners by imposing discriminatory conditions in the selection of the contracting partner or by requiring that the royalty be based on the last stage of the value chain.

(1)   The plaintiff has fulfilled its secondary burden of proof by claiming that it has so far not issued any licenses to component suppliers in the automotive industry. So far, it had only concluded a license agreement with another major automobile manufacturer "X", which contained the same license conditions as the second license offer it had made to the defendant (see e.g. AR-KAR 2); this license agreement has been terminated by "X" in the meantime (...).

The plaintiff further specified that the defendant's suppliers SH4, and A. ("A.") (a subsidiary of ...) and V. and Y. are not licensed for products used in the automotive sector. The license agreement between SH4 and the plaintiff is a December 2017 license agreement on SEPs, which covers end devices such as cell phones, tablets and USB surfsticks (see also intervener SH4 e.g. Exhibit PBP 00). In this regard, the plaintiff added that it was undisputed that special conditions had been agreed with SH4 in its capacity as smartphone manufacturer and patent owner. (...) The fact that SH4 wants to sue for a license (see below D. III.) proves that not only SH4 does not have a license, but also A. cannot derive a license from SH4 from the supply chain. (...) The plaintiff had made the same CVVCL offer to V. as to the interveners. In a complaint against the plaintiff to the EU Commission, which has become known, Y. himself claims not to have a relevant license for the plaintiff's SEP portfolio.

24



KATHER · AUGENSTEIN
RECHTSANWÄLTE

With regard to a license agreement concluded by the plaintiff in the year ... with the company S., which has in the meantime probably also been active as a supplier to the automotive industry, the plaintiff has shown that the facts are not equivalent (...).

Contrary to the submissions of the interveners SH7 ("SH7") and SH2/3, the plaintiff finally submitted that an agreement between it and Q. from the year 2008 is not comparable with the facts to be assessed here. This agreement was part of a comprehensive settlement between the chip manufacturer - and at the same time SEP owner - Q. and plaintiff., whereby the contracting parties granted each other rights (see also SH2/3 FBD 13, ...). These rights included, among other things, a license for the plaintiff to Q. patents on the one hand and the plaintiff's obligation to offer Q. customers licenses for GSM, WCDMA, CDMA2000, and/or OFDM standards under certain conditions on the other hand (see annex SH7 HL 2; SH2/3 FBD 13, loc. cit.). Subsequently, the Plaintiff has made license offers to various Q. customers, including those in the automotive industry. Among others, the plaintiff wrote to the defendant on 24 April 2013 (AR-KAR 27), which then referred to its suppliers. On July 2, 2013, the plaintiff also submitted to the intervener SH7 a license offer limited until June 20, 2014 in accordance with the conditions agreed with Q. (Annex SH7 HL 7). According to the plaintiff's submission, no license agreements were concluded in the automotive industry as a consequence. No further rights could be derived from the agreement with Q.

(2)    The fact that it is common practice on the market for the development and manufacture of vehicles (with regard to other components) for suppliers to take licences (based on the price of the components) does not force the plaintiff to adopt a corresponding approach in the absence of a competitive relationship.

This is all the more true in view of the fact that other car manufacturers such as ..., ... and ... have already concluded Avanci pool licensing agreements and in-licensed connectivity components (see above C. II. 2. c) cc). Thus, the licensing practice, which

25



according to the plaintiff's submission and the Chamber's experience in the mobile telephony sector is not exclusive but is extremely widespread, that the manufacturers of mobile telephones take licences or base their licence rates on the sales prices of mobile telephones as end products, has already been applied to the car industry (see above C. II. 2. C) bb) (2)); for the submission on counter-examples see above C. II. 2. c) cc) (3) / C. II. 3. a) aa) (1)).

(3)    Overall, there is no evidence of a distortion of competition through discriminatory conditions. In particular, there is no risk that the defendant will be placed at a competitive disadvantage compared with other car manufacturers, nor that the defendant will be able to switch to other suppliers - licensed (possibly more favourably) by the plaintiff for LTE connectivity in vehicles - at the expense of the existing supplier chain.

b)

Nor can the reference to suppliers be justified by the fact that recourse to the defendant allegedly leads to an undue restriction of production, marketing or technical development to the detriment of consumers.

The defendant, which is burdened with the burden of presentation and evidence, has already failed to assert that the mere fact that a licence is granted only at a certain supplier level would not constitute a restriction of competition under Article 102(1), (2)(b) TFEU. In so far as, in particular, the intervener SH4 argues that licensing by the defendant is insufficient for the upstream supply chain and that associated have-made rights are unusual, the plaintiff has contested that assertion. It submits that its offer of a licence to the defendant includes the right to have components for the licensed products manufactured by third parties (so-called 'have-made rights'), which normally ensures production, sales and technical development by suppliers.

26



The fact that such have-made rights - especially in the mobile phone sector in view of the licensing practice described above of regularly licensing at the end of the value chain - are recognised means in the design of licences is set out in point 6.1 of the ETSI-IPR Policy, according to which SEP holders must grant licences for production including the right to have components for the end product manufactured ("MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE", Exhibit B-KAR 3). Thus, the counter-offers of the (Tier 1/Tier 2) suppliers SH2/3 and SH4 also contain have-made rights (see Exhibit FBD 34, Section 2.1; exhibit PBP 4, p. 8). Such licensing structures can only be avoided if licensing is in principle at the level of the smallest technical unit (such as the telecommunications chip); it has not been argued either that this is always common in the automotive industry.

c)

Finally, the defendant's unwillingness to licence, which was reflected in particular in a counter-offer not in conformity with FRAND, cannot be justified by the fact that the plaintiff allegedly did not provide sufficient information.

aa)    The SEP holder is obliged, in the context of a licence offer, "in particular the licence fee and the way in which it is calculated" (CJEU, loc. cit. para. 63 - Huawei/ZTE). This means in particular not only an explanation of the royalty and the modalities of its calculation, but also of those circumstances which show that the contractual remuneration factors are free of discrimination and exploitation (HRC Karlsruhe, judgment of 30.10.2019, 6 U 183/16, GRUR 2020, 166 marginal no. 122 - Datenpaketverarbeitung). Only with knowledge of these circumstances is it possible for the licence seeker to make a meaningful assessment of the licence offer and - if this asymmetry of information actually exists - to make a corresponding counter-offer (cf.

27



FCJ judgment of 5 May 2020, KZR 36/17 margin no. 75 - FRAND-Einwand; cf. 30.10.2019, 6 U 183/16 loc. cit. recital 122). This is also the only way to increase the chance of the parties being able to talk to each other and to discuss the question of the royalty and individual questions of the licence agreement's design constructively (HRC Karlsruhe, judgment of 30 October 2019, 6 U 183/16 loc. cit. 30.10.2019, 6 U 183/16 loc. cit. margin no. 122; Mannheim District Court, judgment of 30.10.2019, 6 U 183/16 loc. cit. 28.09.2018, 7 O 165/16 marginal no. 66). If the SEP holder has concluded third-party licence agreements with different licence conditions, he will regularly have to present and explain at least the content of the material licence agreement conditions of those agreements in a sufficiently robust manner so that the licence seeker can see whether, where applicable to what extent and for what material reasons he is exposed to economically unequal conditions (Karlsruhe Higher Regional Court, judgment of 30 October 2019, 6 U 183/16, loc. cit.) The scope and extent to which these explanations and information are substantiated depends on the licensing situation in the individual case (FCJ, judgment of 5 May 2020, KZR 36/17 marginal no. 81 - FRAND-Einwand; HRC Karlsruhe, judgment of 30.10.2019, 6 U 183/16 loc. cit. recital 133).

bb)    The plaintiff has submitted two individual licence offers to the defendant, of which the second licence offer of 27.02.2019 (Exhibit AR 14) - with individual modifications offered in the replica in favour of the defendant - is currently maintained. The Defendant had sufficient explanatory information available to it (see 1). Furthermore, the Defendant had information on the Avanci license model (see (2)). To the extent that the defendant also requires the plaintiff to explain license agreements with third parties in the mobile phone sector, the relevance of these agreements is not apparent (see (3)).

(1)    The plaintiff explained to the defendant that, in its offer, the licence fee was based on the benefit of connectivity in the vehicle as the end product product, thereby addressing the decisive aspect of the license assessment (see already email K.of 07.12.2016 (exhibit AR 13) "…").

28



KATHER · AUGENSTEIN
RECHTSANWÄLTE

In order to quantify the economic benefit, the plaintiff submitted to the defendant, by email of 26 January 2018 (AR 16), a study by the consultancy S. ("S. study"). The plaintiff explained that the study quantified the benefit of connectivity for the defendant in particular on the basis of the willingness of consumers to pay for that connectivity ("..."). In addition, by email of 27 February 2019 (AR 14), the plaintiff explained that an individual offer is in principle more expensive than Avanci's pool licences, which are cheaper because of the synergy effects, and that the total charge for the licensing of all SEPs licences according to the plaintiff's model is below x % the benefit of connectivity determined by the S. study. In so far as the defendant considers that that information is insufficient or that it and the interveners methodically attack the S. study, it is not a lack of explanation that is criticised, but its content, which is already a question of the FRAND nature of the offer. That information has enabled it to consider the content of the study and to quantify the economic benefits of the technology in the final product which it produces itself.

In order to determine the plaintiff's share of all SEPs, the plaintiff referred by email of 26 January 2018 (AR 16) to a study by the company ..., which examined the essential nature of SEPs. Even though the study itself was not sent to the defendant, this information enabled the defendant to understand the offer and (as was done in the context of the counter-offer [B-KAR 12, B-KAR-13] and in the proceedings) to deal with the content of the calculation modes.

Finally, the plaintiff drew the defendant's attention to the fact that, on 21.03.2019, it had concluded a licence agreement – cancelled in the meantime – with another major car manufacturer in the top 10 worldwide, which contained the same licensing conditions and the same royalty rate as the second offer offered to the defendants.



KATHER·AUGENSTEIN

RECHTSANWÄLTE

In the meantime, the defendant has inspected this licence agreement in the parallel proceedings under the protection of non-disclosure agreements with all parties to the proceedings (AR KAR 2a) following orders of the Munich Regional Court I of 13 November 2019 and 20 February 2020. There is therefore no reason for a submission order under Section 142 of the German Code of Civil Procedure (ZPO) for licence agreements between the plaintiff and car manufacturers (production suggestion SH7 Duplik p. 126).

(2)    The Defendant has sufficient information on the Avanci pool license model, taking into account the fact that, firstly, there is no need to review the FRAND conformity of the Avanci pool license offer to the Defendant in the present case and, secondly, the Defendant has itself been in negotiations with Avanci since January 2018 at the latest.

Thus, Defendant has submitted an email from Avanci dated 11 February 2019, in which Avanci explained a pool license agreement offer from January 2018 (B-KAR 30), in which the calculation method for the royalty known from the mobile communications sector is derived and justified with reference to publicly available sources (see C. II. 2. c) cc) [redacted].

In that email, Avanci also pointed out that it had concluded a licence agreement with ... and offered to allow the defendant to inspect it after concluding a nondisclosure agreement ("...", refer also to AR-KAR 7). In that regard, it is accordingly inaccurate that, in its counter-offer of 9 May 2019, the defendant states that there are no comparable licences in the automobile sector and that the licence agreement between Avanci and ... is not available (B-KAR 12, ppt. p. 3: "...").

In the meantime, the defendant has inspected the licence agreements concluded by Avanci with car manufacturers. In two of the proceedings brought by S. against the defendant before the Munich District Court, Avanci provided the defendant with



KATHER · AUGENSTEIN
RECHTSANWÄLTE

(partially redacted) copies of the Avanci licence agreements on submission orders and after conclusion of a nondisclosure agreement.

Against this background, there is no need to order the production of documents from the Avanci licence pool at the Court's discretion under Seciton 142(1) Code of Civil Procedure. The email from Avanci to the Defendant dated 11 February 2019 (production request KE II p. 35) was submitted by the Defendant in unredacted form as Exhibit B-KAR 30, after supplementing its confidentiality agreement with Avanci. To the extent that the defendant requested that the Avanci license agreement be submitted with ... because it was disputed that ... had comprehensively licensed LTE (submission KE II p. 34), this fact was submitted with the affidavit in exhibit B-KAR 28 and is taken as a basis. Since it is not the subject of this judgment whether the plaintiff's offer is FRAND in comparison to the Avanci agreements or whether the Avanci licence offer to the defendant is FRAND, the (renewed) submission of the concluded pool licence agreements or the [*redacted*] offer to the defendant is not relevant (see Duplik II p. 26; production suggestion SH7 Duplik p. 127; application by SH5, Duplik, p. 2).

(3)     Moreover, the defendant has not shown that the further clarification or submission of other licence agreements concluded by the plaintiff with third parties is necessary for the formulation of a counter-offer.

The plaintiff has substantiated that there are no relevant licence agreements between the plaintiff and the defendant's suppliers or other contractors which are relevant for the purposes of examining the reasonableness of the price and discrimination (see C. II. 3. a) aa) above). The plaintiff has fulfilled its secondary burden of proof with regard to licence agreements between the plaintiff and the intervener SH4 (production request defendants KE II, p. 45) and Q. (production request defendant KE II p. 46) and Y. as well as S. (production request defendant Duplik II, p. 49, SH2/3 KE p. 30, SH7 Duplik p. 126), so that



the Chamber does not see any need for a production order under section 142 code of civil procedure.

Furthermore, the plaintiff is not required to describe or submit such licence agreements which it has concluded in the mobile telephone sector. There is generally no sufficient basis for the assumption that the SEP holder must declare the complete content of all licences concluded or submit all licence agreements (HRC Karlsruhe, judgment of 30.10.2019, 6 U 183/16 GRUR 2020, 166 marginal no. 123). Furthermore, the plaintiff's licence agreements from the mobile phone sector are not relevant in the present case for the determination of FRAND conditions in the automotive sector. [*redacted*]

4.

Due to the defendant's unwillingness to license, it may be undecided whether, after the infringer's declaration of willingness to license and after the submission and explanation of a license offer by the patentee, it must first be examined whether the counter-offer to be made by the defendant satisfies FRAND criteria, without the obligation of the defendant to make such a counter-offer being dependent on whether the plaintiff's license offer is actually comprehensive FRAND (as already concluded by the Mannheim District Court, judgment of 27.11.2015, 2 O 106/14 marginal no. 221 (juris) = WuW 2016, 86; at least for certain obligations to react RC Düsseldorf, judgment of 03.11.2015, 4a O 93/14 marginal no. 125 - juris). Since the counter-offer does not meet FRAND criteria, as explained above, this sequence of checks would also mean that the defendant cannot rely on the FRAND objection in the present case.

III.

Nor can the defendant rely on a FRAND objection raised by its interveners, who joined the proceedings as its suppliers and raised that objection.



KATHER · AUGENSTEIN
RECHTSANWÄLTE

It can be left open whether the producer of a saleable final product is in principle entitled to a FRAND objection derived from its upstream supply chain. Where a derived FRAND objection was accepted in case law, the facts of the case concerned downstream distribution chains, so that the distribution partner was able to raise a FRAND objection by the manufacturer ( HRC Karlsruhe, decision of 23 April 2015, 6 U 44/15, GRUR-RR 2015, 326; RC Düsseldorf, judgment of 11.07.2018, 4c O 81/17 marginal 10 / 237 - juris; RC Düsseldorf, judgment of 11.07.2018. 31.03.2016, 4a O 126/14 margin no. 15 /311 - juris; District Court of Düsseldorf, conclusion of judgment of 31.03.2016 31.03.2016, 4a O 73/14, marginals 209 et seq. - juris). These facts differ from the present case of the upstream supply chain in that a saleable end product can be used at any level of the distribution chain for the calculation of the royalty, which makes it possible for the patentee to participate in the benefit of the technology in the end product without further ado.

This special feature of the upstream supply chain must be taken into account in any case when the content of the objection is defined. A derived FRAND objection does not apply in the present case because the interveners have not agreed to base the licence fee on the economic benefit of the technology in the saleable end product (see 1.). Furthermore, the derived FRAND objection does not apply to Tier 1 suppliers SH6 and SH5, who only identified themselves as such after the action was brought (see paragraph 2 above). Nor does the fact that the plaintiff explicitly excluded Tier 1 supplier A. in its description of the attacked embodiment (see 3.) indicate otherwise.

1.

The defendant cannot rely on an alleged FRAND objection raised by the interveners SH2/3, SH7, SH1 and SH4, as well as SH6 and SH5 (both as a separate FRAND objection and as a derived FRAND objection from the company u.).

33



KATHER · AUGENSTEIN
RECHTSANWÄLTE

a)

In the context of a derived FRAND objection by the manufacturer, the willingness of its suppliers to enter into a licence agreement with the patent holder with an appropriate royalty must include a sharing of the benefit of the technology in the saleable end product by the patent holder.

As explained above, the appropriate royalty should in principle be based on the value of the technology in the saleable end product (for the state of opinion see above C.II. 2. c) aa). This applies - subject to the absence of discrimination here (see C. II. 3. above) - irrespective of the question at which level of the supply chain a licence is granted (in particular Kühnen, GRUR 2019, 665, 671). Otherwise, the level of remuneration could be manipulated by manufacturers by organising themselves on the basis of the division of labour, whereas those manufacturers who do not use a deep value chain would be disadvantaged (cf. Kühnen, GRUR 2019, 665, 671).

It is also necessary to avoid that an infringer unlawfully refers the patent holder to his suppliers, as set out here, in order to generate a lower royalty burden by means of a derived FRAND charge at supplier level. An unsuccessful FRAND objection by the infringer - precisely because of an inadmissible reference to the suppliers - may not be revived by means of a derived FRAND objection. The relevant requirements must remain the same in the chain of FRAND objections.

The Chamber does not ignore the fact that, in practice, it may be difficult for suppliers to recover the licence fee from the manufacturer by adding a surcharge to their sales price. For example, the intervener SH2/3 has shown that, particularly in the automobile industry, it is ultimately the suppliers who are economically affected by higher licence fees, since it is in line with the long-standing practice there that manufacturers pass on higher costs to their suppliers. This would be done either within the framework of

34



KATHER·AUGENSTEIN
RECHTSANWÄLTE

existing exemption agreements, by means of claims for damages or by offsetting the suppliers' outstanding claims for delivered products. However, there is a risk that suppliers will be burdened with costs regardless of the level at which a licence is taken. This is because in the above-mentioned exemption agreements it is a question of the contractual arrangements between the manufacturer and its suppliers as to who bears the risk of additional royalties - not calculated at the beginning of the supply relationship. However, it is not up to the patent holder to be relegated to a level in the supply chain as a result of the contractual design of third parties, which may be influenced by the market power of a manufacturer, without being able to benefit from the use of the patented technology in the final product.

b)

There is no evidence, apparent or submitted, that the interveners are prepared to pay a royalty which is determined by the usefulness of the technology in the saleable end product. The interveners submit at the hearing that the manufacturer of the attacked embodiment does not hold a licence because the plaintiff refuses to grant a licence to its suppliers, without prejudice to the subsequent distribution channel. They assume - wrongly - that only a licence fee is appropriate, based at most on the sales price of the TCU, if not the NAD.

That view of the interveners is confirmed by the following counter-offers, which are essentially based on the selling prices of the components in a top-down approach:

By letter of 30 January 2018, the intervener SH1 informed the plaintiff of the selling prices of the components it had supplied and submitted a counter-offer based on those prices (with regard to figures partially redacted annexes GLP 007, GLP-008: "The fair and in particular non-discriminatory basis for the applicable royalty rate of x% to x% for each 3G/4G/multimode MCU is therefore x €.") Against this background, the intervener's

35



application for a court order for an unredacted version of the counter-offer which is unredacted with regard to the further concrete figures according to Sections 428, 142 Code of Civil Procedure (SH1 KE, p. 2), need no longer be granted.

On December 7, 2019, the intervener SH2/3 submitted a counter offer to the plaintiff (Exhibits FBD 34 and FBD 35), which, based on different calculation approaches, results in a total license fee of x USD for 4G. In the top-down calculation, the intervener, as shown in its explanations, took into account in particular the profit margin of the baseband chipset concerned as well as the sales price of the TCU, which it compared additionally with a cost-based approach (see expert opinion Prof. A. and Prof. F., exhibit FBD 22).

The intervener SH7 submitted a counteroffer to the plaintiff on 30 January 2020 (Exhibits HL 54 to 56), which is based on the average net value of NADs for 4G in the amount of x EUR (see also already counterproposal of the intervener dated 8 November 2017 Annex HL 20, 21).

Also with regard to the counter-offer of the intervener SH4, which the intervener submitted to the plaintiff on 16.01.2020 (Exhibit PBP04), there is no evidence that it would allow the plaintiff to share the benefit of the technology in the vehicle. The counter-offer - like the defendant - arrives at a license fee of x EUR by transferring license terms from a single mobile phone license agreement between the plaintiff and the intervener SH4 (for this already above C. II. 3. a) bb) (1). However, it is undisputed that this mobile phone license agreement with the intervener, which also acts on the market as a smartphone manufacturer and patent holder, contains special conditions. (...), which is not dealt with in the expert opinion of Prof. H. on the counter offer submitted by SH4 (PBP07). According to this expert opinion, the proposed license fee corresponds only to the amount the parties could agree on "for telematics components" - without considering the value share of the technology in the overall product (PBP07, p. 6, 9, 12 et seq., 19 et seq.). Accordingly, the intervener further submits that the value of connectivity should be linked to the price

36



of a TCU of around EUR x, whereas the question of what happens to data transmitted in the vehicle via 4G is not covered by the plaintiff's patent portfolio already implemented in the TCU. Against this background, there is no sufficient reason for a submission of the license agreement with SH4 according to Section 142 Code of Civil Procedure.

Finally, the interveners' willingness to pay an appropriate licence fee does not result from the fact that the counter-offer of SH7 does not provide for the possibility of the plaintiff bringing an action before Regional Court Düsseldorf for review of the licence fees under Section 315(3) Civil Code, or that the counter-offer of SH2/3 provides for a possible review by a US court, or that SH2/3 has brought an action in the United States for the grant of a FRAND licence against members of the Avanci pool. In that regard, the willingness of the interveners to take a licence is in each case subject to judicial review, while at the same time they are in dispute in the respective proceedings for a licence fee which is not in conformity with FRAND (see C.II.2.d above).

2.

Furthermore, the defendant cannot rely on any FRAND objection raised by the interveners SH6 and SH5, since it only became known to the plaintiff in the course of the dispute that those undertakings were Tier 1 suppliers of the defendant for the attacked embodiments.

The plaintiff was not obliged to provide the interveners with a separate notice of infringement. This is because the condition imposed by the CJEU for the enforcement of the injunction cannot be directly applied to every market participant in the supply chain (also RC Düsseldorf, judgment of 31.03.2016, 4a O 73/14, marginal no. 213 - juris). The notification of infringement to the suppliers is rather derived from the notification of infringement to the manufacturer of the end product. The CJEU's program of obligations does not induce the plaintiff to independently determine who could possibly be

37



considered as a supplier or distribution partner of a manufacturer of the attacked embodiment and to send infringement notices to potential market participants in the blue. It is therefore incumbent on the defendant to inform the plaintiff of its suppliers, for example, or otherwise to ensure that the infringement notice is forwarded to its suppliers.

Subsequently, it is therefore incumbent on suppliers to show that they are willing to license in accordance with the CJEU's programme of obligations. The fact that the interveners SH6 and SH5 only identified themselves as suppliers in the context of the dispute after the action was brought is not sufficient in view of the parties' negotiating history. Thus, since November 2016, the plaintiff has been negotiating with the Tier 1 supplier A. on the Tier 1 model. The Tier 1 suppliers SH2/3 (cf. FDB 2) and SH1 (cf. AR-KAR 13) also contacted the plaintiff in 2017. There is no reason given why SH6 and SH5 did not similarly already reveal themselves to Plaintiff as Tier 1 suppliers in this context. Against this background, a subsequent disclosure of other Tier 1 suppliers about two years after the start of negotiations and after the filing of the action is part of a hold out strategy and cannot justify a derived FRAND objection of the defendant.

3.

Nor can a derived FRAND objection be inferred from the fact that, in describing the attacked embodiment, the plaintiff excluded components from the Tier 1 supplier A. The interveners are not thereby discriminated against (on the legal principles of discrimination, see C.II. 3. a) aa above).

The description of the attacked embodiment does not in itself constitute differential treatment of suppliers that distorts competition between trading partners. For the action is directed solely against the defendant, so that no selective enforcement of rights against the suppliers takes place (see for clarification Reply II p. 82). The fact that the

38

other suppliers - licensed (possibly more favourably) by the plaintiff for LTE connectivity in vehicles - at the expense of the existing supplier chain.

4.

It is therefore open to question whether the CVVCL offer made by the plaintiff to Tier 1 suppliers is indeed FRAND. In particular, it can be left open whether the suppliers are entitled to a bilateral licence (so-called License to All; for this Kühnen GRUR 2019, 665, 666; Wilhelmi in BeckOK Patentrecht, 16. Ed. 2020 § 24 Rn. 111; Rosenbock, Why the ETSI IPR Policy Requires Licensing to All, August 2017, https://www.fair-standards.org/wp-content/uploads/2017/08/Why the ETSI IPR-Policy-Requires-Licensing-to-All_Karl-Heinz- Rosenbrock_2017.pdf; Geradin, SEP Licensing After two Decades of Legal Wrangling: Some Issues Solved, Many Still to Address (March 3, 2020), p. 19 ff, https://ssrn.com/abstract=3547891; Dornis, WRP 2020, 688, 693), or whether Art. 102 TFEU and the ETSI declaration merely result in a claim to access to the patented technology (so-called Access to All; for this: Huber, Why the ETSI IPR Policy Does Not and Has Never Required Compulsory 'License to All': A Rebuttal to Karl Heinz Rosenbrock (September 15, 2017), https://ssrn.com/abstract=3038447; Martinez, GRUR Int. 2019, 633, 636; Borghetti/Nikolic/Petit, FRAND Licensing Levels under EU Law (February 5, 2020), p. 32, https://ssrn.com/abstract=3532469).

Likewise, it can be left open whether a derived FRAND objection by the defendant can only be fully successful in accordance with the scope of a granted licence if all Tier 1 suppliers - to be named by the defendant logically and, if necessary, first in full - are entitled to a FRAND objection.

[...]

## **CERTIFICATE OF SERVICE**

I, Robert M. Vrana, hereby certify that on April 26, 2021, I caused to be electronically filed a true and correct copy of the foregoing sealed document with the Clerk of the Court using CM/ECF, which will send notification of such filing to all counsel of record.

I further certify that on April 26, 2021, I caused the foregoing sealed document to be served via electronic mail upon the following counsel:

Brian P. Egan, Esquire
Andrew M. Moshos, Esquire
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
*began@mnat.com*
*amoshos@mnat.com*

*Attorneys for Defendants Thales DIS*
*AIS USA LLC, Thales DIS AIS Deutschland GmbH,*
*Thales USA, Inc., and Thales S.A.*

Michael L. Keeley, Esquire
R. Paul Zeineddin, Esquire
Ashton Copeland, Esquire
Axinn, Veltrop & Harkrider LLP
950 F Street, NW
Washington, DC 20004
*mkelley@axinn.com*
*pzeineddin@axinn.com*
*acopeland@axinn.com*

27909392.1

Jeannine Yoo Sano, Esquire
Eric Krause, Esquire
AXINN, VELTROP & HARKRIDER LLP
560 Mission Street
San Francisco, CA 94105
*jsano@axinn.com*
*ekrause@axinn.com*

Thomas K. Hedemann
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
*thedemann@axinn.com*

*Attorneys for Thales DIS AIS USA, LLC and
Thales DIS AIS Deutschland GmbH*

Chad S.C. Stover, Esquire
Barnes & Thornburg LLP
1000 N. West Street, Suite 1500
Wilmington, DE  19801
*chad.stover@btlaw.com*

*Attorney for CalAmp Corp.*

Kenneth L. Dorsney, Esquire
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
*kdorsney@morrisjames.com*

Michael D. Harris, Esquire
Steven C. Sereboff, Esquire
SoCal IP Law Group LLP
310 N. Westlake Blvd., Suite 120
Westlake Village, CA 91362
*mharris@socalip.com*
*ssereboff@socalip.com*

*Attorneys for Xirgo Technologies, LLP*

27909392.1

2

John C. Phillips, Jr., Esquire
Megan C. Haney, Esquire
Phillips, McLaughlin & Hall, P.A.
1200 North Broom Street
Wilmington, DE 19806
*jcp@pmhdelaw.com*
*mch@pmhdelaw.com*

Rudolph A. Telscher, Jr., Esquire
Daisy Manning, Esquire
Husch Blackwell LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
*rudy.telscher@huschblackwell.com*
*daisy.manning@huschblackwell.com*

*Attorney for Defendant Laird Connectivity, Inc.*


Dated:  April 26, 2021                          YOUNG CONAWAY STARGATT
                                                      & TAYLOR, LLP

                                                */s/ Robert M. Vrana*
                                                Adam W. Poff (No. 3990)
                                                Robert M. Vrana (No. 5666)
                                                Beth A. Swadley (No. 6331)
                                                Rodney Square
                                                1000 North King Street
                                                Wilmington, Delaware 19801
                                                (302) 571-6600
                                                *apoff@ycst.com*
                                                *rvrana@ycst.com*
                                                *bswadley@ycst.com*

                                                *Attorneys for Plaintiff*

27909392.1

3

## **CERTIFICATE OF SERVICE**

I, Robert M. Vrana, hereby certify that on May 3, 2021, I caused to be

electronically filed a true and correct copy of the foregoing document with the

Clerk of the Court using CM/ECF, which will send notification that such filing is

available for viewing and downloading to all counsel of record.

I further certify that on May 3, 2021, I caused the foregoing document to be

served via electronic mail upon the following counsel:

> Brian P. Egan, Esquire
> Andrew M. Moshos, Esquire
> Morris, Nichols, Arsht & Tunnell
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE  19899
> *began@mnat.com*
> *amoshos@mnat.com*
>
> *Attorneys for Defendants Thales DIS*
> *AIS USA LLC, Thales DIS AIS Deutschland GmbH,*
> *Thales USA, Inc., and Thales S.A.*
>
> Michael L. Keeley, Esquire
> R. Paul Zeineddin, Esquire
> Ashton Copeland, Esquire
> Axinn, Veltrop & Harkrider LLP
> 950 F Street, NW
> Washington, DC 20004
> *mkelley@axinn.com*
> *pzeineddin@axinn.com*
> *acopeland@axinn.com*

Jeannine Yoo Sano, Esquire
Eric Krause, Esquire
AXINN, VELTROP & HARKRIDER LLP
560 Mission Street
San Francisco, CA 94105
*jsano@axinn.com*
*ekrause@axinn.com*

Thomas K. Hedemann
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
*thedemann@axinn.com*

*Attorneys for Thales DIS AIS USA, LLC and*
*Thales DIS AIS Deutschland GmbH*

Chad S.C. Stover, Esquire
Barnes & Thornburg LLP
1000 N. West Street, Suite 1500
Wilmington, DE  19801
*chad.stover@btlaw.com*

*Attorney for CalAmp Corp.*

Kenneth L. Dorsney, Esquire
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
*kdorsney@morrisjames.com*

Michael D. Harris, Esquire
Steven C. Sereboff, Esquire
SoCal IP Law Group LLP
310 N. Westlake Blvd., Suite 120
Westlake Village, CA 91362
*mharris@socalip.com*
*ssereboff@socalip.com*

*Attorneys for Xirgo Technologies, LLP*

27587980.1

2

John C. Phillips, Jr., Esquire
Megan C. Haney, Esquire
Phillips, McLaughlin & Hall, P.A.
1200 North Broom Street
Wilmington, DE 19806
*jcp@pmhdelaw.com*
*mch@pmhdelaw.com*

Rudolph A. Telscher, Jr., Esquire
Daisy Manning, Esquire
Husch Blackwell LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
*rudy.telscher@huschblackwell.com*
*daisy.manning@huschblackwell.com*

*Attorney for Defendant Laird Connectivity, Inc.*

Dated:  May 3, 2021

YOUNG CONAWAY STARGATT
  & TAYLOR, LLP

*/s/ Robert M. Vrana*
Adam W. Poff (No. 3990)
Robert M. Vrana (No. 5666)
Beth A. Swadley (No. 6331)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
*apoff@ycst.com*
*rvrana@ycst.com*
*bswadley@ycst.com*

*Attorneys for Plaintiff*

27587980.1

3